## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| **JOHN DOE** | &#124; | |
| | &#124; | |
| **Plaintiff,** | &#124; | |
| | &#124; | **CIVIL ACTION** |
| v. | &#124; | |
| | &#124; | |
| **GRINNELL COLLEGE,** | &#124; | |
| **RAYNARD S. KINGTON**, as agent for | &#124; | **COMPLAINT** |
| Grinnell College, **SARAH MOSCHENROSS**, | &#124; | **AND** |
| as agent for Grinnell College, **ANGELA VOOS**, | &#124; | **JURY TRIAL DEMAND** |
| as agent for Grinnell College, **ANDREA B.** | &#124; | |
| **CONNER**, as agent for Grinnell College, | &#124; | |
| **BAILEY ASBERRY**, as agent for Grinnell | &#124; | |
| College **MARSHA TERNUS**, as agent for | &#124; | |
| Grinnell College, and **HUSCH BLACKWELL,** | &#124; | |
| **LLP**, as agent for Grinnell College, | &#124; | |
| | &#124; | |
| **Defendants.** | &#124; | |

## COMPLAINT

Plaintiff John Doe[1], by his attorneys Nesenoff & Miltenberg, LLP and Babich Goldman,

P.C., as and for his Complaint against Defendants Grinnell College, Sarah Moschenross, Angela

Voos, Andrea B. Conner, Bailey Asberry, Marsha Ternus and Husch Blackwell, LLP,

(collectively, "Defendants"), alleges as follows:

## THE NATURE OF THIS ACTION

1.     This action based on constitutional due process, Title IX reverse discrimination

and related state law action is brought on behalf of Plaintiff John Doe ("Plaintiff" or "John

Doe"), a now expelled, former student at Defendant Grinnell College ("Grinnell" or the

"College").

---

[1] Plaintiff herewith files a motion to proceed pseudonymously.

2.      Facing negative publicity and an OCR investigation, Grinnell implemented a policy which denies respondents, who are habitually male, their rights to fair process in the investigation and adjudication of sexual misconduct complaints.  In 2015, a group of student activists brought press attention to their perception that Grinnell needed to crack down on male respondents in Title IX cases. These students filed a complaint with the Department of Education's ("DOE") Office for Civil Rights ("OCR"), which commenced an investigation into Grinnell's Title IX process in July 2015, a few months before the initial report was lodged against John Doe.

3.      Shortly before the OCR investigation was commenced, Grinnell tried to take a hard line approach.  Grinnell's President wrote a letter asking the OCR to investigate the College, and the decision was made to replace the Grinnell's hearing panel with a single adjudicator.  At the time, the College's Dean of Students told the Huffington Post that in adjudicating all of its Title IX cases, Grinnell worked backwards from the idea that a respondent should be expelled and then weighed mitigating factors before reaching a final decision.

4.      Against this backdrop, Grinnell decided to hold John Doe up as an example of its hard line policy.  Months after the OCR investigation began, the Title IX Office received a report from a female student, Jane Doe,[2] concerning sexual contact she had with John Doe over a year earlier.  At that time, John Doe was informed that the report did not warrant an investigation, and the case was closed.  To his surprise, Grinnell resurrected Jane Doe's false allegations against John Doe when a second report was received from another female student, Jane Roe,[3] in early 2016.  At that time, the College solicited Jane Doe into pursuing a complaint against John Doe, subjecting him to double jeopardy.  It further used Jane Doe's allegations to fabricate a

---

[2] This individual's name has been changed to a pseudonym to protect her identity.
[3] Once again, the complainant's name has been changed to protect her identity.

"predatory pattern" of misconduct against John Doe, which would guarantee the imposition of a severe sanction.   As a result, the College launched a combined, biased and prejudicial investigation against John Doe.

5.      The investigators hired by the College issued a report which evidenced clear bias against John Doe on the basis of his gender.   The investigators coached the complainants and asked them leading questions which suggested that John Doe's actions were worthy of punishment.   The investigators also included highly prejudicial and irrelevant assumptions about John Doe's sexual history in the report that was passed on to the adjudicator—the sole person responsible for determining the outcome of the case.   Both the investigators and the adjudicator clearly ignored conflicting statements made by the complainants.   For example, Jane Doe suddenly alleged that she engaged in sexual activities with John Doe on a second night—her initial report stated it was one night.   Jane Roe gave conflicting testimony about key details of her interaction with John Doe.   Finally, both women expressed safety concerns and fear to the adjudicator which had not previously been mentioned.   Neither complainant sought interim protective measures at the time their complaints were filed.

6.      In erroneously deciding that John Doe engaged in sexual misconduct in violation of Grinnell's Title IX policy, the adjudicator relied on prejudicial assumptions and failed to apply the requisite preponderance of evidence standard required by both the College's own policies and Title IX.   At all times, John Doe was deemed guilty. Further, John Doe was assumed to be responsible for obtaining consent from the complainants despite circumstances under which both parties engaged in the sexual activity should have been responsible under the College's Title IX policy.   Consequently, John Doe was expelled, and a permanent notation was added to his transcript.   This extreme and severe sanction was not warranted in light of the evidence.

7.      Defendant Grinnell conducted a procedurally flawed investigation leading to an erroneous outcome and an unduly severe, disproportionate sanction resulting from anti-male discriminatory bias in violation of Title IX.

## **THE PARTIES**

8.      John Doe is a natural person residing in the State of Washington.  During the events described herein, John Doe was a student at Grinnell College.  John Doe resided in Grinnell, Iowa from August 2014-May 2016.  John Doe's parents also reside in the State of Washington.

9.      Defendant Grinnell College ("Grinnell" or the "College") is a private liberal arts college located in Grinnell, Iowa.  It is the recipient of state and federal grants and contracts.

10.      Defendant Raynard S. Kington ("Kington") is a resident of the State of Iowa and was the President of Grinnell College at all relevant times herein.

11.      Defendant Sarah Moschenross ("Moschenross") is a resident of the State of Iowa and was  the Dean of Students at Grinnell at all relevant times herein

12.      Defendant Andrea Conner ("Conner") is a resident of the State of Iowa and was Associate Vice President of Student Affairs at Grinnell at all relevant times herein.

13.      Defendant Angela Voos ("Voos") is a resident of the State of Iowa and was Title IX Coordinator at Grinnell at all relevant times herein.

14.      Defendant Bailey Asberry ("Asberry"), formerly known as Bailey Thompson, is a resident of the State of Iowa and was the Title IX Deputy for Case Management at all relevant times herein.

15.     Defendant Marsha Ternus ("Ternus") is a resident of the State of Iowa and served as Grinnell's Title IX adjudicator in John Doe's case.  Ms. Ternus has a private law practice in Grimes, Iowa.

16.     Defendant Husch Blackwell, LLP is the law firm retained by Grinnell to investigate the allegations against John Doe.  The investigators assigned to the case by Husch Blackwell worked out of its Kansas City, Missouri office, located at 4801 Main Street, Kansas City, Missouri 64112.

## JURISDICTION AND VENUE

17.     This Court has federal and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because: (i) the case arises under the laws of the United States; (ii) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq., and 42 U.S.C. § 1983 are civil rights claims; and (iii) the state law claims are so closely related to the Title IX and 42 U.S.C. § 1983 federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between Plaintiff and Defendants.

18.     This Court has personal jurisdiction over Defendants on the grounds that Defendants are conducting business at Defendant Grinnell and within the State of Iowa.

19.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.**   **Background: The "April 2011 Dear Colleague Letter"**
        **Of The Department of Education's Office for Civil Rights.**

20.     On April 4, 2011, the OCR sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter"). The "April 2011 Dear Colleague Letter" provides a necessary set of background facts to this action.

21.     The "April 2011 Dear Colleague Letter" advised that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct. Most notably, the "April 2011 Dear Colleague Letter" required schools to adopt a relatively low burden of proof—"more likely than not"—in cases involving sexual misconduct, including sexual assault. Several colleges had previously been using a "clear and convincing" standard of proof, and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt."

22.     The "April 2011 Dear Colleague Letter" states that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing. The "April 2011 Dear Colleague Letter," while not completely ignoring due process concerns, suggested that schools focus more on victim advocacy. The "April 2011 Dear Colleague Letter" states that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student. After the "April 2011 Dear Colleague Letter" was published, many schools changed their sexual assault and sexual harassment policies and procedures.

23.     The Obama Administration, through the DOE and OCR, treated the 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Catherine

Lhamon ("Lhamon"), former Assistant Secretary of the Department of Education ("DOE") in charge of its Office for Civil Rights ("OCR"), delivered the following marching orders to colleges and universities:

(a)   In February 2014, Lhamon told college officials attending a conference at the University of Virginia that schools needed to make "radical" changes. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

(b)   In June 2014, Lhamon testified at a Senate Hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter.  Lhamon further told the Senate Committee, "Th[e] [Obama] Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She also told the Committee: If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. Lhamon additionally stood behind the "April 2011 Dear Colleague Letter."

(c)   In July 2014, Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any

college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding, "If a school refuses to comply with Title IX in any respect, I will enforce." Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . . . It means that so far the process has been working." Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

(d)  Lhamon was quoted in the *Los Angeles Times* stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," *Los Angeles Times*, August 17, 2015.

24.     To support making the "April 2011 Dear Colleague Letter" binding, the OCR hired hundreds of more investigators for Title IX enforcement.  As of Feb. 1, 2017, the Federal Government has 306 open investigations at institutions of higher education, including Defendant Grinnell.  The Department of Education has negotiated settlements with many schools, including Ohio State University.

25.     On July 22, 2015 the OCR informed Grinnell that it was opening an investigation into a Title IX complaint filed by a group of students.  In response to the investigation, Grinnell issued a press release in which it informed the campus community that it continued to proactively develop its "sexual respect" policies to ensure that its practices are "trauma

informed," "prompt and equitable" and "fair."  "Office of Civil Rights Investigation Initiated," http://www.grinnell.edu/new/office-civil-rights-investigation-initiated.                    Prior       to       the announcement of OCR's investigation, Defendant Grinnell had fought to ward off negative press by requesting that the OCR review its Title IX policies and procedures.  By that time, the OCR complaint had already been filed, spearheaded by a campus activism group called Dissenting Voices, "an activist group committed to educating students about their civil right to education free from sexual violence and harassment, while also pushing policy and legislative change at the college level for better administrative enforcement of that same right."  The OCR investigation at Grinnell remains ongoing.

26.     The colleges and universities under OCR investigation, including Defendant Grinnell, are fearful of being sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ").  In April 2014, the White House issued a report entitled "Not Alone," which included a warning that if the OCR finds that a Title IX violation has occurred, the "school risks losing federal funds" and that the DOJ shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools.  The Report further warns that if a voluntary resolution cannot be reached, the DOJ may initiate litigation.  In July 2016, former Vice President Joe Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. "Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault," Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

27.     To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government.  Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in

the air on this topic, . . . It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."  "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

28.     The DOE and OCR have created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate."  "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.  Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR, September 3, 2014. g.

29.     In response to pressure from OCR, DOJ, and the Obama Administration, educational institutions, like Defendant Grinnell—which also faced negative publicity and the ire

of a student activist group—have limited the procedural protections afforded to male students, like John Doe, in sexual misconduct cases.

**B. November 17, 2015: John Doe Meets With Title IX Administrators Regarding Complaint Deemed Unworthy of Investigation**

30.     John Doe and Jane Doe both arrived as First Year Students at Grinnell in August 2014.  They had three courses together and on the first day of classes, August 28, 2014, Jane Doe invited John Doe to her dorm room to study.  The two began studying together, then mutually initiated and engaged in consensual, sexual contact in Jane Doe's room.

31.     Both John Doe and Jane Doe were sober during this interaction.  Jane Doe was fully clothed for the duration of the activities while John Doe had his shirt off.  Jane Doe was, admittedly, sexually inexperienced and had never been kissed prior to kissing John Doe for the first time on August 28th.  After this interaction, Jane Doe and John Doe went their separate ways.

32.     Approximately two months later, John Doe learned through friends that Jane Doe had expressed being uncomfortable about their sexual interaction.  John Doe immediately reached out to Jane Doe via text message and apologized, expressing that he was unaware of how she felt at the time.  In response, Jane Doe asked John Doe to meet with her to discuss her feelings.  John Doe suggested they meet at a public space on campus, to which Jane Doe responded that she would prefer to meet in her room.  John Doe next suggested that the two meet in one of the conference rooms on campus.  Jane Doe suddenly became too busy to meet with him.

33.     John Doe heard nothing further <u>until over a year later</u>, in November 2015, when he learned that Jane Doe had made a report against him at the College's Title IX office in regard to the events that took place in her dorm room on August 28, 2014.  Jane Doe's complaint was

filed approximately three months after Grinnell received widespread publicity over the OCR's announcement of its Title IX investigation at the College.  The allegations against Grinnell included improper resolution of Title IX complaints through mediation.  It was also around the time that Jane Doe wrote an article in the College newspaper about intimate partner violence and abuse, and a recent "Sexual Climate Survey" was released at the College.  Despite making a report to the Title IX office, Jane Doe sought no protective measures from the College, such as a no contact order, and none were put in place.

34.     On November 17, 2015, John Doe and his advisor at the time, Rabbi Rob Cabelli, met with the Dean of Students, Defendant Moschenross, the lead Title IX Coordinator, Defendant Voos, and the Title IX Deputy for Case Management, Defendant Asberry who informed him that Jane Doe had filed a report against him one month earlier.  At the November 17th meeting, Defendant Moschenross further informed John Doe that Jane Doe's report would best be handled through the College's _informal_ resolution process.  According to the "Grinnell College Policy, Procedures and Guide to Preventing, Reporting, and Responding to Sexual Misconduct and Other Forms of Interpersonal Violence," (the "Grinnell Policy" or "Policy"), the informal resolution of a complaint is often its _final resolution_.  John Doe was further informed that Jane Doe did not wish to pursue any action against him.

35.     As also noted in the Grinnell Policy, "[i]f the reported information would not support a policy violation, accepting all reported information as true, the College may decline to pursue an investigation."  In November 2015, the College decided not to pursue an investigation into Jane Doe's allegations, indicating that they _did not_ support a violation of the Grinnell Policy.  No interim protective measures were implemented by the College, nor was John Doe disciplined.  After meeting with Defendants Moschenross, Voos, and Asberry in November

12

2015, it was John Doe's understanding that Jane Doe's complaint against him was resolved, and the matter closed.

### C. **April 13, 2016: John Doe Notified of Complaint Reported Two Months Earlier**

36.     Jane Roe made a report to Grinnell's Title IX Office in February 2016 in which she lodged an allegation of sexual assault against John Doe.  However, Jane Roe elected not to make a formal complaint against John Doe.  Instead, Grinnell elected to pursue the claim.  Jane Roe cooperated by participating in interviews with investigators, but refused to participate in the adjudication process by submitting to a meeting with the adjudicator hired by the College.

37.     Jane Roe and John Doe engaged in sexual activity in the summer of 2015.The two met at an outing in which a group of Grinnell students went to a public park to go skinny dipping.  Several hours later, after returning to John Doe's campus housing, John Doe asked Jane Roe if she would like to go to his room.  Jane Roe agreed.  When they got to his room, Jane Roe undressed herself completely and the two engaged in various forms of sexual contact including oral sex and sexual intercourse.  Neither Jane Roe nor John Doe was intoxicated.  Jane Roe further told Title IX investigators assigned to the case that she was free to leave at any time.  There were also three other people in John Doe's house at the time.

38.     Jane Roe also told the Title IX investigators that she consented to the sexual contact with John Doe but <u>not</u> the sexual intercourse.  She alleged that the intercourse was painful because her body was not responding yet she presented no evidence of harm or injury to her person, nor did she visit a doctor.  Ms. Roe further told investigators that she had sexual intercourse with John Doe in various positions.  After Jane Roe and John Doe had sexual intercourse she remained in his room for several hours.

39.     Shortly before her encounter with John Doe, and unbeknownst to John Doe, Ms. Roe had stopped taking prescribed anti-anxiety medication.  She had also stopped taking her birth control pill.  One of Jane Roe's friends reported to investigators that Ms. Roe "g[ot] herself into these situations often" when learning of Ms. Roe's accusations against John Doe.  At the time that Ms. Roe filed her complaint, she sought no interim protective measures such as a no-contact order.  Grinnell, further, implemented no protective measures at that time.

40.     On April 13, 2016, <u>two months</u> after Jane Roe made her report against John Doe, Defendant Voss, Grinnell's Title IX Coordinator, emailed a Notice of Investigation to John Doe. The Notice addressed Jane Roe's allegations <u>plus</u> Jane Doe's report concerning the August 28, 2014 sexual encounter that had previously been resolved by the College's informal process.

### D.  Grinnell Subjects John Doe to Double Jeopardy By Unilaterally Opening An Investigation Into A Previously Resolved Complaint

41.     In complete disregard of the concept of double jeopardy—and Grinnell's prior decision to informally resolve Jane Doe's complaint—Defendants Moschenross, Voss, and Asberry decided to open an investigation into Jane Doe's allegations concerning her sexual contact with John Doe in August 2014.  This was despite the fact that the Title IX Office, led by the same individuals, had determined that a formal investigation into Jane Doe's allegations was <u>unnecessary</u> and closed the matter.  In further error, the College determined that both complaints should be investigated at the same time, and as part of one investigation, despite the fact that the two complaints were wholly unrelated and occurred one year apart.

42.     The Title IX Office unilaterally determined that the incident alleged by Jane Doe now rose to the level of investigation after the second complaint had been filed, based on the erroneous conclusion that, taken together, the two incidents constituted a pattern of conduct warranting a formal investigation under Title IX.  The true reason behind the revival of Jane

Doe's complaint was that Grinnell was now facing the OCR's scrutiny for using mediation to resolve Title IX complaints—which it had done in Jane Doe's case while under investigation—and wanted to correct its error.

43.     The decision to investigate both claims was a complete misinterpretation of OCR guidance on the April 2011 Dear Colleague Letter, which informs that a pattern of conduct may exist if "school officials receive a credible report that a student has perpetrated *several acts* of *sexual violence* against different students." (emphasis added).  With only one unproven claim of sexual misconduct by Jane Roe, Grinnell imposed a new finding for a previously resolved, unrelated and unsubstantiated matter and redefined the incident as a second claim of sexual misconduct.  Grinnell further undermined the responsibilities of the investigators and the adjudicator, identified further below, to provide a fair and impartial proceeding by unjustly predetermining that John Doe was guilty of a non-existent, predatory pattern of behavior.

44.     After fabricating a pattern of misconduct where none existed, the Title IX Office next solicited Jane Doe's participation in the investigation.  Curiously, Jane Doe then added a second claim to her prior report, suddenly alleging—for the first time—that she and John Doe had sexual contact in his dorm room on August 29, 2014 on a break in between classes.  Thus, nearly two years after engaging in sexual contact with John Doe, Jane Doe brought forth a new story.  John Doe consistently and credibly denied having any contact with Jane Doe on August 29, 2014.

45.     When agreeing to participate in the investigation, Jane Doe did not request that any interim protective measures be put in place, such as a no contact order.

**E.  Grinnell's Inherently Biased Title IX Policy**

46.     Despite the fact that Jane Doe's allegations concerned events that occurred in 2014, and Jane Roe's allegations concerned events that occurred in 2015, the College's Title IX Office and its investigators opted to apply the Grinnell Policy enacted in May 2016 when evaluating the allegations against John Doe.

47.     The investigators retained by the College attributed the application of the new policy to the fact that Grinnell identified a "potential pattern of policy violations in <u>April 2016</u>." Putting aside that no pattern existed, this explanation is nonsensical and makes clear that the College denied John Doe fair process in failing to adjudicate the claims against him under each relevant Title IX policy.

48.     The Policy applied in John Doe's case is inherently biased against the male accused, and is primarily focused on complainants, which it refers to as "survivors" and "victims."   The Grinnell Policy exhibits bias against the male accused—here, John Doe—in the following ways:

(a) the Policy is based on affirmative consent.  Affirmative consent improperly shifts the burden of proof to the accused when charges are brought, forcing the accused to prove that affirmative consent was agreed upon throughout each moment of a sexual interaction;

(b) the Grinnell Policy contains pages of resources for <u>complainants</u> to utilize, both on and off campus, , including a crisis hotline and crime victims' compensation fund. Notably absent from the Policy are any references to resources for respondents absent the public defender's office in Des Moines.  As John Doe discovered when he called, the public defender's office can only assist with criminal cases.  Grinnell's Title IX

staff, Rabbi Cabelli and Jeff Pederson, acknowledged that the support services offered by Grinnell were biased in favor of the "victim;"

(c) the Policy permits complainants to "set the pace" and determine how "best to proceed" against a male accused;

(d) the Policy does not require the College to immediately notify the accused that a report has been made against him. Rather "depending on the circumstances and requested resolution, the Respondent *may or may not* be notified of the report *or resolution*;"

(e) before collecting <u>any</u> information from the accused, the Dean of Students, in this case Defendant Moschenross, is permitted to conduct an "initial assessment" which includes, among other things: (i) addressing the immediate safety and emotional well-being of the *complainant*; (ii) notifying the *complainant* of her right to contact law enforcement; (iii) notifying the *complainant* of the right to seek medical treatment; (iv) notifying the *complainant* of the importance of preserving evidence; (v) providing the *complainant* with written information about on and off campus resources; (vi) assessing for any pattern of conduct by the accused; and (vii) discussing the *complainant's* preferred method of resolution. Under this process, a male accused has no opportunity to present his side of story until the College has decided that some form of action against him is necessary. The extended timeframe provided for the initial assessment also permits the complainant time to build a case against the male accused, in part, by utilizing the resources provided by the College and speaking to potential witnesses;

(f) the Policy contains an entire section on complainant "agency and autonomy" but contains no section addressing respondents' rights;

17

(g) in cases where the College pursues formal resolution of a complaint, the investigator(s) assigned are solely responsible for weighing the probative value of witness testimony and the relevance of the evidence collected for inclusion in a final report that will be provided to a sole adjudicator.  The investigator(s) may also redact information found to be irrelevant, prejudicial, or immaterial <u>before</u> providing the report to the adjudicator.  The stated purpose of each investigation is to "establish whether there is a basis for believing that it is more likely than not the alleged violation of th[e] policy has occurred;"

(h) in weighing evidence, the investigators are not be permitted to use evidence of a complainant's prior sexual history as evidence of character or reputation, but may use evidence of a respondent's prior sexual history, including "similar conduct," to establish character, reputation, motive, or intent;

(i) the Policy does not provide for a hearing in which a respondent may cross-examine witnesses or even permit a respondent to submit written questions to the adjudicator;

(j) under the Policy, a single adjudicator is responsible for conducting interviews of the complainant and respondent and singlehandedly determining, under a preponderance of the evidence standard, whether a Policy violation has occurred.  The adjudicator is not permitted to interview any witnesses;

(k) The Policy further describes the adjudication process—in which a respondent's education and future may hang in the balance—as "not intended to be adversarial" but "educational, corrective, and developmental."  It further describes adjudication meetings as "informal proceeding[s]."  Yet, the Policy points out that these

"informal" meetings are relied on by the College to determine whether a respondent should be sanctioned; and

(l) While appeals are permitted, they are reviewed, and decided, by a single arbiter, typically the Assistant Vice President of Student Affairs.

In sum, the Grinnell Policy fosters an atmosphere in which a male accused is presumed guilty until proven otherwise, complainants are perceived as victims, covert investigations take place that are prejudicial to the male accused, and a respondent's future is in the hands of a single adjudicator who determines responsibility without a proper hearing.

### F.  Grinnell's Biased Investigation

49.     At some point after its receipt of Jane Roe's complaint against John Doe, and prior to notifying John Doe of the allegations against him, the College retained an outside law firm, Defendant Husch Blackwell, which represents colleges and universities in Title IX OCR investigations, to investigate the complaints against John Doe.  Husch Blackwell assigned two of its attorneys to the case.  The utilization of attorneys retained by the College to act as Title IX investigators was inherently biased against John Doe because those attorneys had an obligation to act in the College's best interests and, by default, could not remain objective despite their best intentions.  In fact, and as set forth below, the attorney investigators were negligent in their investigation of the facts pertaining to the claims against John Doe, resulting in a biased and prejudicial investigation report.  This report was delivered to the adjudicator.

50.     In March 2016, before John Doe was notified of any allegations against him, the investigators interviewed Jane Doe.  The investigators started off the interview by informing Jane Doe that the "college ha[d] some concerns that there could be a pattern."

51.     On April 13, 2016, John Doe received a Notice of Investigation from Defendant Voos, the Title IX Coordinator.

52.     On April 14, 2016, he met with Defendants Moschenross, Voos and Asberry.  At this time, John Doe was informed that the College decided to reopen Jane Doe's claim—which it previously found unworthy of investigation—and proceed with Jane Roe's claim.   At the meeting, John Doe was offered an appointment with a counselor, and Defendant Voos purportedly scheduled an immediate appointment for him at the office of Student Health and Counseling Services.   However, when John Doe arrived for his appointment, he was informed that they were too busy to see him until the end of April.

53.     On April 18, 2016, the investigators sent a separate Notice of Investigation to John Doe.

54.     On April 20, 2016, the investigators interviewed John Doe without his advisor present.   A second interview was conducted on May 4, 2016, in the presence of John Doe's advisor.

55.     The investigation was completed on May 23, 2016.   John Doe was sent the investigation report for review on May 30, 2016, and submitted his comments before the required deadline of June 2, 2016—a deadline set for all parties.   Jane Roe did not provide any comments to the report.

56.     Two weeks before the end of the semester, in May 2016, Jane Roe requested a no contact order from the College, even though she had had no contact with John Doe since the summer of 2015.   She did not request any specific times or places for the no contact order to be in effect.   She had not been in contact with John Doe since the summer of 2015.

57.     On June 3, 2016, Jane Doe submitted comments to her interview transcript, including statements that were incorrectly attributed to her.   Rather than include Jane Doe's comments in the addendum to their investigation report, the investigators changed the interview transcript on the ground that they were "not substantive."   However, the substantive nature of the changes should have been left to the determination of the adjudicator.

58.     On June 8, 2016, John Doe received an email from Defendant Moschenross, which stated:

> [Jane Doe] had to travel [abroad] and therefore, had her adjudication early.  However, she still wanted to submit her edits to the Preliminary Report.  Because these are out of order with the timeline, I am not submitting them to be included in the final [investigative report].  Rather, I will post them to One Hub so you may view them and submit them to the [adjudicator].  She can choose whether to consider them or not.

Incredibly, the Dean of Students assigned John Doe, *the respondent*, the task of submitting a complainant's revisions to the adjudicator.  It was later discovered that Defendant Moschenross submitted Jane Doe's comments to the adjudicator personally, even though the deadline had passed.  It is unclear whether the Dean advised the adjudicator that she could choose whether or not to consider the improperly submitted evidence.

59.     The Final Investigation Report revealed the inherent bias of the investigators against John Doe as a male accused:

(a) the investigators asked the complainants leading questions and it is apparent that the complainants were coached prior to sitting for their interviews.  For example, on more than one occasion Jane Roe stated that her action or inaction should be excused because of John Doe's "coercive" behavior;

(b) the investigators, improperly tasked by the College with the investigation of two distinct, unrelated complaints against John Doe (one of which had already been

closed by the College), asked each complainant whether she knew of the other's case against John Doe.  For instance, the investigator asked Jane Doe, "Do you know Jane Roe?" to which she replied "I was told that I am a co-complainant."  Jane Roe was informed by the investigator that "the College has concerns that there might be a pattern."   This breach of confidentiality violated John Doe's right to a fair and impartial proceeding, prejudiced the complainant's responses, and encouraged the complainants to communicate with one another;

(c) the investigators failed to fully explore the discrepancies between Jane Doe's October 2015 report to the Title IX Office which detailed <u>only</u> one instance of sexual contact with John Doe, on August 28, 2014, and her new allegation, after being solicited by the Title IX Office, that she also had sexual contact with John Doe on August 29, 2014.  Jane Doe's handwritten statement, submitted as an exhibit to the Report, provides a glaring lack of detail concerning the alleged second occurrence.  John Doe further denied that he had any contact with Jane Doe on August 29, 2014;

(d) the investigators failed to interview the witnesses named by Jane Doe, even though there were discrepancies between her initial report in 2015 and her account in 2016;

(e) the investigators failed to adequately explore whether each <u>complainant</u> followed the guidelines of affirmative consent, including the guideline that "if at any time it is reasonably apparent that either party is hesitant, confused or unsure, <u>both parties</u> should stop and obtain mutual verbal consent before continuing such activity."  It is clear from the Report that the investigators placed the burden to stop and obtain consent on John Doe, alone, even where circumstances could have been confusing or unclear;

(f) the investigators chose to include in the report Jane Roe's statements about John Doe's sexual history, including her statement that she was "worried that [John Doe] is confusing their sexual encounter with a sexual encounter he had with someone he met on the night before." This highly prejudicial statement, which has no probative value or relevance, should have been redacted by the investigators, as permitted under the Policy;

(g) the investigators asked Jane Roe—who chose not to proceed with a formal complaint and later failed to participate in the adjudication of the College's complaint—what she thought John Doe's punishment should be. The Grinnell Policy makes clear that the adjudicator is responsible for determining the appropriate sanction.

60.     Overall, the attorneys retained by the College to investigate the allegations against John Doe were demonstrably biased against John Doe, the male accused. Their questioning techniques, lines of inquiry, and failure to probe key questions violated John Doe's right to a "fair and reliable gathering of facts" as promised in the Policy.

61.     The purpose of the investigators' report, as stated in the Policy, "to establish whether there is a basis for believing that it is more likely than not the alleged violation occurred," is designed to create bias against the male accused. While the investigators are not explicitly tasked with determining whether a violation has occurred, the Policy directs them to conduct their investigation with the preponderance of the evidence standard in mind, as opposed to providing a straightforward, impartial summary of the evidence in question.

### G.     June 20, 2016: The Sole Adjudicator Issues Her Findings

62.     Grinnell utilized an outside adjudicator, Defendant Ternus, to determine whether John Doe violated the Grinnell Policy by engaging in nonconsensual sexual contact with Jane

Doe and/or Jane Roe.  Ternus was first hired by the College in early 2015 as Grinnell faced the possibility of the OCR investigation that is now pending.  The only reasonable explanation for Grinnell doing away with a hearing panel and placing Ternus in position as the sole adjudicator of Title IX complaints is that it wanted to signal to the OCR that it was cracking down on male respondents.

63.     At the time Ternus was hired, Defendant Conner and Defendant Kington were publicly seeking OCR review of Grinnell's Title IX policies in order to ward off the filing of a complaint by students.  Defendant Conner stated to a Huffington Post reporter, "[w]hen a student is found responsible in sexual misconduct cases, the college's first consideration as a sanction is always dismissal…Grinnell then works backward from there depending on mitigating or aggravating factors."  This is an exemplar of Grinnell's backlash against male students accused of sexual misconduct in the wake of criticism that the College's Title IX process had been too lenient.  The biased approach to adjudicating sexual misconduct cases continues today, as demonstrated by the proceedings against John Doe.

64.     Upon information and belief, Ternus has found in every case she has adjudicated since 2015 that the male respondent was responsible for violating the Grinnell Policy and has suggested the imposition of extreme sanctions.  The result was the same with respect to the allegations against John Doe.

65.     On June 20, 2016, Ternus issued an opinion addressing Jane Doe's allegations that on August 28th and 29th 2014 John Doe "sexually assaulted [Jane Doe] by having sexual contact with [her] without her consent by kissing her and touching her intimate parts in a sexual manner."  The adjudicator found that "a preponderance of the evidence shows that [John Doe] engaged in sexual touching of [Jane Doe] without her consent on two occasions in August of

2014. This adjudicator concludes, therefore, that [John Doe] is responsible for the charge of the sexual assault by nonconsensual sexual contact."

66.     Ternus rendered her opinion without a hearing on the accusations, much less a hearing where sworn testimony was taken and cross-examination afforded.  The adjudicator's decision was based solely on separate, private interviews with Jane Doe and John Doe via Skype. Ternus was not permitted to interview any witnesses, nor did the College permit either the complainant or respondent to submit questions to be asked by the adjudicator.  The only other evidence available to Ternus in evaluating Jane Doe's allegations was the biased Final Investigation Report and Jane Doe's late comments to the Report, which were improperly submitted to Ternus by Defendant Moschenross on June 8, 2016.

67.     A review of Ternus' opinion demonstrates that the adjudicator failed to use the preponderance of the evidence standard.  Among other things, the adjudicator accepted Jane Doe's credibility without question, despite the drastic difference between her initial report to the Title IX Office in October 2015 and her subsequent account—namely, the addition to her story that she and John Doe engaged in sexual contact on August 29, 2016.  The basis for the adjudicator's reliance on Jane Doe's testimony over John Doe's—despite the complainant's prior glaring omissions—was simply that "these incidents were very out of the ordinary and very impactful on her."  Yet Jane Doe never sought a protective order against John Doe, and initially chose not to file a complaint against him.  The Final Investigation Report makes no reference to any impact suffered by Jane Doe;

68.     The adjudicator also chose to omit from her evaluation a crucial component of the Grinnell Policy's definition of affirmative consent, "if at any time it is reasonably apparent that either party is hesitant, confused or unsure, both parties should stop and obtain mutual verbal

consent before continuing such activity." (emphasis added).  The opinion makes clear that the adjudicator placed the burden of obtaining consent solely on John Doe and never asked Jane Doe about her understanding of affirmative consent.

69.     The adjudicator ultimately recommended that John Doe be expelled.   Her recommendation was based, in part, on Jane Doe feeling unsafe on campus and having "flashbacks and panic attacks."   In the nearly two years prior to the commencement of the investigation, including when Jane Doe approached the Title IX Office in October 2015, there was no mention of this.  It was, further, glaringly absent from the Final Investigation Report. The adjudicator further ignored that Jane Doe continued to take classes attended by John Doe without issue.

70.     On June 20, 2016, Ternus rendered an opinion concerning Jane Roe's allegation that in the summer of 2015 John Doe "sexually assaulted [Jane Roe] by having sexual intercourse without her consent."   The opinion was based on the biased Final Investigation Report and a Skype interview with John Doe.  Jane Roe declined to participate.  The adjudicator found that "by a preponderance of the evidence [Jane Roe] did not consent to…sexual intercourse with [John Doe].   Therefore, this adjudicator concludes that [John Doe] is responsible for sexual assault by nonconsensual sexual intercourse."

71.     In rendering her opinion, the adjudicator once again failed to properly apply the preponderance of the evidence standard, giving unreasonable weight to facts that were neither relevant nor dispositive.  For example, the adjudicator found that the fact that Jane Roe's birth control pills had run out supported her assertion that she did not want to have sex with John Doe. This is a complete mischaracterization of Jane Roe's interview testimony in which she stated that she was unable to renew her prescription because her doctor was in California.  The adjudicator

also gave unreasonable weight to Jane Roe tapering off her anti-anxiety medication prior to her contact with John Doe, even though there was no finding that either individual was incapacitated at the time of their interaction.  The investigation also made clear that Jane Roe never told John Doe that she had taken any medication or was suffering any effects from tapering off her medication.  The adjudicator further ignored clear inconsistencies in Jane Roe's account to investigators, including key details about the events in question.

72.     The adjudicator also misapplied Grinnell's definition of affirmative consent, in particular her finding that Jane Roe was coerced by John Doe into giving consent to sexual intercourse.  There was no evidence that John Doe engaged in conduct that "impair[ed] the other's freedom of will and inability to choose whether or not to engage in sexual activity."  Once again, the adjudicator placed the burden of proof on John Doe to prove that he obtained consent at each stage of his encounter with Jane Roe, and to prove that her allegations were false.

73.     The adjudicator's recommendation that John Doe be expelled from the College was grounded in the erroneous finding that "the incidents, occurring about a year apart, show a pattern of conduct."  This finding was in direct contravention of the evidence and violated John Doe's right to fair process.

74.     The adjudicator also relied on Jane Roe's suggestion to investigators that John Doe be expelled when Grinnell Policy makes clear that complainants should not be involved in deciding which sanctions are considered by the adjudicator.

75.     Grinnell began the investigation against John Doe with the assumption that he had engaged in a pattern of "predatory behavior," despite finding Jane Doe's account of what had happened on August 28, 2014, to be unworthy of further action.  This assumption clearly carried over to the investigation and the adjudication of the allegations against him.  In violation of the

Dear Colleague Letter guidance of Title IX, which requires a fair and impartial proceeding, Grinnell unjustly predetermined that John Doe was guilty of a predatory pattern of behavior where none existed.

**H.      June 22, 2016: John Doe Receives Outcome Letter From Dean of Students**

76.      On June 22, 2016, Defendant Moschenross issued an outcome letter to John Doe, which informed him that he was responsible for two violations of the Grinnell Policy:(i) "Sexual Assault Non-consensual Sexual Contact;" and (ii) "Sexual Assault Non-consensual Sexual Intercourse."  As a result of the adjudicator's findings, John Doe was immediately dismissed, or expelled, from the College, and a permanent notation of the sanction was placed on his transcript.  This extreme and disproportionate sanction was unsupported by the reasoning provided in the outcome letter.

**I.      July 13, 2016: The College Rejects John Doe's Appeal**

77.      Shortly after receiving the outcome letter, on June 29, 2016, John Doe filed a timely appeal on the grounds that: (i) he was improperly subjected to double jeopardy; (ii) the College utilized Jane Doe's unfounded claim to fabricate a pattern of misconduct against him; (iii) the combined investigation of the two reports violated John Doe's right to a fair and independent investigation; (iv) the adjudicator failed to apply the requisite preponderance of the evidence standard; (v) the adjudicator demonstrated bias against John Doe by presuming his guilt from the outset; and (vi) the sanction was unsupported by the evidence.

78.      Since the College does not convene an impartial panel to review appeals, it assigned Defendant Conner, Associate Vice President of Student Affairs, as the sole arbiter of John Doe's appeal.  Conner, who appears to have been involved in the investigation process against John Doe, should not have been assigned as the appeal officer.  According to Grinnell

Policyand Title IX guidance, individuals involved in the complaint/grievance process should not be assigned as appeals officers, as this creates a conflict of interest. Moreover, Conner's biography on the College's website fails to reference any specific training or education she has received in regard to Title IX. It is therefore questionable whether Defendant Conner was knowledgeable enough to adequately evaluate John Doe's appeal. Finally, the Grinnell Policy provides only 10 business days for appeals officers to review and render decisions on appeals. The foregoing suggests that Grinnell's appeals process is a sham, meant to quell student concerns about due process when, in fact, it provides for no real review at all. The use of a single appeals officer further violates a respondent's right to fair process because it fails to guarantee an impartial review of the issues raised in the appeal.

79.     On July 13, 2016, Defendant Conner sent a letter to John Doe, informing him that the College had denied his appeal. Again, this letter demonstrated a clear bias against John Doe as a male accused and relied on factual errors to sustain the College's unduly harsh punishment of John Doe. For example, the letter stated that at the time Jane Doe made her report to the College, in the fall of 2015, the College did not have the ability to move forward with an investigation without her consent. This statement indicates that under the prior sexual misconduct policy, Grinnell could not open investigations without a complainant's consent. Once a new policy was implemented in 2016, the College decided to solicit a complaint from Jane Doe in order to bolster its case against John Doe. This also flatly contradicts the College's prior representations to John Doe that the report did not warrant investigation. As acknowledged in the letter, "[i]n that process, you were not formally charged with any policy violation…[nor] found responsible for any prohibited behaviors, and no sanctions (outcomes) were imposed." Taken together, these statements demonstrate the College's pursuit of an arbitrary and

discriminatory process against John Doe through its misapplication of the Grinnell Policy to Jane Doe's report and its mischaracterization of its prior findings.   They further conflate the imposition of sanctions with the resolution of a Title IX complaint, presuming that all respondents must be guilty as charged.

80.     The letter next made a self-serving statement defending the College's process as containing "appropriate procedural safeguards."   One item mentioned was "the careful redaction of . . . overly prejudicial or immaterial information."   The appeals officer clearly did not notice the investigators' failure to redact Jane Roe's statements about John Doe's sexual history or the line of questioning to Jane Roe concerning how John Doe should be punished.   The letter also referenced the opportunity to challenge the adjudicator for bias.   This is yet another aspect of the sham process put in place by the College since a respondent has two business days from the date he receives notice of the name of the adjudicator to challenge actual bias.

81.     Defendant Conner also relied on erroneous facts to support the College's decision to reopen Jane Doe's report and impose the harsh sanction of expulsion.   According to Conner, "the information related to the resolution of [Jane Doe's] report was relevant based on the inference that *prior educational conversations* were disregarded."   (emphasis added).   In the letter, Conner states that, on November 17, 2015, John Doe was "educated about consent."   The events in question occurred prior to that meeting.   Putting aside the complete lack of evidence that John Doe violated the Grinnell Policy in either case, the alleged sexual contact with Jane Doe occurred in August 2014 and the alleged sexual contact with Jane Roe occurred in the summer of 2015, before the educational meeting took place.   There has been no allegation that John Doe engaged in sexual misconduct after the November 17, 2015 meeting.   Thus, the College's stated basis for finding a pattern of behavior was completely unfounded.   There simply

was no reason to reopen Jane Doe's case other than the College's desire to appear more vigilant about Title IX complaints, demonstrating an inherent bias against the male accused.

82.     Finally, like the adjudicator, the appeals officer failed to recognize the inherent bias in Grinnell's affirmative consent policy, the adjudicator's failure to consider that mutual consent needs to be re-established where one party to sexual contact might be hesitant or confused, and the fact that both the investigators and the adjudicator assumed John Doe was solely responsible for obtaining consent.

83.     In sum, like all respondents at Grinnell, who are habitually male, John Doe's rights to fair process were violated by the application of a discriminatory sexual misconduct policy which denied him the right to a fair and impartial hearing, subjected him to double jeopardy, and resulted in an extreme and unwarranted sanction.

**COUNT I**
**(42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process**
**Against Defendant Grinnell)**

84.     John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

85.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  In this case, Defendants are state actors subject to the Fourteenth Amendment.

86.     Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

87.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

88.    On April 4, 2011, the United States, by and through its agent the United States Department of Education, sent a 19-page "Dear Colleague" letter to colleges and universities all over the country, stating that "sexual violence" on campus was a form of "sexual harassment prohibited by Title IX" ("Dear Colleague Letter").

89.    Reversing previous federal policy, the Dear Colleague Letter threatened colleges with hundreds of millions of dollars in de-funding penalties if they did not immediately begin investigating and adjudicating allegations of campus sexual assault under detailed procedures and terms dictated by the federal government.

90.    For example, and without limitation, as a result of the Dear Colleague Letter and later statements, actions, and directives issued by the United States, colleges were as of 2016:

(i)      Required to investigate and adjudicate campus sexual assault allegations regardless of whether the complainant reported his or her allegations to the police (whereas previous federal policy had permitted colleges to allow law enforcement to handle allegations of sexual assault);

(ii)     Required to establish a coordinated and centralized investigative and adjudicative procedure according to detailed rules mandated by the federal government and headed by a Title IX coordinator;

(iii)    Required to protect the anonymity of students accusing another student of sexual assault if the student making the allegations so requests;

(iv)     Required to apply a preponderance of the evidence standard when adjudicating such allegations (whereas previously colleges frequently applied higher evidentiary standards, such as the clear and convincing evidence standard);

(v)      Required not to allow cross-examination by the accused student;

(vi)     Required or strongly encouraged to expel students that the college finds to have engaged in unconsented-to sexual intercourse with another student.

91.     Since 2011, the United States has consistently reaffirmed and adhered to the threat of substantial monetary penalties made in the Dear Colleague Letter.  For example, in July 2014, former DOE Assistant Secretary for Civil Rights, Catherine Lhamon, stated that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned.

92.     Upon information and belief, since 2011, Grinnell has revised its policies in response to the federal government's threat that colleges refusing to comply would be found in violation of Title IX and be subject to extremely substantial, and in fact crippling, monetary penalties.

93.     Indeed, demonstrating its attempted compliance with the 2011 Dear Colleague Letter, Grinnell's Clery Reports reveal that the number of forcible sex offenses reported on Grinnell's campus increased considerably from 8 reported instances in 2013, to 13 reports in 2014, and 24 reported incidents in 2015.  Notably, the OCR opened an investigation at Grinnell in 2015.  Grinnell also did away with its Title IX review panel in 2015, which was replaced by a single-adjudicator model.

94.     The Dear Colleague Letter has resulted in significant action and legal consequences.  Former Assistant Secretary for the Office of Civil Rights Catherine Lhamon recognized that: "Our release of the 2011 DCL is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL."

95.     Speaking at a conference on campus sexual assault held at Dartmouth College in July 2014, Lhamon also stated that despite the fact it had never been done before, she was prepared to cut off federal funding to schools that violate Title IX.  She went on to describe that

enforcement mechanism as part of a set of "very, very effective tools."   Lhamon said, "If a school refuses to comply with Title IX in any respect, I will enforce."

96.      In fact, former Secretary Lhamon admitted: "It's nice when you carry the big stick of the federal government."   Concerning why there is a higher volume of complaints being made to the OCR, Lhamon stated: "I think there is more public awareness about the issue and also more confidence from survivors that we will be there for them." http://www.si.com/college-football/2016/10/20/title-ix-sexual-assault-explained

97.      Accordingly, Grinnell was coerced by the United States into complying with the Title IX investigative and adjudicatory process mandated by the Dear Colleague Letter and by subsequent federal actions, statements, and directives.

98.      Grinnell applied the investigative and adjudicatory process dictated to it by the federal government when it investigated and adjudicated the sexual assault complaints against John Doe.

99.      Under clear and controlling federal constitutional case law, a private actor becomes a state actor when his or its actions are coerced by the United States government.

100.      Under clear and controlling federal constitutional case law, a private actor required by the United States to investigate and adjudicate alleged violations of a federal statute under terms and procedures dictated by the federal government is a state actor when engaging in such investigation and adjudication.

101.      Accordingly, when Grinnell investigated and adjudicated the sexual assault complaints against John Doe, and imposed a sanction of expulsion on John Doe upon reaching its conclusions, Grinnell was a state actor and was therefore required to honor the rights and guarantees set forth in the United States Constitution.

102.    In the course of such investigation and adjudication, Grinnell flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its repeated acts of gender bias and of deprivation of the minimal requirements of procedural fairness.

103.    Defendant Grinnell deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to: his right to a fair adjudication; his right to be informed of the exact charges against him; his right to be heard by an impartial fact finder; his right to question his accuser; his right to challenge the credibility of other adverse witnesses; and his right to present evidence and witnesses in support of his defense.

104.    As a result, Defendant Grinnell failed to provide Plaintiff with the basic due process protections that they are required to provide to students accused of sexual misconduct, in violation of the 14th Amendment.

105.    Based on the foregoing, Grinnell was a state actor when it violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of the complaints against John Doe.

106.    As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages.

107.    Accordingly, Defendant Grinnell is liable to Plaintiff for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

108.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and

career opportunities, reputational damages, economic injuries and other direct and consequential damages.

109.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT II**
**(Violation of Title IX of the Education Amendments of 1972 Against   All Defendants)**

110.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

111.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

112.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of school sports.

113.    According to published audited financial statements, at fiscal year-end 2015, Defendant Grinnell had accrued long-term liability of $2,533,000 in advances from the federal government and was the recipient of $923,000 in grants and contracts provided by the federal government.

114.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.  In either case, the statute is enforceable through an implied private right of action.

115.    The Obama Administration's DOE promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. Such prohibited actions include all forms of sexual misconduct. 34 C.F.R. § 106.8(b).

116.    Even the Obama Administration's DOE ostensibly recognized that the procedures adopted by a school such as Defendant Grinnell covered by Title IX must accord due process to both parties involved. The practical reason why due process matters is so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

117.    Even the Obama Administration's DOE ostensibly recognized that there must be "[a]dequate, reliable, and impartial investigation of complaints" and that a school has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes alleged sexual assaults."

118.    Challenges to university disciplinary proceedings for sex discrimination generally fall into two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "severity of penalty/selective initiation" cases, in which the claim generally asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

119.    An "erroneous outcome" occurred in this case because John Doe was innocent and wrongly found to have committed sexual assault, and gender bias was a motivating factor.

120.    The denial of due process and the procedural errors made in this case resulted in an "erroneous outcome" based on a flawed and distorted conception of the facts.

121.    Defendant Grinnell failed to conduct an adequate, reliable, and impartial investigation when it chose to pursue an improper course of double jeopardy by reopening Jane Doe's prior report and combining it with Jane Roe's complaint into one investigation.  The subsequent investigation and adjudication were further conducted in a manner that was biased against John Doe.   John Doe was tasked with the burden of proving his innocence and overcoming the presumption of the investigators that he was solely responsible for obtaining consent.   The investigators and adjudicator were further biased by the College's erroneous conclusion that John Doe had engaged in a pattern of misconduct.

122.    The 2016 Grinnell Policy that was wrongly applied to John Doe's case is also inherently biased against respondents, which are habitually male, because it: (i) is grounded in affirmative consent, which improperly shifts the burden of proof to the accused; (ii) contains pages of resources for complaints, described as "victims" and "survivors," and provides no similar support for respondents; (iii) permits complainants to "set the pace;" (iv) does not require the College to notify the accused that a report has been made against him; (v) permits the College to conduct an in-depth assessment of a case before collecting any information from the accused; and (vi) provides for adjudication by a single individual, without a hearing.

123.    Defendant Grinnell has created a victim-centered process in which an accused male student is prosecuted under a presumption of guilt and improperly placed the burden of proof on John Doe. Such a one-sided process deprived John Doe, as a male student, of educational opportunities at Defendant Grinnell on the basis of his sex.

124. Cross-examination has been recognized as the greatest legal engine ever invented for discovery of the truth, *Lilly v. Virginia*, 527 U.S. 116, 124 (1999), and has been ruled to be required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F. Supp. 136 (N.D.N.Y. 1997). Yet, in a case where Defendant Grinnell relied upon a credibility assessment, no cross-examination was available and no sworn testimony was taken, in violation of due process of law. *John Doe v. University of Cincinnati*, No. 16-cv-987, 2016 WL 6996194 (S.D. Ohio Nov. 30, 2016).

125. The totality of the circumstances establishes that Defendants acted out of gender bias in reaching the "erroneous outcome." The Defendants chose to reopen Jane Doe's report of sexual misconduct, which the College had previously decided did not warrant an investigation, in order to bolster the College's case against John Doe when Jane Roe came forward. This led to an investigation and adjudication based on a pattern of sexual misconduct where none existed. OCR guidance states that patterns of misconduct may be based on *several instances* of sexual *violence*. The case against John Doe involved a sketchy and incredible report by Jane Doe concerning a sexual encounter that took place within her first few days as a freshman at Grinnell, when she was admittedly naïve about sexual intimacy and had never been kissed. No violence or injury was alleged. She brought a report against John Doe <u>fourteen months</u> after their sexual interaction and chose not to pursue a complaint. The College informed John Doe that the report did not warrant an investigation and closed the case. Jane Roe's complaint was made in 2016 and concerned what she alleged to be primarily consensual contact between her and John Doe. Jane Roe presented a conflicting account of what happened that evening, including the key details of the "non-consensual" conduct alleged. No violence or injury was alleged in Jane Roe's

case.   Thus, a review of the evidence in John Roe's case shows that there was no pattern of misconduct present.

126.     The College's investigators submitted a prejudicial and biased report to the adjudicator which showed that they coached the complainants and asked them leading questions. The investigators also included in the report highly prejudicial and irrelevant information concerning John Doe's sexual history, as well as Jane Roe's suggestions for what sanction should be imposed.   The investigators also failed to explore clear discrepancies in the case, such as Jane Doe's sudden recollection in 2016 that she and John Doe engaged in sexual activities on two separate occasions rather than one, as previously alleged.   The Final Investigation Report was motivated by the assumption that the female complainants were victims and that John Doe was guilty of a predatory pattern of sexual deviance, a clear bias against him because of his gender.

127.     The sole adjudicator in John Doe's case also discriminated against him based on his male gender, assuming that the burden was on him to obtain consent, and failing to question the complainants' roles in the sexual acts they engaged in with John Doe.   The adjudicator also overlooked Jane Doe's sudden recollection that she engaged in sexual contact with John Doe on more than one occasion and found that she had a confident recollection of the events that occurred nearly two years prior.   Regarding Jane Roe, the adjudicator credited the complainant's inability to renew her birth control pill to a lack of desire to have sexual intercourse with John Doe.   The adjudicator further expressed concern for the safety of women on campus, portraying John Doe as a crazed predator, even though Jane Doe continued to take classes with him and even though neither complainant sought protective measures in the years following the events in question.

128.    Defendant Moschenross' decision to order sanctions that were unduly severe was tainted by the false presumption that John Doe engaged in a predatory pattern of behavior and that somehow the women of Grinnell were in harm's way.   All Defendants ignored the holes in each complainant's account and held John Doe responsible for every sexual act that took place without exploring the accountability of either complainant or the idea of mutual consent under the Grinnell Policy.   They further asserted that John Doe was insusceptible to prior education on Title IX, discounting that (i) he had received further education <u>after</u> the events in question and (ii) he had not been accused of any acts of sexual misconduct since receiving further education on consent.   The sanction also failed to take into account that John Doe had a previously unblemished disciplinary record.

129.    Upon information and belief, Defendants were pressured by a campus activist group that was calling for harsher penalties for respondents in Title IX cases, a student complaint filed with OCR, and a pending OCR investigation that was commenced before the complaints were alleged against John Doe.   The Obama Administration's Department of Education pressured colleges and universities into following the Title IX investigative and adjudicatory process mandated by the 2011 Dear Colleague Letter regardless of due process considerations. Upon information and belief, Defendant Grinnell's mishandling of John Doe's case was wrongfully affected by federal pressure.

131.    The totality of circumstances establishes that Defendant Grinnell has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

132.    Upon information and belief, all students that have been suspended or expelled from Defendant Grinnell for sexual misconduct have been male.

133.    Male respondents in sexual misconduct cases at Defendant Grinnell are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the evidence or lack thereof.

134.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic and career opportunities, economic injuries and other direct and consequential damages.

135.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints.

## COUNT III
### (State Law Breach of Contract against Defendant Grinnell)

136.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

137.    Defendant Grinnell created express and/or implied contracts when John Doe accepted an offer of admission to Defendant Grinnell and paid the tuition and fees.

138.    Defendant Grinnell breached express and/or implied contracts with John Doe.

139.    Defendant Grinnell's Policy provides that students are to have a fair and impartial disciplinary process in which it is the responsibility of the College to show that a violation has occurred before any sanctions are imposed.  Defendant Grinnell breached its contract with John Doe when it failed to conduct a fair and impartial process, including not holding a hearing.  At no time was John Doe afforded the procedural guarantees that generally accompany a hearing, such as the right to present witnesses and evidence, confront one's accuser, and cross-examine and challenge any witnesses against him, all before an impartial and objective fact-finder.  Thus,

Defendants violated the contract with John Doe when they failed to afford him a proper hearing on the accusations against him.

140.     The U.S. Department of Education Office for Civil Rights requires that the excessively low preponderance of the evidence burden of proof be used to evaluate allegations of sexual misconduct.  Though an inadequate standard to protect the procedural rights of accused students, Defendant Grinnell utilizes this standard of review, as recognized in its Policy. Defendant Grinnell violated this provision when it improperly placed the burden of proof on John Doe to prove that the accusations against him were not true and when it failed to utilize the preponderance of the evidence standard in fact in reaching the outcome.  Defendant Grinnell therefore breached its contract with John Doe when it failed to utilize the requisite preponderance of the evidence standard.

141.     Based on the aforementioned facts and circumstances, Defendant Grinnell breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe.  Defendant Grinnell failed its duty of good faith and fair dealing when it meted out a disproportionate sanction notwithstanding the flawed process and lack of evidence in support of the allegations of sexual misconduct.

142.     John Doe is entitled to recover damages for Defendant Grinnell's breach of the express and/or implied contractual obligations described above.  As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

143.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT IV
### (State Law Estoppel and Reliance against Defendant Grinnell)

144.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

145.    Defendant Grinnell's various policies constitute representations and promises that Defendant Grinnell should have reasonably expected to induce action or forbearance by John Doe.

146.    Defendant Grinnell expected or should have expected John Doe to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Defendant Grinnell would not tolerate, and John Doe would not suffer, harassment by fellow students and would not deny John Doe his procedural rights should he be accused of a violation of Grinnell Policies.

147.    John Doe relied to his detriment on these express and implied promises and representations made by Defendant Grinnell.

148.    Based on the foregoing, Defendant Grinnell is liable to John Doe based on estoppel.

149.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

## COUNT V
### (State Law Negligent Misrepresentation against Defendants Grinnell, Moschenross, Voos, and Asberry)

150.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

151.    John Doe met with Defendants Moschenross, Voos and Asberry on November 17, 2015, to discuss the report filed by Jane Doe a month earlier.  At this meeting, Defendants told John Doe about Jane Doe's allegations, that Jane Doe did not wish to pursue a complaint against him, and that the allegations did not rise to the level of warranting an investigation.  Defendants further informed John Doe that the matter had been resolved through an informal resolution process.  At that time, it was John Doe's understanding that the matter was closed and that the College would take no further action in regard to Jane Doe's report.

152.    Defendants, as Grinnell's Title IX administrators, owed John Doe a duty to provide him with accurate information concerning the resolution of Jane Doe's report against him.  Defendants knew that John Doe would expect, and require, truthful disclosure from them about a report that could impact the further pursuit of his education at Grinnell and, potentially, his future.  Defendants further knew that, due to their positions as school administrators, John Doe would rely upon the information provided to him at the November 17, 2015 meeting.  John Doe did in fact rely on this information and believed that the matter was closed.  Accordingly, he continued his studies at Grinnell.

153.    John Doe was, understandably, shocked to discover in April 2016 that Defendants had been conducting a covert "assessment" of allegations against him, including those put to rest at the November 17, 2015 meeting.  He was further surprised to discover that the College had opened an investigation into a false pattern of conduct, premised on Jane Doe's report.  At this point, it became clear to John Doe that Defendants had provided false information to him at the November 17th meeting.

154.    The true reason behind the revival of Jane Doe's complaint was that Grinnell was now facing the OCR's scrutiny for using mediation to resolve Title IX complaints—which it had

done in Jane Doe's case while under investigation—and wanted to correct its error.  Not only did Defendants falsely inform John Doe that they were not investigating Jane Doe's allegations they used their covert assessment of these allegations to bias the investigation of Jane Roe's allegations against John Doe.  Defendants further influenced the adjudicator's assessment of the case by causing her to assume that a pattern existed.  This bias led to the imposition of the unwarranted and extreme sanction of expulsion against John Doe.

155.   As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against Defendants as follows:

(i)    on the first cause of action for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against Defendants awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements an injunction  enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints;

(ii)   on the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendants awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints;

(iii)    on the third cause of action for state law breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    on the fourth cause of action for state law breach estoppel and reliance, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)    on the fifth cause of action for state law negligent misrepresentation, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    awarding John Doe such other and further relief as the Court deems just, equitable and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

**Dated: March 2, 2017**

**Respectfully submitted,**

_____/s/ David H. Goldman_____

David H. Goldman, Esq.
Phillip F. Van Liew, Esq.
BABICH GOLDMAN, P.C.
501 S.W. 7th Street, Suite J
Des Moines, Iowa 50309
Telephone: (515) 244-4300
Email: dgoldman@babichgoldman.com
Email: pvanliew@babichgoldman.com

**-and-**

_____/s/ Andrew T. Miltenberg_____

Andrew T. Miltenberg, Esq. (*pro hac vice* pending)
Tara Davis, Esq. (*pro hac vice* pending)
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
Email: amiltenberg@nmllplaw.com
Email: tdavis@nmllplaw.com

**ATTORNEYS FOR PLAINTIFF JOHN DOE**