IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>        Plaintiff,<br><br>vs.<br><br>GRINNELL COLLEGE, SARAH MOSCHENROSS, ANGELA VOOS, and BAILEY ASBERRY,<br><br>        Defendants. | No. 4:17-cv-079-RGE-SBJ<br><br><br>**UNSEALED APPENDIX IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

TABLE OF CONTENTS FOR ENTIRE APPENDIX
(SEALED MATERIALS NOTED)

Community Standards (Exhibit D2) ............................................................DEF APP1-2

Policy (Exhibit P41).................................................................................DEF APP3-52

Excerpts of Former Policy (Exhibit D3)......................................................DEF APP53-56

Excerpts of Policy (Exhibit D4)..................................................................DEF APP57-58

Excerpts of Plaintiff's Deposition (SEALED) .............................................DEF APP59-68

Excerpts of Grinnell's 30(b)(6) Deposition (SEALED) ...............................DEF APP69-74

Excerpts of Voos Deposition (SEALED) .....................................................DEF APP75-98

Excerpts of Asberry Deposition (SEALED)................................................DEFAPP99-113

Excerpts of Moschenross Deposition (SEALED)........................................DEFAPP114-123

Excerpts of Conner Deposition (SEALED)..................................................DEFAPP124-134

Excerpts of Ternus Deposition (SEALED)...................................................DEFAPP135-148

Excerpts of Norton Deposition (SEALED) ..................................................DEFAPP149-154

*Huffington Post* Article (Exhibit P7) ..........................................................DEFAPP155-166

Draft Informal Resolution Summary (Exhibit P19) (SEALED) ..................DEFAPP167-169

Email (Exhibit P25) (SEALED) ...................................................................DEFAPP170

Notes (Exhibit P26) (SEALED) ....................................................................DEFAPP171-174

Kington Letter & Letter to Community (Excerpts of Exhibit P34) ..............DEFAPP175-194

Title IX Chart (Exhibit P37) (SEALED) ......................................................DEFAPP195-196

Outcome Letter (Exhibit P59) (SEALED) ....................................................DEFAPP197-200

Notes (Exhibit 73) (SEALED) .....................................................................DEFAPP201-203

Notes (Exhibit 74) (SEALED) .....................................................................DEFAPP204-207

Email (Exhibit P82) (SEALED) ...................................................................DEFAPP208-209

Notes (Exhibit P83) (SEALED) ...................................................................DEFAPP210-212

Emails (P84) (SEALED) ..............................................................................DEFAPP213-220

Emails (P85) (SEALED) ..............................................................................DEFAPP221

Notice of report (P86) (SEALED) ...............................................................DEFAPP222

Opinion on Jane Doe Report (Exhibit P112) (SEALED) .............................DEFAPP223-228

Opinion on Jane Roe Report (Exhibit P113) (SEALED) .............................DEFAPP229-236

Corrected Opinion on Jane Roe Report (Exhibit 114) (SEALED) ...............DEFAPP237-244

Recommended Educational Outcome (Exhibit 115) (SEALED) .................DEFAPP245-247

Final Report (addenda removed) (Excerpts P118) (SEALED).....................DEFAPP248-283

Emails (P120) (SEALED) ............................................................................DEFAPP284-285

Appeal (D13) (SEALED) .............................................................................DEFAPP286-288

Appeal Outcome (D15) (SEALED) ..............................................................DEFAPP289-294

Declaration of Angela Voos.........................................................................DEF APP295

.

/s/  Frank Boyd Harty
Frank Boyd Harty
Nyemaster Goode, P.C.
700 Walnut Street, Suite 1600
Des Moines, Iowa 50309
Telephone: 515-283-3100
Facsimile: 515-283-8045
Email: fharty@nyemaster.com

and

/s/ Frances M. Haas
Frances M. Haas
Nyemaster Goode, P.C.
625 First Street SE, Suite 400
Cedar Rapids, Iowa  52401
Telephone:  319-286-7000
Facsimile: 319-286-7050
Email:  fmhaas@nyemaster.com

ATTORNEYS FOR DEFENDANTS GRINNELL
COLLEGE, RAYNARD S. KINGTON, SARAH
MOSCHENCROSS, ANGELA VOOS, ANDREA
CONNOR, AND BAILEY ASBERRY

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 26, 2018 I electronically filed the foregoing document with the Clerk of Court using the ECF system which will send notification of such filing to the following:

David H. Goldman, Esq.
Phillip F. Van Liew, Esq.
BABICH GOLDMAN, P.C.
501 S.W. 7th Street, Suite J
Des Moines, Iowa  50309
Telephone:  (515) 244-4300
Email: dgoldman@babichgoldman.com
Email: pvanliew@babichgoldman.com

-AND-
Andrew T. Miltenberg, Esq. (*pro hac vice*)
Tara J. Davis, Esq. (*pro hac vice*)
Kara L. Gorycki, Esq. (*pro hac vice*)
Philip Byler, Esq. *(pro hac vice)*
NESNOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Telephone: (212) 736-4500
Email: AMiltenberg@nmllplaw.com
Email: tdavis@nmllplaw.com
Email: kgorycki@nmllplaw.com
Email: pbyler@nmllplaw.com

ATTORNEYS FOR PLAINTIFF JOHN DOE

/s/  *Shannon Greenman*_____

## Community Standards

Grinnell College is a residential community where self-governance and personal responsibility are hallmarks. As such, the following community standards build upon the Statement of Values and describe how students who are engaged in activities sponsored by the College act with integrity, honesty, and in a socially-just manner.

Because Grinnellians are expected to act with integrity at all times, these Community Standards are applicable to Grinnell College students both on campus and in the town of Grinnell. Egregious and/or repeated violations of these Standards in the town of Grinnell may be adjudicated through the College's conduct process.

**Standard One:** **Grinnellians act with integrity and consider how their actions will impact others.**

Self-governance is grounded in responsibility and respect for others. As such, it is important for Grinnell College community members to act with integrity. This means students will not commit academic dishonesty, or engage in disorderly or disruptive conduct on College premises or at College-sponsored activities that interferes with the activities of others – including but not limited to studying, teaching, research, and College administration. Furthermore, intentionally furnishing false information or reports to the College, making, possessing, or using any forged, altered, or falsified instrument of identification or College document is contrary to this Standard.

Violating published College regulations, rules, or policies is dishonorable and unacceptable behavior. Such regulations or policies may include the residence hall agreement form, alcohol agreement form, or the smoking policy.

Knowingly violating the terms of any educational outcome (sanction) imposed in accordance with this *Handbook*, and/or abusing the student conduct process – including but not limited to harassing or intimidating a member of a conduct review board or any participant prior to, during, or after a student conduct proceeding – is prohibited as these acts do not uphold this Standard.

**Standard Two:** **Grinnellians value the personal safety of themselves and other members of the Grinnell community.**

This includes harassment, sexual misconduct, domestic/dating partner violence, physical assault, threatening behavior, hazing, or any related activities aimed at



EXHIBIT
D2
74-02-18 SW Trubee

GRINNELL0007701
DEF APP 001

any member of the College community – including one's self – that harms someone physically or psychologically, or causes others to fear being harmed. Also prohibited are hate crimes and/or bias-motivated incidents – including but not limited to racial, ethnic, religious, sexual orientation, gender identity and expression, or sexual discrimination, threatening remarks or gestures that are directly and specifically intended for another individual – that interfere with or limits one's ability to attain his/her/hir educational goals. Reckless or intentional acts or destructive behavior which undermines another's basic dignity or self-esteem are contrary to this Standard.

The illegal or unauthorized use, possession, or storage of firearms, explosives, fireworks or other weapons in violation of College policy is not allowed in our community. Intentionally or recklessly misusing or damaging fire safety equipment, intentionally or recklessly setting a fire, activating a false fire alarm, and/or failing to comply with the directions of College officials, including Campus Safety & Security, who are acting in performance of their duties jeopardizes the safety of one's self and others and is prohibited.

**Standard Three:** Grinnellians respect personal and College property and role model good citizenship by abiding by local, state, and federal laws and accept the consequences for not adhering to them.

Destroying, damaging, misusing, or illegally possessing the property of the College, its members, or others – regardless of intent – is contrary to this Standard. This includes but is not limited to College-controlled keys, academic materials or instructional equipment (such as laboratory equipment, computers, electronic devices, or library materials), and personal belongings. Attempts to gain access to any portion of the College's premises (including College-owned or College-leased property) without authorization are a violation of this Standard.

The College enforces all relevant local, state, and federal laws regarding alcohol and illicit drugs and certifies itself to the federal government as a drug-free campus. It is the College's commitment to provide a living and learning environment that is free from the use, sale, possession, or distribution of illegal drugs, controlled substances, or drug paraphernalia, or the improper or abusive use of legal drugs or alcohol on Grinnell College premises. For further details, refer to the Alcohol and Other Drugs policy.

### GRINNELL COLLEGE POLICY, PROCEDURES AND GUIDE TO PREVENTING, REPORTING, AND RESPONDING TO SEXUAL MISCONDUCT AND OTHER FORMS OF INTERPERSONAL VIOLENCE

*Applies to all forms of sexual and gender-based harassment, sexual assault, sexual exploitation, intimate partner violence (including dating violence and domestic violence), stalking and retaliation.*

I.      Purpose and Intent
II.     Scope
III.    Related Policies
IV.     Title IX
V.      Privacy and Confidentiality
VI.     Prohibited Conduct
VII.    Consent and Related Concepts
VIII.   Prohibited Relationships by Persons In Authority
IX.     Resources and Support
X.      Reporting and Community Responsibility
XI.     Responding to a Report: Initial Assessment and Interim Measures
XII.    Informal and Formal Resolution Options
XIII.   Prevention and Education Programs

### I.      Purpose and Intent

Grinnell College is committed to providing a learning, living and working environment that is free from all forms of discrimination and harassment, including sexual and gender-based harassment, sexual misconduct, intimate partner violence, and stalking ( referred to collectively in this guide as Prohibited Conduct).  Grinnell College provides ongoing education and prevention programming and training in an effort to promote an environment free of sexual and other unlawful harassment and discrimination.  The College also strives to make reporting concerns and incidents of Prohibited Conduct a responsibility of the community so that affected individuals can be offered support and a range of resources that Grinnell has developed, and appropriate steps can be taken to assess the reported conduct, and as appropriate, eliminate the Prohibited Conduct, prevent its recurrence, and address its effects.

This document, referred to interchangeably as a policy or guide, contains the College's policies and procedures for preventing, reporting and responding to sexual misconduct and other forms of interpersonal violence.  The guide also contains information about options, resources, and remedies for all students, employees and third parties who have experienced or been affected by Prohibited Conduct.

All Grinnell College community members have a responsibility to adhere to College policies and local, state, and federal law.  Sexual misconduct and interpersonal violence, as used in this guide, are broad terms meant to capture the many varied forms of conduct that may impact our community.  Conduct prohibited under this policy poses a threat both to individual members of the Grinnell College community and to the community collectively.  These forms of

1



EXHIBIT
P 41
08-17-18 SW
PENGAD 800-631-6989

conduct represent a fundamental failure to recognize and respect the intrinsic worth and dignity of other members of the community. Acts of Prohibited Conduct are contrary to the values and standards of the Grinnell College community and against Grinnell College policy, and the College will respond accordingly, considering both the severity of the conduct and the threat it poses to the community. Individuals who are found responsible for Prohibited Conduct may receive educational outcomes or face corrective action up to and including dismissal for students and termination for employees.

The College is prepared to take all appropriate steps to prevent and correct Prohibited Conduct, including providing interim remedial and protective measures and support, conducting a Title IX review of the conduct, pursuing informal resolution, or taking formal conduct (corrective) action. Recognizing that each report has a unique context, the College will respond promptly and equitably while tailoring the solution to best fit the facts and circumstances.

This guide is intended to:

- Provide the Grinnell College community with a clear set of behavioral standards and Prohibited Conduct;

- Identify the Title IX Coordinator and Title IX Deputy Coordinators and outline the College's response to Prohibited Conduct under Title IX of the Education Amendments of 1972 (Title IX) and the Violence Against Women Reauthorization Act of 2013 (VAWA);

- Outline where a College community member can obtain support and/ or access resources confidentially, both on campus and in the local community;

- Explain how a College community member can make a report to the College and/or to law enforcement;

- Outline the reporting responsibilities of College employees so that College community members understand how and where their information will be shared;

- Identify the range of interim measures and other supportive resources available following a report of Prohibited Conduct to the College; and,

- Provide information about the options for resolving a report of Prohibited Conduct, including how a report against a student, employee or third party will be investigated, evaluated, and adjudicated by the College.

This guide uses the term Complainant to refer to the individual(s) who has experienced a possible instance of Prohibited Conduct, regardless of whether that individual makes a report

2

Confidential

**DEF APP 004**
GRINNELL0001879

or seeks formal conduct (corrective) action under this policy.  The term Respondent refers to the individual(s) who has been accused of Prohibited Conduct.

Retaliation or reprisal against *any* person, including the Complainant(s) or the Respondent(s), for making a report in good faith, cooperating with an investigation, or participating in a grievance procedure is a violation of the College's non-retaliation policy.  Retaliation should be reported promptly to the Title IX Coordinator for investigation, which may result in conduct (corrective) action independent of any educational outcome (corrective action) or interim measures imposed in response to the underlying allegations of prohibited conduct.  The College will promptly respond to any act of Retaliation.

II.    **Scope**

This policy prohibits Prohibited Conduct by or against all members of the Grinnell College community.  It applies to all students, employees, volunteers, independent contractors, and visitors, including any individuals regularly or temporarily employed, studying, living, visiting, conducting business, or having any official capacity at Grinnell College.  It also applies to community members of any gender, gender identity, gender expression, or sexual orientation.

The College has jurisdiction over Prohibited Conduct occurring on campus or in the context of any College program or activity, regardless of where it occurs.  The College also has jurisdiction over Prohibited Conduct occurring off campus, during semester breaks, or between semesters, if the Complainant(s) and/or Respondent(s) are Grinnell College students and the off-campus conduct is likely to have continuing adverse effects on campus life and activities, or if the conduct poses a threat of danger to any member of the Grinnell College community.

III.    **Related Policies**

A.    **Non-Discrimination Policy**

The College does not discriminate on the basis of race, color, ethnicity, national origin, age, sex, gender, sexual orientation, pregnancy, childbirth, gender identity or expression, marital status, veteran status, religion, disability, creed or any other protected class.  Grinnell College is committed to a policy of nondiscrimination in matters of admission, employment, and housing, and in access to and participation in its education programs, services, and activities.  Discrimination or harassment on any of the bases covered by state or federal antidiscrimination statutes is unlawful and a violation of the Grinnell College Non-Discrimination Policy.

Grinnell College recognizes that harassment can relate to an individual's membership in more than one protected class.  Targeting individuals on the basis of their membership in any protected class is also a violation of Grinnell's Community Standards and Responsibilities and may violate the College's Hate Crime and Bias-Motivated Incident Policy.  Under these circumstances, the College will coordinate the investigation and

3

Confidential

resolution, provided that doing so does not unduly delay prompt and equitable resolution under this policy.

This policy prohibits sexual harassment, sexual violence, sexual assault, and intimate partner violence against Grinnell College community members of any gender, gender identity, gender expression, or sexual orientation. This policy also prohibits gender-based harassment that does not involve conduct of a sexual nature.

### B.  Academic Freedom and Integrity

The application of the College's nondiscrimination policies will often involve conflicting interests. This may especially be the case when it is applied to questions of freedom of speech and freedom of association. Because of these inherent difficulties, the evaluation of verbal or written conduct may not be simple or straightforward. The primary mission of the College is liberal education. Liberal education cannot take place without the free, open, and civil exchange of ideas. As such, the application of this policy will strive to consider how best to preserve that free, open, and civil exchange of ideas. The College believes that ideas, creativity, and free expression thrive and, indeed, can only exist for the entire community in an atmosphere free of discrimination and sexual harassment. The essential importance of academic freedom is recognized, and a standard of reasonableness will guide the College. Only when academic freedom is used to disguise, or is the vehicle for Prohibited Conduct, will it be questioned.

### C.  Pregnant and Parenting Students, Faculty, and Staff

Grinnell College does not discriminate against a student, staff, or faculty member because of her pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery from pregnancy/childbirth. Faculty and staff members may refer to maternity leave in the faculty and staff handbooks under FMLA and Iowa Civil Rights Act. Students are provided equal access to curricular and extra-curricular activities and will be excused from activities and classes as is deemed necessary by the student's doctor and will be given a reasonable amount of time to make up work that she misses. A pregnant student may continue her studies and activities for as long as she wants, unless the student and her physician decide otherwise.

> **Pregnant Student Athletes:** Grinnell College adheres to the NCAA options as described below by the National Association of College and University Attorneys (NACUA). The following is excerpted from Gender Equity: Pregnant and Parenting Student Athletes, NACUA 2003.
>
> NCAA bylaws offer student-athletes extensions that may apply during a student's athletic career, typically referred to as a "red-shirted" year. Under these rules, student-athletes may be granted an additional year of competition due to "hardship." These rules allow student-athletes to complete four seasons of participation during the first 10 semesters or 15 quarters in which the student is

4

**DEF APP 006**
GRINNELL0001881

enrolled in a collegiate institution in at least a minimum full-time program of studies for Divisions II and III.

In addition, NCAA bylaws specifically permit member institutions to approve an extra one-year extension of the five-year period or 10- semester/15-quarter period of eligibility for a female student-athlete due to her pregnancy. The bylaw allows pregnant student-athletes to complete four years of competition within six years or 12 semesters/18 quarters. A pregnant student-athlete who competed during, but did not complete the season, may be granted a hardship waiver and be awarded an additional season of competition, provided there is contemporaneous medical documentation that indicates the student-athlete was unable to compete for the remainder of the season.

**D.      Child Abuse Reporting Policy**

In compliance with <u>Iowa Code 261.9 (1)(h): Child Abuse Reporting Law</u>, the College will report all suspected child abuse and neglect involving minors, including sexual assault, to <u>law enforcement</u> and <u>Campus Safety and Security</u>.  College employees who, in the scope of their employment responsibilities, examine, attend, counsel, or treat a child must report physical or sexual child abuse to law enforcement and Campus Safety and Security when they see, know about, or reasonably suspect the physical or sexual abuse of a child.  This includes most College employees, including, but not limited to, faculty, coaches, student employees, administrators and staff.  If an employee is not sure whether he/she/zi is required to report, he/she/zi is encouraged to err on the side of caution and report.

The College must act immediately in response to suspected sexual or physical abuse of a minor.  It is not the responsibility of any employee, student, or volunteer to investigate suspected child abuse.  This is the role of child protective services and law enforcement authorities.  The source of abuse does not need to be known in order to file a report.

A report must be made as follows:

- In the event of an emergency, first call the police (911).

- Suspected abuse must be reported within twenty-four hours to both:

    o  **Grinnell Police Department Dispatch Center**: 641-623-5679 *and*

    o  **Grinnell College Campus Safety and Security**: 641-269-4600

- Additionally, you may choose to report to:

    o  **Iowa Department of Human Services**: 800-362-2178

5

Confidential

**DEF APP 007**
GRINNELL0001882

When reporting suspected child abuse, the community member will need to provide the following information to the best of his/her/hir knowledge:

- Name of the alleged victim(s)

- Name of the alleged perpetrator(s)

- Time and date of the incident(s) being reported

- Location where the incident(s) occurred; and

- Any additional information supporting the suspicion that misconduct has occurred.

The College will attempt to protect the identity of any employee who makes a good faith report of suspected physical or sexual abuse of a child.  If an employee or faculty member feels that he/she/zi is being retaliated against for making a good faith report of suspected physical or sexual abuse of a minor or because he/she/zi has aided and assisted in the assessment of a child abuse report, he/she/zi must report this immediately to the Assistant Vice President of Human Resources.

**E.      Conflict of Interest Policy**

Grinnell College has an obligation to demonstrate and document good governance in order to protect the integrity and credibility of the College and to maintain the trust and confidence of our constituents.  All College employees involved in investigating or resolving a report of Prohibited Conduct will receive appropriate training in support of their role, and will be impartial and free from actual conflict of interest or bias.  The College maintains a separate Conflict of Interest Policy.  The Policy is also intended to address conflicts that arise when a College employee's personal interests or relationships conflict with the ability of such employee to act in a neutral manner with regard to a complaint against a faculty member, staff member or student.

**IV.   Title IX**

**A.      Notice of Non-Discrimination under Title IX**

Grinnell College does not discriminate on the basis of sex in its educational, extra- and co-curricular, athletic, or other programs, or in the context of employment. Sex discrimination, which includes sexual and gender-based harassment and violence, is prohibited by Title IX of the Education Amendments of 1972, a federal law that provides that:

> *No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.*

6

Confidential

Sexual harassment is also prohibited under Title VII of the Civil Rights Act of 1964, Iowa Code Section 216.9, Iowa Code Section 216.6, and other applicable statutes. In addition, the College's response to sexual assault, dating violence, domestic violence and stalking is governed by the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (Clery Act), as amended by relevant provisions of the Violence Against Women Reauthorization Act of 2013 (VAWA).

The College, as an educational community, will promptly and equitably respond to reports of Prohibited Conduct in order to eliminate the conduct, prevent its recurrence, and address its effects on any individual or the community.

Title IX provides educational processes, remedies, and outcomes. Conduct that violates Title IX may also constitute criminal conduct under local, state, or federal laws. While the College will act using the educational lens of Title IX, Complainants always have the option to report Prohibited Conduct to the appropriate law enforcement agencies, and will be fully supported by the College in doing so.

**B.      Role of the Title IX Coordinator**

The President of the College has appointed a senior administrator, the Vice President for Strategic Planning and Chief of Staff, to serve as Title IX Coordinator. This office is currently held by Angela Voos. The Title IX Coordinator can be contacted by telephone, e-mail, or in person during regular office hours (8 a.m. - 5 p.m., Monday-Friday; 7:30 a.m. - 4:30 p.m., Monday-Friday during summer hours).

> Angela Voos, Title IX Coordinator
> Nollen House
> 1121 Park St.
> Grinnell, IA 50112
> 641-269-4999
> voos@grinnell.edu

The Title IX Coordinator oversees the College's centralized review, investigation, and resolution of reports of Prohibited Conduct. The Title IX Coordinator also coordinates the College's compliance with Title IX. The Title IX Coordinator is:

- Responsible for oversight of the investigation and resolution of all reports of Prohibited Conduct;

- Knowledgeable and trained in relevant state and federal laws and College policy and procedure;

- Available to advise any individual, including a Complainant or Respondent, about the courses of action available at the College, both informally and formally;

7

Confidential

**DEF APP 009**
GRINNELL0001884

- Available to provide assistance to any College member regarding how to respond appropriately to reports of Prohibited Conduct;

- Responsible for monitoring full compliance with all requirements and timelines specified in the complaint procedures; and

- Responsible for compiling Annual Reports.

**C.**     **Role of the Title IX Deputies**

Title IX Deputy Coordinators who can also offer assistance in the areas of conduct process, prevention, athletics, confidential response and support, and case management are available in the following offices:

> Jen Jacobson '95, Director of Student Wellness and Prevention
> **Deputy Title IX Coordinator for Prevention**
> 641-269-3704 | jacobsen@grinnell.edu
> BEAR Center   Office F201

> Sarah Moschenross, Dean of Students
> **Deputy Title IX Coordinator for Student Conduct Process**
> 641-269-3714 | moschenr@grinnell.edu
> JRC 3rd Floor

> Jeff Pedersen '02, Assistant Professor of Physical Education, Head Football Coach and Assistant Track Coach
> **Deputy Title IX Coordinator for Athletics**
> 641-269-4848 | pedersej@grinnell.edu
> BEAR Center   Office F138

> Deanna Shorb, Dean of Religious Life
> **Deputy Title IX Coordinator for Confidential Response and Support**
> 641-269-4981 | shorb@grinnell.edu
> CRSSJ 1233 Park St.

> Bailey Thompson, Strategic Planning Assistant
> **Deputy Title IX Coordinator for Case Management**
> 641-269-4999 | thompsob@grinnell.edu
> Nollen House

**D.**     **The Title IX Team**

The Title IX Coordinator is supported by an interdepartmental Title IX team, comprised of Deputy Title IX Coordinators, the Dean of Students, Dean of the College, Assistant Vice President of Human Resources, the Director of Campus Safety and Security, and others as may be necessary.

8

Confidential

**DEF APP 010**
GRINNELL0001885

To achieve a learning, living, and working environment that fosters a productive and comfortable learning space and workplace, the College encourages all community members to report Prohibited Conduct. Although a report may come in through many sources, the College is committed to ensuring that all reports are referred to the Title IX team to ensure consistent application of the policy to all individuals and allow the College to respond promptly and equitably to eliminate the reported conduct, prevent its recurrence, and address its effects. This team, led by the Title IX Coordinator, assists in the review, investigation, and/or resolution of the report.

The members of this team oversee the resolution of reported conduct through the College's grievance procedures. The process followed will be determined by the role of the Respondent (e.g., student, staff member or faculty member). Each process is guided by the same principles of equity, fairness and respect for all parties. Resources are available for both students and employees, whether as Complainants or Respondents, to provide guidance throughout the investigation and resolution of the complaint.

Inquiries or complaints concerning the application of Title IX may be referred to the College's Title IX Coordinator and/or to the United States Department of Education's Office for Civil Rights, Region Five, 500 West Madison St.; Suite 1475, Chicago, IL, 60661, Tel: 312-730-1560 (U.S. Office for Civil Rights). Questions about violations of Iowa statutes can be directed to The Iowa Civil Rights Commission. Employees may also file complaints with the U.S. Equal Employment Opportunity Commission.

## V.   Privacy and Confidentiality

The College is committed to protecting the privacy of all individuals involved in a report of Prohibited Conduct. In any report, investigation, or resolution of a report under this policy, every effort will be made to protect the privacy interests of all individuals involved in a manner consistent with the need for a thorough review of the allegation(s).

### A.   The Distinction Between Privacy and Confidentiality

**Privacy:** Privacy means that information related to a report under this policy will only be shared with those College employees who "need to know" in order to assist in the review, investigation, or resolution of the report. Moreover, all College employees who are involved in the College's Title IX response, including outside adjudicators, receive specific training and guidance about safeguarding private information.

The privacy of student education records will be protected in accordance with the College's policy for compliance with the Family Educational Rights and Privacy Act (FERPA). The privacy of an individual's medical and related records generally are protected in the United States by the Health Insurance Portability and Accountability Act (HIPAA), excepting health records protected by FERPA. Access to personnel records is restricted in accordance with Grinnell College policy.

9

Confidential

**DEF APP 011**
GRINNELL0001886

**Confidentiality:** Confidentiality means that information shared by an individual with designated campus or community professionals cannot be revealed to any other person without express permission of the individual, or as otherwise permitted or required by law. Community members wishing to seek <u>confidential</u> assistance may do so by speaking with professionals who have a statutorily-protected or designated confidentiality. For students, these professionals include the counseling and medical staff at Student Health and Counseling Services (SHACS), the Chaplain and Associate Chaplain, Ombuds, and Grinnell Advocates. Employees may also access confidential assistance through the Employee Assistance Program. These individuals are prohibited from breaking confidentiality unless (i) given permission to do so by the person who disclosed the information; (ii) there is an imminent threat of harm to self or others; (iii) the conduct involves suspected abuse of a minor under the age of 18; or (iv) as otherwise required or permitted by law or court order.

**B.      Employee Reporting Responsibilities**

With the exception of designated confidential resources, all College employees, including students in leadership positions or volunteers responsible for the welfare of other students, are **required** to share information about Prohibited Conduct with the Title IX Coordinator. Examples of students who have a duty to share information with the Title IX Coordinator include, but are not limited to Student Advisers (SAs) and Student Government Association (SGA) executives.

The Title IX Coordinator is supported by a Title IX team, comprised of Deputy Title IX Coordinators and the Dean of Students, Dean of the College, Assistant Vice President of Human Resources, the Director of Campus Safety and Security, and others as may be necessary. This team, led by the Title IX Coordinator, will conduct an initial assessment of the conduct, the Complainant's expressed course of action, and the necessity for any interim remedial or protective measures to protect the safety of the Complainant or the community. As set forth in Section XI.B (titled Complainant Agency and Autonomy), the College will balance a Complainant's request for a particular course of action with its dual obligation to provide a safe and non-discriminatory environment for all Grinnell College community members.

**C.      Release of Information**

The College complies with the Clery Act, which requires the College to inform community members about certain crimes that occur on or near campus and are reported to designated employees of the College. Consistent with the Clery Act, if a report of Prohibited Conduct discloses a serious or continuing threat to the College campus community, the College may issue a timely warning to protect the health or safety of its members. The timely warning will not include any identifying information about the Complainant. The College may also share non-identifying information about reports received in the College's daily crime log, the Annual Security Report or in aggregate form, including data about educational outcomes (sanctions) in College

10

**DEF APP 012**
GRINNELL0001887

publications. In addition, the College will provide annual crime statistics to the U.S. Department of Education.

All College proceedings are conducted in compliance with the requirements of FERPA, the Clery Act, Title IX, Iowa law, and College policy. No information shall be released from such proceedings except as required or permitted by law and College policy.

## VI.    Prohibited Conduct

The College prohibits all forms of sexual and gender-based harassment, sexual misconduct, intimate partner violence and other forms of interpersonal violence. These are umbrella terms which encompass a broad range of behavior. Grinnell College community members are fully supported in using the words that they feel express and/or represent their experience - including words like rape, abuse, attack, or fondling - even when the College policy uses these other, more overarching terms when adjudicating and classifying allegations. Within these broad categories, the College specifically prohibits sexual or gender-based harassment, sexual assault, sexual exploitation, intimate partner violence/relationship abuse, stalking, and retaliation.

Examples of Prohibited Conduct can be found on the College's Sexual Respect website. An individual who is uncertain about whether their experience meets one of the definitions below should consult with the Title IX Coordinator. In all instances, the College encourages reporting of conduct that is unwelcome or harassing, regardless of whether it appears to meet one of the stated definitions below. The Title IX Coordinator can assist an individual in identifying available courses of action based on the conduct at issue.

### A.    Harassment on the Basis of Sex or Gender

#### 1.    Sexual Harassment

Sexual harassment is any unwelcome sexual advance, request for sexual favors, or other unwanted verbal or physical conduct of a sexual nature when one of the following conditions is present:

- Submission to or rejection of such conduct is an explicit or implicit condition of an individual's employment, evaluation of academic work, or participation in social, co- or extra-curricular activities (*quid pro quo*); or

- Submission to or rejection of such conduct is used as the basis for decisions affecting that individual (*quid pro quo*); or

- Such conduct is sufficiently severe, persistent or pervasive that it unreasonably interferes with an individual's work or academic

11

Confidential

**DEF APP 013**
GRINNELL0001888

performance by creating an intimidating, hostile, or offensive working, academic, or social environment under both an objective and subjective standard (*hostile environment*).

## 2.    Gender-Based Harassment

Gender-based harassment includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical, or otherwise, even if the acts do not involve conduct of a sexual nature when one of the following conditions is present:

- Submission to or rejection of such conduct is an explicit or implicit condition of an individual's employment, evaluation of academic work, or participation in social, co- or extra-curricular activities (*quid pro quo*); or

- Submission to or rejection of such conduct is used as the basis for decisions affecting that individual (*quid pro quo*); or

- Such conduct is sufficiently severe, persistent or pervasive that it unreasonably interferes with an individual's work or academic performance by creating an intimidating, hostile, or offensive working, academic, or social environment under both an objective and subjective standard (*hostile environment*).

## 3.    Evaluating a Hostile Environment

In evaluating whether a hostile environment exists under either sexual or gender-based harassment, the College will consider the totality of known circumstances, including, but not limited to:

- The frequency, nature and severity of the conduct;
- Whether the conduct was physically threatening;
- The effect of the conduct on the Complainant's mental or emotional state;
- Whether the conduct was directed at more than one person;
- Whether the conduct arose in the context of other discriminatory conduct;
- Whether the conduct unreasonably interfered with the Complainant's educational or work performance and/or University programs or activities; and
- Whether the conduct implicates concerns related to academic freedom or protected speech.

12

Confidential

**DEF APP 014**
GRINNELL0001889

A hostile environment can be created by persistent or pervasive conduct or by a single or isolated incident, if sufficiently severe. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical. A single incident of sexual assault, for example, may be sufficiently severe to constitute a hostile environment. In contrast, the perceived offensiveness of a single verbal or written expression, standing alone, is typically not sufficient to constitute a hostile environment.

4.     **Additional Guidance about Sexual or Gender-Based Harassment**

Sexual or gender-based harassment:

- May be blatant and intentional and involve an overt action, a threat or reprisal, or may be subtle and indirect, with a coercive aspect that is unstated.

- Does NOT have to include intent to harm, be directed at a specific target, or involve repeated incidents.

- May be committed by anyone, regardless of gender, age, position, or authority. While there is often a power differential between two persons, perhaps due to differences in age, social, educational, or employment relationships, harassment can occur in any context.

- May be committed by a stranger, an acquaintance, or someone with whom the Complainant has an intimate or sexual relationship.

- May be committed by or against an individual or group.

- May occur by or against an individual of any sex, gender identity, gender expression, or sexual orientation.

- May occur in the classroom, in the workplace, in residential settings, or in any other setting.

- May be a one-time event or can be part of a pattern of behavior.

- May be committed in the presence of others or when the parties are alone.

- May affect the Complainant and third parties who witness or observe harassment and are affected by it.

13

Confidential

**DEF APP 015**
GRINNELL0001890

**B.      Sexual Assault**

Sexual assault means having or attempting to have sexual intercourse or sexual contact with another individual without consent. This includes sexual intercourse or sexual contact achieved by the use or threat of force or coercion, where an individual does not consent to the sexual act, or where an individual is incapacitated. Sexual assault includes the following acts:

> **Related to Non-consensual Sexual Intercourse:** Having or attempting to have sexual intercourse with another individual without consent. Sexual intercourse includes vaginal or anal penetration, however slight, with a body part or object, or oral copulation by mouth-to-genital contact.

> **Related to Non-consensual Sexual Contact:** Having or attempting to have sexual contact with another individual without consent. Sexual contact includes kissing, touching the intimate parts of another, causing the other to touch one's intimate parts, causing the other to touch their own intimate parts, or disrobing or exposure of another without permission. Intimate parts may include the breasts, groin, genitals, buttocks, mouth or any other part of the body that is touched in a sexual manner. Non-consensual Sexual Contact can occur whether individuals are clothed or unclothed.

**C.      Sexual Exploitation**

Sexual exploitation is knowingly committing non-consensual abuse or exploitation of another person's sexuality for the purpose of sexual gratification, financial gain, personal benefit or advantage, or any other non-legitimate purpose. Examples include, but are not limited to:

- Observing, recording or photographing another individual's nudity or sexual activity or allowing another to observe, record or photograph consensual sexual activity without the knowledge and consent of all parties involved in a place where the individual would have a reasonable expectation of privacy;

- Streaming or distribution of private images, photography, video or audio recording of sexual activity or nudity without the knowledge and consent of all parties involved;

- Prostituting another individual;

- Exposing one's genitals in non-consensual circumstances;

- Exposing another individual to a sexually transmitted infection or virus without his/her/hir knowledge; and

14

Confidential

> - Inducing incapacitation for the purpose of making another person vulnerable to non-consensual sexual activity.

**D.    Intimate Partner Violence/Relationship Abuse/Dating Violence/Domestic Violence**

Intimate partner violence is also referred to as dating violence, domestic violence, and relationship abuse or violence. Intimate partner violence includes any act of violence or threatened act of violence against a person who is or has been involved in a sexual, dating, domestic, or other intimate relationship by the other person in the relationship. It may involve one act or an ongoing pattern of behavior. Intimate partner violence, may take the form of threats, assault, property damage, violence or threat of violence to one's self, one's sexual or romantic partner, and/or to the family members or friends of the sexual or romantic partner. Intimate partner violence affects individuals of all genders, gender identities and expressions, sexual orientation, and racial, ethnic, social, and economic backgrounds. Intimate partner violence can encompass a broad range of behavior, including, but not limited to:

- physical violence
- sexual violence
- emotional violence
- economic abuse
- threats
- assault
- property damage
- violence or threat of violence to one's self, one's sexual or romantic partner, and/or to the family members or friends of the sexual or romantic partner.

The College will not tolerate intimate partner violence of any form. For the purposes of this policy, the College does not define intimate partner violence as a distinct form of misconduct. Rather, the College recognizes that sexual and gender-based harassment, sexual assault, sexual exploitation, stalking, and retaliation may all be forms of intimate partner violence when committed by a person who is or has been involved in a sexual, dating, or other social relationship of a romantic or intimate nature with the Complainant.

**E.    Stalking**

Stalking is a course (more than once) of unwelcome conduct directed toward another person that could be reasonably regarded as likely to alarm, harass, and/or cause reasonable fear of harm or injury to that person, or to a third party, such as a roommate or friend. The feared harm or injury may be physical, emotional, or psychological, to the personal safety, property, education, or employment of that individual. Stalking includes the concept of cyber-stalking, a particular form of stalking in which electronic media

Confidential

**DEF APP 017**
GRINNELL0001892

such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact are used.

Stalking can look like:

- Unwelcome and repeated visual or physical proximity to a person;

- Repeated oral or written threats;

- Extortion of money or valuables;

- Implicitly threatening physical conduct or any combination of these behaviors directed toward an individual person.

- Unwelcome/unsolicited emails, instant messages, and messages on on-line bulletin boards;

- Unwelcome/unsolicited communications about a person, their family, friends, or co-workers; and/or

- Sending/posting unwelcome/unsolicited messages with another username.

**F.      Retaliation**

Retaliation means any adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in any proceeding under this policy. Retaliation includes threatening, intimidating, harassing, coercing or any other conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct. Retaliation can be committed by any individual or group of individuals, not just by a Respondent or Complainant. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct.

**VII.   <u>Consent and Related Concepts</u>**

**A.      Consent**

This policy is based on affirmative consent. In the spring of 2012, the Grinnell College student body voted overwhelmingly to revise the then-existing Sexual Harassment and Misconduct policy to incorporate affirmative consent. Consent to engage in sexual activity must be given knowingly, voluntarily, and affirmatively. Consent to engage in sexual activity must exist from the beginning to end of each instance of sexual activity and for each form of sexual contact. Consent is demonstrated through mutually understandable words and/or clear, unambiguous actions that indicate a willingness to engage freely in sexual activity. Consent is active, not passive.

16

Confidential

- Each participant in a sexual encounter is expected to obtain and give consent to each act of sexual activity.  Consent to one form of sexual contact does not constitute consent to engage in all forms of sexual contact.

- Consent consists of an outward demonstration indicating that an individual has freely chosen to engage in sexual activity.  Relying on non-verbal communication can lead to misunderstandings or potential policy violations.  Consent may not be inferred from silence, passivity, lack of resistance, or lack of an active response alone.  A person who does not physically resist or verbally refuse sexual activity is not necessarily giving consent.

- If at any time it is reasonably apparent that either party is hesitant, confused, or unsure, both parties should stop and obtain mutual verbal consent before continuing such activity.

- Consent may be withdrawn by either party at any time.  Withdrawal of consent must also be outwardly demonstrated by mutually understandable words or clear, unambiguous actions that indicate a desire to end sexual activity.  Once withdrawal of consent has been expressed, sexual activity must cease.

- Individuals with a previous or current intimate relationship do not automatically give initial or continued consent to sexual activity.  Even in the context of a relationship, there must be mutually understandable communication that clearly and unambiguously indicates a willingness to engage in sexual activity.

- Consent is not affirmative if it results from the use or threat of physical force, intimidation, or coercion, or any other factor that would eliminate an individual's ability to exercise his/her/hir or own free will to choose whether or not to have sexual contact.

- An individual who is physically incapacitated from alcohol and/or other drug consumption (voluntarily or involuntarily), or is unconscious, asleep, unaware, or otherwise mentally or physically helpless is considered unable to give consent.

- In the state of Iowa, consent can never be given by minors under the age of 16.

When evaluating consent, the College will consider the objectively apparent indicia of consent (or lack of consent) from a reasonableness perspective.

17

Confidential

**B.     Coercion**

Coercion is direct or implied threat of force, violence, danger, hardship, or retribution sufficient to persuade a reasonable person of ordinary susceptibility to perform an act which otherwise would not have been performed or acquiesce in an act to which one would not have submitted.  Coercion can include unreasonable and sustained pressure for sexual activity.  Coercive behavior differs from seductive behavior based on the type of pressure someone uses to get consent from another.  A person's words or conduct cannot amount to coercion unless they wrongfully impair the other's freedom of will and ability to choose whether or not to engage in sexual activity.  When someone makes it clear that he/she/zi does not want to engage in sexual activity, that he/she/zi wants to stop, or that he/she/zi does not want to go past a certain point of sexual interaction, continued pressure beyond that point can be coercive.

**C.     Force**

Force is the use or threat of physical violence or intimidation to overcome an individual's freedom to choose whether or not to participate in sexual activity.

**D.     Incapacitation**

An individual who is incapacitated cannot consent to sexual activity. Incapacitation is defined as the inability, temporarily or permanently, to give consent, because an individual is mentally and/or physically helpless, asleep unconscious, or unaware that the sexual activity is occurring.  Incapacitation means that a person lacks the ability to make informed, rational judgments about whether or not to engage in sexual activity. Where alcohol and/or other drugs (including prescription drugs) are involved, incapacitation is a state beyond drunkenness or intoxication.  A person is not incapacitated merely because they have been drinking or using drugs. The impact of alcohol and other drugs varies from person to person.  Although every individual may manifest signs of incapacitation differently, typical signs that a person may be approaching incapacitation may include slurred or incomprehensible speech, vomiting, unsteady gait (i.e., a manner of walking, stepping, or running), incontinence, odor of alcohol or other substance, combativeness, and/or emotional volatility.

An individual who engages in sexual activity with someone the individual knows or reasonably should know is incapable of making a rational, reasonable decision about whether to engage in sexual activity is in violation of this policy.  This includes persons whose incapacity results from ingestion of a "date-rape" or "predatory" drug. Possession, use, and/or distribution of any of these drugs, including Rohypnol, Zolpidem, Ketamine, GHB, Burundanga, etc., is prohibited, and administering one of these drugs to another person for the purpose of inducing incapacity is prohibited under College policy and state criminal statutes.

18

Confidential

E.      **Alcohol and/or Other Drugs**

In general, the College considers sexual contact and/or intercourse while under the influence of alcohol and/or other drugs to be risky behavior. Alcohol and other drugs impair a person's decision-making capacity, awareness of the consequences, and ability to make informed judgments. From the perspective of the Complainant, the use of alcohol and/or other drugs can limit a person's ability to give consent knowingly, voluntarily, and affirmatively. From the perspective of a Respondent, the use of alcohol and/or other drugs can create an atmosphere of confusion over whether or not consent has been given knowingly, voluntarily, and affirmatively. It is especially important, therefore, that anyone engaging in sexual activity be aware of the other person's level of intoxication. If there is any doubt as to the level or extent of the other individual's intoxication or impairment, the prudent course of action is to forgo or cease any sexual contact or activity.

The perspective of a reasonable person will be the basis for determining whether a Respondent should have been aware of the extent and amount of the ingestion of alcohol and/or other drugs by the Complainant or of the extent to which the use of alcohol and/or other drugs impacted a Complainant's ability to give consent. For example, an individual who is in a blackout may appear to act normally and be giving consent but may not actually have conscious awareness, the ability to consent, or later recall the events in question. The extent to which a person in this state affirmatively gives mutually understandable words and/or clear, unambiguous actions indicating a willingness to engage in sexual activity and the other person is unaware – or reasonably could not have known – of the person's level of alcohol consumption and/or level of impairment must be evaluated in determining whether consent has been given.

Being intoxicated or impaired by alcohol and/or other drugs is never an excuse for an act of Prohibited Conduct and does not diminish one's responsibility to obtain consent.

VIII.   **Prohibited Relationships by Persons in Authority**

When there is no supervisory relationship between students, or between members of the faculty, or between staff members, or between faculty and staff members, any recommendations by the College concerning consensual sexual relations would constitute an unacceptable invasion of privacy.

Even when there are supervisory relationships, no institutional mission exists which would pre-empt individual rights to privacy. However, faculty, staff, and others (including volunteers) who educate, supervise, evaluate, employ, counsel, coach, and/or otherwise guide students should understand the power differential in the relationship they have with students and/or subordinates. In cases involving a student who meets the legal age of consent in his or her state, there will still be a strong presumption that sexual activity between an adult school employee and a student is unwelcome and

19

Confidential

**DEF APP 021**
GRINNELL0001896

nonconsensual.[1] Intimate or sexual relationships where there is a differential in power or authority produce risks for every member of the community, and they undermine the professionalism of faculty and staff.

Unlike relationships where no basic institutional interests are at stake, such as those between members of the faculty or between members of the faculty and the staff, relationships between faculty/staff members and students should be informed by the goals of Grinnell College as an institution of higher education. Both faculty and staff members are expected to maintain professional, non-sexual relations with students.

When a member of the faculty or the staff is in a position to educate, supervise, evaluate, employ, counsel, coach, and/or otherwise guide a student, sexual relations are unconditionally unacceptable. When such a supervisory relationship is present, sexual relations are clearly detrimental to the educational process and to an environment free of favoritism and the appearance of favoritism.

Even when no supervisory relationship is present, sexual intimacy between a student and a member of the faculty or staff can be detrimental to the ideal of a professional educational environment. Although the initiator of a sexual relationship may be a student, it is the institutional responsibility of the faculty or staff member to address such a situation, at its inception, in a professional manner. Moreover, a member of the faculty or staff against whom a student makes a complaint of sexual harassment may find it difficult, because of the difference of status between the two persons, to prove that the relationship at issue was a fully consensual one.

Any individual may file a complaint alleging harassment and/or discrimination, including an aggrieved party outside the relationship affected by the perceived harassment or discrimination. Retaliation against any person(s) who report concerns about potentially non-consensual relationships is prohibited and constitutes a violation of this policy.

## IX.   Resources and Support

### A.   Overview

The College is committed to treating all members of the community with dignity, empathy, and respect. Any individual affected by Prohibited Conduct, whether as a Complainant, a Respondent, or other individual, will have equal access to support and counseling services through the College. The College recognizes that deciding whether or not to make a report and choosing how to proceed can be difficult decisions. We encourage any individual who has questions or concerns to seek the support of campus and community resources. These resources can provide guidance in making decisions, information about available resources and procedural options, and assistance to either

---

[1] Page 4 – Questions and Answers on Title IX and Sexual Violence, OCR

Confidential

**DEF APP 022**
GRINNELL0001897

party in the event that a report and/or resolution under this policy is pursued. Individuals are encouraged to use all available resources, regardless of when or where the incident occurred.

**B.     Confidential Resources**

Grinnell College encourages all community members to make a prompt report of Prohibited Conduct to both local law enforcement and the College.  For individuals who are not prepared to make a report but are still seeking information and support, there are several statutorily-protected confidential resources available, as designated below. In addition, the Ombuds office is a designated confidential resource at Grinnell who will not disclose shared information with the College, but may be required to share information pursuant to court order or subpoena.  As set forth in the Confidentiality section, these confidential resources will not share information with the College unless (i) given permission to do so by the person who disclosed the information; (ii) there is an imminent threat of harm to self or others; (iii) the conduct involves suspected abuse of a minor under the age of 18; or (iv) as otherwise required or permitted by law or court order.

| On-Campus Confidential Resources |
|---|
| **Dean of Religious Life and Chaplain, Deanna Shorb**<br>shorb@grinnell.edu<br><br>**Associate Chaplain and Rabbi, Rob Cabelli**<br>cabellir@grinnell.edu<br>641-269-4981<br>1233 Park Street, Grinnell, IA  50112 |
| **Director of Student Health & Counseling Services, Deb Shill**<br>shilldeb@grinnell.edu<br>641-269-3230<br>Lower Level, Forum, Grinnell, IA  50112<br><br>All SHACS staff are confidential resources, including receptionists, nursing staff, psychologists, psychiatrists, and physicians. |
| **Grinnell College Ombuds, Chinyere Ukabiala**<br>ukabiala@grinnell.edu<br>641-269-9399<br>Joe Rosenfield '25 Center 311, Grinnell, IA  50112 |

Confidential

**DEF APP 023**
GRINNELL0001898

**Grinnell College Campus Advocates**
641-260-1615

These are students and community members trained and certified in sexual assault and intimate partner violence advocacy.  To contact a Grinnell Advocate, call Campus Safety and Security (x4600) and ask for a Grinnell Advocate to contact you at your preferred phone number.  Individuals are not required to disclose a name or any identifying information to Campus Safety and Security in order to speak with a Grinnell Advocate.

### Off-Campus Confidential Resources

**Crisis Intervention Services**

1-800-270-1620  (confidential, 24 hrs)

CIS is a local organization which provides support, information, and advocacy to survivors of sexual assault and domestic violence.

**Crisis Center and Women's Shelter for Intimate Partner Violence/Abuse and Stalking**

1-800-464-8340 or 641-683-1750 (confidential, 24 hrs)

Outreach Services: Appanoose, Davis, Jasper, Jefferson, Lucas, Mahaska, Marion, Monroe, Poweshiek, Wapello and Wayne counties, providing support groups, individual counseling, and court advocacy.

C.      **Campus Resources**

In addition to the confidential resources listed above, Grinnell College community members have access to a variety of resources provided by the College.  All of the staff listed below are trained to support individuals affected by Prohibited Conduct and to coordinate with the Title IX Coordinator consistent with the College's commitment to a safe and healthy educational environment.  While not bound by confidentiality, these resources will maintain the privacy of an individual's information within the limited circle of those involved in the Title IX resolution process.

### Campus Resources:  Regular Business Hours (8 a.m.-5 p.m., Mondays-Fridays)

**Title IX Coordinator, Angela Voos**
voos@grinnell.edu

22

**DEF APP 024**
GRINNELL0001899

| |
|---|
| 641-269-4999<br>Nollen House, 1121 Park Street, Grinnell, IA  50112 |
| **Dean of the College, Michael Latham**<br>latham@grinnell.edu<br>641-269-3100<br>Nollen House, 1121 Park Street, Grinnell, IA  50112 |
| **Assistant Vice President of Human Resources, Mary Greiner**<br>greinerm@grinnell.edu<br>641-269-4818<br>Old Glove Factory, Grinnell, IA  50112 |
| **Dean of Students, Sarah Moschenross**<br>moschenr@grinnell.edu<br>641-269-3714<br>310-G Joe Rosenfield '25 Center, Grinnell, IA  50112 |
| **Campus Resources:  24 Hours a day/7 days a week** |
| **Interim Director of Campus Safety and Security, Russ Motta**<br>motta@grinnell.edu<br>641-269-4600 (24 hours)<br>Campus Safety and Security Office, 1432 East Street, Grinnell, IA  50112 |
| **Student Affairs Dean on call**<br>641-269-4600 |

D.     Community Resources

Students, faculty, and staff may also access resources located in the local community. These organizations can provide crisis intervention services, counseling, medical attention, and assistance in interfacing with the criminal justice system.  All individuals are encouraged to use the resources that are best suited to their needs, whether on- or off-campus.

| **Community Resources** |
|---|
| |

23

Confidential

**DEF APP 025**
GRINNELL0001900

**Grinnell Police Department Dispatch Center**
641-623-5679

**Grinnell Regional Medical Center**
641-236-2380 Emergency Room

- HIV/AIDS and Sexually Transmitted Infections (STI) testing

- Medical exam

- Sexual assault exam (SANE Nurses are available on call)

- Morning after pregnancy prevention

These exams do not obligate you to file criminal charges;
evidence is stored by the police to preserve the chain of evidence.

**National Domestic Violence Hotline**
1-800-799-SAFE (7233)

**Central Iowa Family Planning**
(Grinnell Office)
641-236-7787

- Medical exam

- Counseling

- Information and referral

**Polk County Crisis and Advocacy Services**
515-286-3600
Crisis Line
515-286-3535

**RELAY IOWA (Language Line Translation)**
1-800-735-2942 (TTY) *deaf or hard of hearing
or 1-800-735-2943 (VOICE)

**Crime Victim Compensation Program**
515-281-5044 or 1-800-373-5044

24

Confidential

DEF APP 026
GRINNELL0001901

| | |
|---|---|
| Iowa Attorney General's Office, Crime Victim Assistance Division<br>321 East 12th Street, Des Moines, IA 50319 | |
| Iowa Coalition Against Sexual Assault<br>515-244-7424 | |

X.   **Reporting and Community Responsibility**

The College is committed to providing a variety of welcoming and accessible ways for community members to voice concerns about and report instances of Prohibited Conduct. These categories are meant to be inclusive and expansive, not exclusive.

The College recognizes that the decision whether or not to report Prohibited Conduct is personal, and that there are many barriers, both individual and societal, to reporting. Not every individual will be prepared to make a report to the College or to law enforcement, and individuals are not expected or required to pursue any specific course of action. The College will approach the assessment of each report with an earnest intent to understand the perspective and experiences of each individual involved in order to ensure fair and impartial evaluation and resolution. As outlined in the Resources section of this policy, there are confidential resources on campus and in the community available to individuals not wishing to make a report to the College.

Complainants, victims and survivors are fully supported in using the words that they feel express and/or represent their experience - including words like rape, abuse, attack, or fondling - even when the College policy uses these other, more overarching terms when adjudicating and classifying allegations. Reporting an issue is the best way for the community to help an individual receive the resources, support, and accommodations available at Grinnell. Not only does reporting help the individual, but increased communication about issues related to sexual misconduct and interpersonal violence can help prevent future acts of Prohibited Conduct. The information community members report can illuminate patterns of behavior, immediate threats to the safety of the community, and systemic issues.

At the time a report is made, a Complainant does not have to decide whether or not to request any particular course of action, including conduct (corrective) action. Choosing to make a report, and deciding how to proceed after making the report, can be a process that unfolds over time. College officials will do everything possible to respect an individual's autonomy in making these important decisions and to provide support that will assist each individual in making that determination. Unless there is an immediate threat to the community or a minor is involved, the Complainant can help set the pace and make decisions about how best to proceed (including not naming the other party/ies at the time of the report).

Confidential

**DEF APP 027**
GRINNELL0001902

## A.      Emergency/Immediate Reporting Options

The College encourages all individuals to seek immediate assistance from a medical provider and/or law enforcement. This is the best option to ensure preservation of evidence and to begin a timely investigative and remedial response. The College will assist any Grinnell College community member to get to a safe place and will provide transportation to the hospital, coordination with law enforcement, and information about the College's resources and complaint processes.

Assistance is available from the College 24 hours a day year-round by calling the Campus Safety and Security Department (641-269-4600) and/or the Grinnell Police Department (911 for emergencies or( 641-623-5679) for all other calls). Any individual may request that a member of the Campus Safety and Security Department and/or the Grinnell Police Department respond and take a report. An individual may also request to speak with a Student Affairs Dean on call (641-269-4600) or a member of the Student Health and Counseling Services (SHACS) staff (641-269-3230 during academic year business hours). There is no requirement that an individual file an incident report with the Campus Safety and Security Department and/or the Grinnell Police Department in order to speak with a Student Affairs Dean or a member of the Student Health and Counseling Services staff.

An individual can also contact a Student Health and Counseling Services nurse (during business hours) and/or the Grinnell Regional Medical Center (24 hours/day). A medical provider at Grinnell Regional Medical Center can provide emergency and/or follow-up medical services and provide a forum to discuss any health care concerns related to the incident in a confidential medical setting. The medical exam has two goals: first, to diagnose and treat the full extent of any injury or physical effect (sexually transmitted infections and/or pregnancy) and, second, to properly collect and preserve evidence.

An individual may request a support person (friend, Residence Life Coordinator (RLC), confidential campus resource, trained campus advocate or DVA/SAC advocate), to accompany the individual during the exam. There is a limited window of time (typically 72 to 96 hours) following an incident of sexual assault to preserve physical and other forms of evidence. Taking the step to gather evidence immediately does not commit an individual to any course of action. The decision to seek medical attention and gather any evidence will remain confidential and preserve the full range of options to seek resolution through the College's grievance procedures and/or criminal action.

**Emergency Response**

Confidential

**DEF APP 028**
GRINNELL0001903

---

**911**

**Grinnell College Campus Safety and Security**
641-269-4600

**Grinnell Police Department**
641-623-5679

**Health and Safety**

**Student Health and Counseling Services**
641-269-3230
Available during regular office hours during academic year,
Monday-Friday 8am to 5pm

**Grinnell Regional Medical Center**
641-236-7511-Receptionist
641-236-2380-Emergency Room (ER)

---

**B.     Campus Reporting Options**

The College recognizes that an individual may choose to report Prohibited Conduct to any trusted employee of the College.  For example, a student may choose to confide in a Residence Life Coordinator, a faculty member, a mentor, or a coach, all of whom are considered "responsible employees" who must report the incident to the Title IX Coordinator under this policy.  An employee may choose to confide in a supervisor, also considered a "responsible employee."  Under this policy, any employee who receives a report of Prohibited Conduct must share the report with the Title IX Coordinator.  The trained Title IX Coordinator is specifically charged with coordinating the initial assessment, initiating the investigation, and responding to reports of Prohibited Conduct to eliminate the conduct, prevent its recurrence, and address its effects.

To enable the College to respond to all reports in a prompt and equitable manner, the College encourages all individuals to directly report any incident to the Title IX Coordinator, the Director of Campus Safety and Security, the Dean of the College, the Assistant Vice President of Human Resources, or the Dean of Students.

**C.     Anonymous Reporting**

Any individual may make an anonymous report concerning Prohibited Conduct, or may report the incident without disclosing his/her/hir name, identifying the Respondent, or requesting any action.  Depending on the level of information available about the

27

Confidential

**DEF APP 029**
GRINNELL0001904

incident or the individuals involved, anonymous reporting may impact the College's ability to respond or pursue appropriate action.

Anonymous reports may be made by telephone at 855-667-1753 or online at http://grinnell.ethicspoint.com. All reports will go to the Title IX Coordinator for review. EthicsPoint is a service that allows anyone to report suspected misconduct or other issues with complete anonymity or confidentiality. This service allows the person making the report and College administrators to confer about additional details, while the reporting party's identity remains anonymous and unknown to the college.

EthicsPoint utilizes its own secure servers, outside of the College network, as well as their own call center. While the reports will be forwarded to College administrators for appropriate review and action, the source of all reports submitted to EthicsPoint will remain confidential and will not be shared with College administrators without permission.

**D.      Reporting Considerations: Timeliness of Report, Location of Incident**

Complainants and witnesses are encouraged to report Prohibited Conduct as soon as possible in order to maximize the College's ability to respond promptly and effectively. The College does not, however, limit the timeframe for reporting. If the Respondent is no longer a student or employee, the College will still seek to meet its Title IX obligation by providing reasonably appropriate remedial measures, assisting the Complainant in identifying external reporting options, and taking steps to end the conduct, prevent its recurrence, and address its effects.

An incident does not have to occur on campus to be reported to the College. Off-campus conduct that is likely to have continuing adverse effects on campus life and activities, or pose a threat of danger to any member of the Grinnell College community, will also be addressed under this policy.

Because some forms of Prohibited Conduct involve interactions between persons that are not witnessed by others, a Complainant's account cannot always be substantiated by additional evidence. Lack of corroborating evidence or "proof" should not discourage individuals from reporting Prohibited Conduct under this policy, as College investigators receive specific training in the investigation of Prohibited Conduct.

Any individual may make a report, including Grinnell College students, faculty and staff members, and members of the bargaining unit against a student, faculty member, staff member, or member of the bargaining unit.

**E.      Coordination with Law Enforcement**

The College fully supports Complainants' rights to pursue criminal action for incidents of Prohibited Conduct that may also be considered crimes under Iowa criminal statutes.

Confidential

**DEF APP 030**
GRINNELL0001905

Under federal law, a Complainant has the right to notify, or decline to notify law enforcement. If a Complainant chooses to make a report to external law enforcement, the College will assist the Complainant(s) in making a criminal report and will cooperate with law enforcement agencies if the Complainant(s) decides to pursue the criminal process to the extent permitted by law. Except where the Complainant(s) is/are younger than eighteen (18) years old or the matter involves a threat to health or safety, the College will respect the Complainant's choice whether or not to report an incident to local law enforcement. In a case of suspected child abuse, the College and its members have a responsibility and duty to report the concern under the Child Abuse Reporting Policy.

The College's policy, definitions, and burden of proof may differ from Iowa criminal law. A Complainant may seek resolution through the College's conduct (corrective) action process, may pursue criminal action, may choose one but not the other, or may choose both. Neither law enforcement's determination whether or not to prosecute a Respondent, nor the outcome of any criminal prosecution, are determinative of whether Prohibited Conduct under this policy has occurred. Proceedings under this policy may be carried out prior to, simultaneously with, or following civil or criminal proceedings off-campus.

**F.      Amnesty for Alcohol and Other Drug Use**

The welfare of students, staff, and faculty is of paramount importance. The Grinnell College community encourages the reporting of Prohibited Conduct. Sometimes, students are hesitant to report to College officials because they fear that they themselves may be charged with policy violations, such as underage drinking at the time of the incident. Similarly, students are sometimes hesitant to offer assistance to others for fear that they may get themselves in trouble. (For example, an underage student who has been drinking might hesitate to bring a Complainant to Campus Safety and Security for reporting and/or assistance.) It is in the best interest of the Grinnell College community for individuals to report allegations of Prohibited Conduct to College officials. To encourage reporting, Grinnell College pursues a policy of offering Complainants, witnesses, and students who offer help to others in need a limited immunity from being charged for policy violations related to the incident. The College may, however, provide referrals to counseling and require educational options in such cases.

**G.      Bystander Intervention**

The College considers the welfare of students, faculty, and staff to be of paramount importance. The College recognizes that at times Grinnell community members, on and off campus, may need assistance. The College urges all community members to offer help and assistance to others in need and take reasonable and prudent actions to prevent or stop an act of Prohibited Conduct. Taking action may include indirect or

Confidential

**DEF APP 031**
GRINNELL0001906

direct intervention when safe to do so, enlisting the assistance of friends, contacting law enforcement, and/or seeking assistance from a person in authority, such as faculty members, coaches, deans, safety and security, or police.

**H.    Obligation to Provide Truthful Information**

All College community members are expected to provide truthful information in any report or proceeding under this policy. Submitting or providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct is prohibited and subject to disciplinary. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are not later substantiated.

**I.    Group Infractions**

When members of a student group or organization, individuals acting collusively, or members of a club, or team act in concert in violation of this policy, they may be charged as a group, and conduct action may proceed against the group as joint Respondents.

**J.    Reports Involving Minors**

In compliance with Iowa Code 261.9 (1)(h): Child Abuse Reporting Law, the College will report all suspected child abuse and neglect involving minors, including sexual assault, to law enforcement and Campus Safety and Security.  Grinnell's <u>Child Abuse Reporting Policy</u> is described in section II.

**XI.   <u>Responding to a Report: Initial Assessment and Interim Measures</u>**

The Title IX Coordinator, working with the Title IX team, will ensure that the College responds to all reports in a timely, effective, and consistent manner that treats everyone with dignity and respect.  The College is committed to creating a culture of respect and accountability, and will provide reasonably available interim measures to support the individuals involved and protect the College community.  The Title IX team is positioned to provide seamless support, assess individual and campus safety needs, and effectively respond to reports of Prohibited Conduct.

Not every member of the Title IX team is involved in every issue; only those who "need to know" attend to the issue at hand.  Usually the team includes the Title IX Coordinator, Director of Campus Safety and Security, and, depending on who is involved in the issue, one or more of the following: Dean of Students, Assistant Vice President of Human Resources, or Dean of the College.

Generally speaking, the initial assessment and subsequent <u>grievance procedures</u> against a Respondent are overseen by an administrator designated as the Senior Official:

30

Confidential

**DEF APP 032**
GRINNELL0001907

- For reports against a student, the Senior Official is the Dean of Students.

- For reports against a staff member, the Senior Official is the Assistant Vice President of Human Resources.

- For reports against a faculty member, the Senior Official is the Dean of the College.

The first step in response to a report is an initial assessment. The initial assessment will consider the nature of the report, the Complainant's expressed preference for resolution, and the appropriate course of action, which may include Informal or Formal Resolution.

As described in greater detail below, Informal Resolution encompasses a wide variety of actions that may be taken, in support of a Complainant's request, to eliminate the Prohibited Conduct, prevent its recurrence, and address its effects. Informal Resolution does not involve disciplinary action against a Respondent. Formal Resolution, which involves an investigation to determine if there has been a policy violation, may result in the imposition of sanctions through conduct (corrective) action. The decision whether to pursue Informal or Formal Resolution will be made by the Senior Official, in consultation with the Title IX Coordinator. There is no burden on the Complainant to affirmatively seek one form of resolution over another; to the contrary, it is always the College's burden to determine the appropriate course of action in light of the known facts and circumstances.

A.    **Title IX Review and Assessment**

In response to every report of Prohibited Conduct, the College will make an immediate assessment of the reported information and respond to any immediate health of safety concerns raised by the report. Appropriate steps may include reasonably available interim measures to provide for the safety of the individual and the campus community.

As part of the initial assessment of the facts, the Title IX team will:

- Assess the nature and circumstances of the report;

- Address immediate physical safety and emotional well-being;

- Notify the Complainant of his/her/hir right to contact (or decline to contact) law enforcement or seek a civil protection order;

- Notify the Complainant of the right to seek medical treatment;

- Notify the Complainant of the importance of preservation of evidence;

31

Confidential

- Enter the report into the College's daily crime log if required by the Clery Act;

- Assess the reported conduct and discern the need for a timely warning under the Clery Act;

- Provide the Complainant with written information about on- and off-campus resources;

- Notify the Complainant of the range of interim measures available to him/her/hir;

- Provide the Complainant with an explanation of the procedural options, including Informal Resolution and Formal Resolution;

- Explain the role of and offer an advisor, advocate, or support person;

- Assess for any pattern of conduct by Respondent;

- Discuss the Complainant's expressed preference for manner of resolution and any barriers to proceeding;

- Explain the College's policy prohibiting retaliation and that the College will take prompt action in response to any act of retaliation; and

- Determine age of Complainant and if the Complainant is a minor, make the appropriate notifications under the Child Abuse Reporting Policy.

The initial review will proceed to the point at which a reasonable assessment of the safety of the individual and of the campus community can be made, and the Senior Official, in consultation with the Title IX Coordinator, has sufficient information to determine the appropriate manner of resolution. The Title IX assessment includes explicit consideration of a Complainant's requested course of action, as outlined in greater detail in the following section on Complainant Agency and Autonomy.

At the conclusion of the Title IX assessment, the Senior Official (Dean of Students, Dean of the College, Assistant Vice President of Human Resources), in consultation with the Title IX Coordinator and the Title IX team, will determine the appropriate manner of resolution. If the reported information would not support a policy violation, accepting all reported information as true, the College may decline to pursue an investigation. It is at the discretion of the College to determine which method of resolution is appropriate.

The Senior Official or Title IX Coordinator will communicate the decided upon manner of resolution to the Complainant in writing. Depending on the circumstances and requested resolution, the Respondent may or may not be notified of the report or

Confidential

**DEF APP 034**
GRINNELL0001909

resolution. A Respondent will be notified when the action would impact a Respondent, such as the imposition of interim protective measures that restrict the Respondent's movement on campus, the initiation of an investigation or the decision to involve the Respondent in an informal process.

**B.    Complainant Agency and Autonomy**

Some Complainants will choose to seek support resources without pursuing conduct (corrective) action.  In all cases, Complainants who come forward will be afforded support, resources, and remedies, whether or not they choose to pursue campus conduct charges.

In the course of the Title IX assessment, College officials, to the best of their ability, will consider the interest of the Complainant and his/her/hir expressed preference for manner of resolution.  Where possible, and as warranted by an assessment of the facts and circumstances, the College will seek action consistent with the Complainant's request.  Where a Complainant requests that his/her/hir name or other identifiable information not be shared with the Respondent or that no formal action be taken, the College will balance this request with its dual obligation to provide a safe and non-discriminatory environment for all College community members and to afford a Respondent procedural protections by providing notice and an opportunity to respond before conduct (corrective) action is taken against a Respondent.

In assessing the appropriate resolution, the College will consider the Complainant's express preference for manner of resolution in light of the following factors:

- The seriousness, persistence, or pervasiveness of the conduct;

- The respective ages and roles of the Complainant and the Respondent;

- Whether there have been other reports of Prohibited Conduct against the Respondent;

- The right of the Respondent to receive notice and relevant information before conduct (corrective) action is sought;

- Whether the circumstances suggest there is an increased risk of the Respondent committing additional acts of Prohibited Conduct;

- Whether the Respondent has a history of arrests or prior conduct violations {at the College or elsewhere, if such information is available) indicating a history of violence;

- Whether the Respondent threatened further acts of Prohibited Conduct or other violence against the Complainant or others;

33

Confidential

**DEF APP 035**

GRINNELL0001910

- Whether the Prohibited Conduct was committed by multiple individuals;

- Whether the circumstances suggest there is an increased risk of future acts of Prohibited Conduct under similar circumstances;

- Whether the Prohibited Conduct was perpetrated with a weapon, by force, or through the use of predatory behavior, including the use of incapacitating substances;

- Whether the College possesses other means to obtain relevant evidence (e.g., security cameras or personnel, physical evidence);

- The Respondent's right to receive information if such information is maintained in an "education record" under FERPA; and,

- The College's obligation to provide a safe and non-discriminatory environment.

The College will take all reasonable steps to investigate and respond to the report consistent with the request for anonymity or request not to pursue a full investigation, but its ability to do so may be limited based on the nature of the request by the Complainant. Where the College determines that action should be taken that is inconsistent with the request of the Complainant, the Senior Official or Title IX Coordinator will inform the Complainant about the chosen course of action, which may include the College initiating conduct (corrective) action against the Respondent. A Complainant will be encouraged, but not required, to participate in the investigation. Alternatively, the course of action may also include steps to eliminate the alleged conduct, prevent its recurrence and address its effects that do not involve conduct (corrective) action against a Respondent or disclosing the identity of the Complainant; this course of action may include a form of Informal Resolution.

**C.      Interim Measures**

Upon receipt of a report of Prohibited Conduct, the College may impose reasonable and appropriate interim measures designed to eliminate the reported hostile environment and protect the parties involved. Interim measures may be both remedial (designed to address the Complainant's well-being and continued access to educational and employment opportunities) or protective (involving action again a Respondent). Remedial measures are available regardless of whether the Complainant chooses to pursue any action under this policy. The Title IX Coordinator will maintain the privacy of any interim measures provided under this policy to the extent possible. The College will maintain consistent contact with the parties to ensure that all safety and emotional and physical well-being concerns are being addressed.

Interim measures may be requested through the Title IX Coordinator or any Senior Official, including the Dean of Students, the Dean of the College or Assistant Vice

Confidential

DEF APP 036
GRINNELL0001911

President of Human Resources.  A Complainant or Respondent may request separation or other protection, or the College may choose to impose interim measures at its discretion to ensure the safety of all parties, the broader College community, and/or the integrity of the process.

All individuals are encouraged to report concerns about failure of another individual to abide by any restrictions imposed by an interim measure.  The College will take immediate and responsive action to enforce a previously implemented measure.

Reasonably available interim measures will be implemented at the discretion of the Title IX Coordinator.  Potential remedies and accommodations that may be applied to the Complainant and/or the Respondent include:

- Access to medical or counseling services and assistance in setting up initial appointments, both on and off campus

- Imposition of campus No-Contact Order

- Assistance in obtaining a civil protection order

- Facilitating a meeting with law enforcement to discuss safety planning and law enforcement options

- Rescheduling of exams and assignments

- Providing alternative course completion options

- A change in class schedule or transferring sections, including the ability to drop a course without penalty

- A change in work schedule or job assignment

- A change in student's College-owned residence

- Assistance from College staff in completing residence relocation

- Limiting an individual or organization's access to certain College facilities or activities pending resolution of the matter

- A voluntary leave of absence

- Providing an escort to ensure safe movement between classes, work and other activities

- Providing academic support services, such as tutoring

35

DEF APP 037
GRINNELL0001912

- An interim restriction on residence hall access pending the outcome of a conduct proceeding

- An interim suspension pending the outcome of a conduct proceeding

- A change of office or work space

- Assistance in resolving concerns about immigration status, visas or financial aid

- Any other remedy which can be tailored to the involved individuals to achieve the goals of this policy

**D.   Interim Suspension or Leave (Pending the Outcome of Conduct/Corrective Action)**

Where the report of Prohibited Conduct poses an ongoing risk of harm to the safety or wellbeing of an individual or members of the campus community, the College may place an individual student or organization on interim suspension pending the outcome of a conduct proceeding. This means pending resolution of the complaint, the individual or organization may be denied access to campus. During interim suspension, a student or group typically may not continue his/her/hir coursework or activities unless otherwise noted in the interim suspension letter. Similarly, the College may impose a leave for an employee. Such leaves will be structured (paid vs. unpaid) at the College's discretion. When interim suspension or leave is imposed, the College will make reasonable efforts to complete the investigation and conduct proceedings (but not appeal), when such is required, within an expedited time frame.

**E.   Time Frame for Resolution**

The College seeks to resolve all reports of Prohibited Conduct within 60 calendar days of the initial report. All time frames expressed in this policy can be extended for good cause, with written notice to the parties of the delay and the reason for the delay. Good cause may include the complexity of the allegations, the number of witnesses involved, the availability of the parties or witnesses, the effect of a concurrent criminal investigation, any intervening school break or vacation, or other unforeseen circumstances.

In general, a Complainant and Respondent can expect to receive timely updates as to the status of the review or investigation. In the event that the investigation and resolution exceed this time frame for good cause, the College will notify all parties of the need for additional time, and best efforts will be made to complete the process in a timely manner while balancing principles of thoroughness and fairness with promptness.

Confidential

**DEF APP 038**
GRINNELL0001913

## XII.   Informal and Formal Resolution Options

As described in greater detail below, Informal Resolution encompasses a wide variety of actions that may be taken, in support of a Complainant's request, to eliminate the Prohibited Conduct, prevent its recurrence, and address its effects. Informal Resolution does not involve disciplinary action against a Respondent. Formal Resolution, which involves an investigation to determine if there has been a policy violation, may result in the imposition of sanctions through conduct (corrective) action. The decision whether to pursue Informal or Formal Resolution will be made by the Senior Official, in consultation with the Title IX Coordinator and the Title IX team. There is no burden on the Complainant to affirmatively seek one form of resolution over another; to the contrary, it is always the College's burden to determine the appropriate course of action in light of the known facts and circumstances.

### A.   Support Person (Advisor)

Complainants and Respondents have the opportunity to consult with and be accompanied by the support person (advisor) of their choice to any related meeting or proceeding under these procedures. The support person (advisor) may be any individual, including an attorney, who is not a witness or otherwise involved in the procedures under this policy. The support person (advisor) is a nonparticipating supporter at any meeting or hearing under this policy and procedures. The support person (advisor) may advise the Complainant or Respondent on the procedural or any other aspects of the matter or assist with the party's review of documents and appeal process in a manner consistent with this policy. The support person (advisor) may not contact the other party or contact potential witnesses without express authority from the Title IX Coordinator or designee.   A party may change their support person (advisor) at any point during the process. The College reserves the right to dismiss a support person (advisor) who is disruptive to College proceedings or does not abide by the restrictions set forth in this policy.

The Dean of Students (or designee) maintains a list of trained individuals who can guide a student through the process, though a party is not required to choose a support person (advisor) from this list. The chosen support person (advisor) must meet with the Dean of Students (or designee) in advance of any participation in any meeting or proceedings to understand the expectations of the role, privacy, and appropriate decorum.

### B.   Informal Resolution

Informal Resolution is the term used to capture a variety of alternative actions that may be taken by the College to eliminate Prohibited Conduct, prevent its recurrence and address its effects. Informal Resolution does not involve conduct (corrective) action against a Respondent. Where the Title IX Coordinator concludes that Informal Resolution may be appropriate, the College will take immediate and corrective action through the imposition of individual and community remedies designed to maximize the

Confidential

DEF APP 039
GRINNELL0001914

Complainant's access to the educational, extracurricular, employment and other activities at the College and to eliminate any hostile environment. As explained above, there is no burden on the Complainant to affirmatively seek one form of resolution over another; to the contrary, it is always the College's burden to determine the appropriate course of action in light of the known facts and circumstances. However, participation in Informal Resolution by a Complainant is voluntary, and a Complainant can request to end Informal Resolution and pursue an investigation or conduct (corrective) action at any time. In some instances, an Informal Resolution, by agreement of the Complainant, the Respondent and the College is meant to be a final resolution.

Informal Resolution is typically used when a Complainant requests anonymity, does not consent to participation in an investigation, or the alleged conduct, even if it does not rise to the level of a policy violation, suggests the need for remedial, educational or preventive action. Depending on the form of Informal Resolution used, it may be possible for a Complainant to maintain anonymity.

Examples of protective measures and accommodations are outlined in section XI. C, Interim Measures. The form of Informal Resolution may vary from case to case, and may include the following: (a) direct approach, (b) third party mediation, or (c) indirect action taken by the Senior Official. Other potential remedies include targeted or broad-based educational programming or training.

The Direct Approach by Complainant and Third-Party Mediation methods are not available in cases involving sexual assault, and a Complainant will never be required to participate in mediation or engage in direct confrontation or contact with a Respondent.

1. **Direct Approach by Complainant:** After a discussion with the Title IX Coordinator, Senior Official or other official designated by the College, a Complainant who feels comfortable contacting the Respondent may, but is never required to, do so. The direct approach might include the Complainant writing a letter to the Respondent asking him/her/hir to change his/her/hir behavior. Another option might be telling the Respondent in person exactly what behavior is offensive and asking the Respondent to stop the behavior.

2. **Third Party Mediation:** The Senior Official or another trained and experienced individual designated by the College may mediate between the Complainant and the Respondent, or informally bring the parties together to address the conduct. This type of intervention may result in an agreement between the parties, no-contact between the parties, referral for either or both parties to counseling programs, an agreement for corrective action, targeted training or educational programs, or the implementation of remedies for the Complainant. Where the College resolves the matter by third party intervention, the Senior Official will

38

**DEF APP 040**
GRINNELL0001915

conduct periodic review and individually follow-up with the parties to assure that the resolution has been implemented effectively.

3. **Indirect Action Taken by the Senior Official**: The Complainant may choose an indirect approach. This approach is intended to alter and stop the Respondent's behavior without requiring the Complainant to participate in the resolution. The Complainant can request Indirect Action through the appropriate Senior Official. Indirect Action may include intervention with the Respondent without identifying the Complainant; implementing targeted or broad-based training or educational programs designed to address the conduct at issue; revising or publicizing College policies or procedures; providing increased monitoring, supervision, or security at locations or activities where the misconduct occurred; conducting climate assessments or surveys to evaluate similar concerns; and similar measures meant to eliminate the conduct, prevent its recurrence and address its effects.

The Title IX Coordinator will maintain records of all reports and conduct referred for Informal Resolution, which will typically be completed within sixty (60) calendar days of the initial report.

C. **Formal Resolution: Investigation**

1. **Decision to Initiate Investigation**

The College will pursue an investigation where a Complainant requests an investigation and conduct (corrective) action, where the College determines that an investigation is warranted based on the Title IX assessment, or where Informal Resolution was unsuccessful or not an appropriate form of resolution.

2. **Notice of Investigation**

When the College initiates an investigation, the Senior Official will issue a written Notice of Investigation to the Complainant and Respondent. The Notice will include the names of the parties, a brief description of the alleged conduct, and the potential policy violations. The investigators may amend the potential charges as part of the investigative process. The Notice of Investigation will also specify which procedures will apply based upon the role of the Respondent.

Either party may raise a challenge to the designated investigator on the basis of actual bias or conflict of interest. This challenge must be raised, in writing, to the Title IX Coordinator within two (2) business days of receipt of the Notice of Investigation.

39

Confidential

**DEF APP 041**
GRINNELL0001916

### 3. Overview of Investigation

Where the College initiates Formal Resolution, the Title IX Coordinator will designate a trained investigator to conduct a prompt, thorough and impartial investigation of reports of Prohibited Conduct. The investigator may be a College employee or it may be an external investigator engaged to assist the College in conducting an investigation. The investigation will treat all parties with appropriate sensitivity and respect. As described in the Statement of Privacy, the investigation will be conducted in a manner that is respectful of individual privacy concerns.

The investigation is designed to provide a fair and reliable gathering of the facts. Information gathered during the review or investigation will be used to ensure the safety of the Complainant and the College campus community, and impose remedies as necessary to address the effects of the alleged conduct.

It is the responsibility of the College, not the parties, to gather relevant evidence, to the extent reasonably possible. The investigator will conduct a fair and reliable fact-gathering in light of the circumstances of the report. The investigator will be responsible for interviewing the Complainant and Respondent (separately); interviewing potential witnesses; collecting relevant documentation and physical evidence, including documents, communications between the parties, and other electronic records as appropriate; creating a timeline; and preparing a written report documenting the complete investigation.

The Complainant and Respondent will have an equal opportunity to be heard, to submit information, and to identify witnesses who may have relevant information. Both parties will also have equal and timely access to information that will be used in the adjudication of the report, and timely notice of meetings or proceedings at which their presence will be required or requested.

Witnesses must have observed the acts in question or have information relevant to the incident and cannot be participating solely to speak about an individual's character. Witnesses will be interviewed by the investigator as part of the College's investigation, and these statements will be integrated into the final investigative report that is circulated to the Complainant, Respondent, and adjudicator. Witnesses will not be called to meet with the adjudicator.

Medical and counseling records of a Complainant and Respondent are privileged confidential records that individuals are not required to disclose. However, these records may contain relevant and material information and a party may voluntarily chose to share such records with the investigator. Any records provided by a party become part of the file and are available to review by the opposing party.

40

Confidential

**DEF APP 042**
GRINNELL0001917

A Complainant's prior sexual history will never be used as evidence of character or reputation, and will only be considered during an investigation under limited circumstances. For example, where there is a current or ongoing relationship between the Complainant and the Respondent, and the Respondent asserts that the conduct was consensual, the prior sexual history between the parties may be relevant to assess the manner and nature of communications between the parties. The mere fact of a current or previous dating or sexual relationship, by itself, is not sufficient to constitute consent. Any prior sexual history of the Complainant with other individuals is typically not relevant and will only be permitted if it is probative of a material fact, for example, to explain an injury or physical finding.

In gathering information, the investigator may also consider other reports of, or findings of responsibility for, similar conduct by the Respondent to the extent such information is relevant and available.  Such information may be relevant to prove motive, intent, absence of mistake, pattern or another material fact.

Where a sufficient informational foundation exists for prior sexual history or pattern evidence, the investigator, in consultation with the Title IX Coordinator, will assess the relevance, form, and reliability of the information and determine if it is appropriate for inclusion in the written investigation report for consideration by the Adjudicator in its determination of responsibility and/or any assigning of a sanction.

The Senior Official, in consultation with the investigator and Title IX Coordinator, has the discretion to consolidate multiple reports against a Respondent into one investigation and resolution if the evidence related to each incident would be relevant and probative in reaching a determination on the other incident. Matters may be consolidated where they involve multiple Complainants, multiple Respondents, or related conduct which would regularly have been heard under the Community Standards and Responsibilities section of the Student Handbook.

The investigator, in consultation with the Title IX Coordinator and/or Senior Official, will determine the relevance of any proffered information.  Information that is irrelevant, more prejudicial than probative, or immaterial may be redacted.  Similarly, the investigator may redact statements of personal opinion, rather than direct observations or reasonable inferences from the facts, or statements as to any party's general reputation for any character trait, including honesty.

The purpose of the investigation is to establish whether there is a basis for believing that it is more likely than not the alleged violation of this policy has occurred. Based on the information gathered in the initial Title IX assessment

Confidential

DEF APP 043
GRINNELL0001918

and/or full investigation, the College will take appropriate measures designed to end the Prohibited Conduct, prevent its recurrence, and address its effects.

At the conclusion of the investigation, the investigator will prepare a preliminary written investigation report based on interviews with the Complainant and Respondent, and other interviews conducted or materials gathered. The investigation report will detail the information gathered, identify the potential policy violations and synthesize the areas of agreement and disagreement between the parties and any supporting information or accounts.

**4.     Review of Investigation Report**

The Complainant and Respondent will both have an opportunity to review the preliminary investigation report. The Senior Official will send a secure, electronic link to the Complainant and Respondent to access the report and supporting materials including any information that will be used during informal and formal disciplinary meetings and hearings. Parties can also review the materials in hard copy at a private office designated by the Senior Official. The Complainant and Respondent may provide comments or identify additional witnesses or source of evidence within five (5) business days after receipt of the preliminary report. The review period may be extended by the Senior Official where the volume of the report requires additional time for review or extenuating circumstances make the time period impractical or unadvisable. The Senior Official or designee will review any submitted responses and ask the investigator(s) to conduct additional investigation as appropriate, including interviewing additional witnesses and follow-up on issues raised during the review process. The investigator(s) will then prepare the final investigative report.

The investigator(s) will not make any findings or determinations of responsibility. The adjudicator bears the ultimate responsibility of determining, by a preponderance of the evidence, whether the Respondent is responsible for committing Prohibited Conduct in violation of this policy.

**5.     Acceptance of Responsibility**

A Respondent may choose to accept responsibility for their conduct at any point during the investigation or thereafter. In the event that the Respondent admits responsibility for committing an act or acts of Prohibited Conduct, the Senior Official will determine whether further investigation is warranted. The Senior Official will issue a finding of responsibility and determine the manner of adjudication to render an appropriate sanction.

Confidential

**DEF APP 044**
GRINNELL0001919

**D.      Formal Resolution: Adjudication Process when Respondent is a Faculty or Staff Member**

If the Respondent is a faculty member or staff member, the final investigative report will form the basis for the Senior Official or an outside adjudicator to make decisions and recommendations. The College will determine the appropriate adjudication process depending on the complexity and facts of the case. The report will include either a finding, by a preponderance of the evidence, of a violation of this policy and a recommendation regarding disciplinary action, or a finding of no violation of this policy. Any action taken against a faculty or staff member would be consistent with applicable employment contracts and faculty/ staff handbook. (See section F. for appeal process.)

**E.      Formal Resolution: Adjudication Process when Respondent is a Student**

If the Respondent is a student, the final investigation report will form the basis adjudication by the Senior Official (Dean of Students), another College administrator serving as the Dean's designee, or a trained individual external to the College (referred to interchangeably in this policy as the adjudicator). The adjudicator will determine responsibility by a preponderance of evidence – whether it is more likely than not that there was a violation of <u>conduct standards</u> or policy.

**1.      Notice of Hearing/Adjudication Meeting**

The Dean of Students (or designee) will contact the Complainant and Respondent to schedule meetings with each party individually. At this pre-adjudication meeting, each party will receive an explanation of the process and have the opportunity to ask any questions before the adjudication occurs. If the Complainant and/or Respondent have elected to have a support person (advisor) throughout the conduct process, the support person (advisor) is encouraged to accompany the Complainant/Respondent to this initial meeting.

Once each party has met with the Dean of Students (or designee), a Notice of Adjudication is sent to the Complainant and the Respondent. The Notice provides each party with a statement of the policy violation(s) that are alleged to have taken place and a summary of the facts underlying the allegations. In addition, the Notice provides the parties with the date, time, and place of the meeting and the name of the adjudicator.

Either party may raise a challenge to the designated adjudicator on the basis of actual bias or conflict of interest. This challenge must be raised, in writing, to the Title IX Coordinator within two (2) business days of receipt of the Notice of Investigation.

In general, the adjudication meeting will be scheduled approximately one to two weeks after the Notice is sent. For good cause, this time frame may be extended by the Dean of Students (or designee).

43

Confidential

2. **External Adjudicator**

The College may engage an outside individual or firm (typically experienced, retired judges, trained in the intricacies of Title IX) to adjudicate cases of sexual assault or other forms of Prohibited Conduct as needed. The adjudicator will possess the requisite training and experience needed to competently and fairly adjudicate the matter, and will be free from actual bias or conflict of interest.

3. **Request to Reschedule Adjudication Meeting**

Either party can request to have an adjudication meeting rescheduled. Absent extenuating circumstances, requests to reschedule must be submitted to the Dean of Students at least five (5) business days prior to the adjudication meeting.

4. **Attendance at the Adjudication Meeting**

If a party does not attend an adjudication meeting, for any non-emergency or non-compelling reason, the meeting may be held in his/her/hir absence at the discretion of the Dean of Students (or designee).

If a student chooses to withdraw or take a leave from the College prior to the conclusion of an investigation and/or formal resolution under this policy, the College will move forward with the adjudication and imposition of educational outcomes, if any, in absentia. The Respondent's academic transcript will be marked with a "Withdrawal Pending Student Conduct Action" notation, or, if finally resolved in absentia, with the final finding(s) of responsibility and educational outcomes, if any, in accordance with regular practice under this policy. Where a notation of "Conduct Suspension" applies, the transcript will indicate such designation.

5. **Adjudication Meetings**

The adjudication meetings are closed and not open to the public. The individuals from the Grinnell College community who may appear before the adjudicator are: the Complainant, the Respondent, any individuals serving as a support person (advisor), and the investigator(s). The Title IX Coordinator, designee, or College counsel may also be present.

6. **Safeguarding of Privacy**

Under Federal privacy laws, all statements of one party that are shared with the other party and any documents provided to the parties during the procedures may not be disclosed outside of the proceedings and any copies of documents must be returned to the Dean of Students (or designee) at the conclusion of the adjudication meeting(s) and any appeals. Any breach of this duty is subject to further student conduct action by the College.

44

Confidential

The College does not, however, prohibit the parties from making disclosures about the incident, their participation in the proceedings or the outcome.

### 7.    Adjudication Procedures

The adjudication meeting is not intended to be adversarial; rather, it is intended to be educational, corrective, and developmental. The adjudication is intended to provide fair and ample opportunity for each side to present his/her/hir account/narrative to determine the facts of the case, make a determination regarding the alleged violations of this policy, College regulations and Community Standards, and to recommend appropriate educational outcomes (sanctions), if necessary. The adjudication meetings are an informal proceeding and the mechanism by which the College assesses and, as appropriate, takes formal conduct (corrective) action regarding a violation of College policy or regulation.

The adjudicator is required to review all pertinent information regarding the incident, including written statements, the investigation report, documents, items, and/or oral information from the Complainant, and Respondent.

Each adjudication meeting will begin with an explanation of the process. The adjudicator will then provide an opportunity to all parties to ask procedural questions prior to initial statements and the presentation of information.

First, the adjudicator will meet separately with a representative of the investigative team. The investigator(s) will provide an opening statement summarizing the investigation. The opening statement should focus on the areas of agreement and disagreement in order to assist the adjudicator in prioritizing areas of inquiry. The adjudicator may make inquiries of the investigator at this juncture, and ask any questions that allow a more full understanding of the case.

Second, the adjudicator will meet with the Complainant and his/her/hir support person (advisor). The Complainant may present his/her/hir own account of the events in a narrative format. The adjudicator may pose questions to the Complainant. The Complainant may also bring an Impact Statement that addresses the impact of this event and their suggestions for educational outcomes (sanctions), to be considered if the Respondent is found responsible for any of the charges in the case.

Third, the adjudicator will meet with the Respondent and his/her/hir support person (advisor). The adjudicator will read the charge(s) against the respondent and ask them to enter a plea of "responsible" or "not responsible" for each of the charges. The Respondent will be given an opportunity, and is encouraged, to present his/her/hir response, again in a narrative format. The adjudicator may pose questions to the Respondent. The Respondent may also bring a Mitigation Statement that addresses the considerations relevant to sanctioning and their suggestions for educational outcomes

Confidential

**DEF APP 047**
GRINNELL0001922

(sanctions), to be considered if the Respondent is found responsible for any of the charges in the case.

### 8. Recording of Proceedings

Adjudication proceedings are digitally audio-recorded. The digital audio recording is created for two limited purposes only: for reference by the adjudicator during deliberations and for review by the appeals officer during an appeal. No other recordings of conduct proceedings are allowed, and no other access to the recordings is permitted. The College may destroy the recording at any point following seven years after the date the proceeding concludes.

### 9. Deliberation and Preponderance of the Evidence

After all of the information has been presented through these three adjudication meetings, the adjudicator will deliberate in private. While finding the facts in the case, the adjudicator must reach a decision on responsibility by using the preponderance of evidence. This means that the adjudicator will decide whether it is "more likely than not," based upon the information provided through the investigation and at the adjudication meeting(s), that the Respondent is responsible for the alleged violation(s). The decision on responsibility will be shared with the Complainant and the Respondent, simultaneously and in writing.

The findings of the adjudicator will be documented in a case opinion within five (5) business days of completion of meetings. The findings will detail the findings of fact and the basis/rationale for the decision of the adjudicator, making reference to the evidence that led to the finding.

### 10. Educational Outcomes (Sanctions)

As mentioned above, the Complainant and Respondent will each have the opportunity to present a written Impact Statement about the impact this incident (as well as conduct proceedings) has had on him/her/hir, other considerations relevant to sanctioning, and/or requested educational outcomes. These statements will be reviewed by the adjudicator only if the Respondent is found responsible for one or more of the charges against them.

If the adjudicator finds a student or student group/organization responsible for a violation of this policy, they will recommend appropriate educational outcomes to the Dean of Students (or designee). The educational outcomes are set forth in the Community Standards and Responsibilities Section of the Student Handbook. The Dean of Students (or designee) is not bound by the recommendations of an external adjudicator and has the final authority to impose appropriate educational outcomes.

46

Confidential

A violation of this policy may result in suspension or dismissal. Educational outcomes may range from written warning to permanent separation (i.e., dismissal) from the College. They may also include educational, remedial, and/or corrective actions as warranted such as: restitution fines, deferred finding of responsibility, conduct warning, conduct probation, behavioral expectations (including a campus no-contact order), parental and guardian notification, College-owned residence suspension, College-owned residence dismissal, suspension, or dismissal from the College, withholding of registration or degree, or rehabilitative measures.

In general:

- Any student who is determined to have engaged in Non-consensual Sexual Intercourse may receive educational outcomes ranging from suspension to dismissal.

- Any student who is determined to have engaged in Non-consensual Sexual Contact (where no intercourse has occurred) may receive educational outcomes ranging from conduct warning to dismissal.

- Any student who is determined to have engaged in any other prohibited form of conduct may receive educational outcomes ranging from conduct warning to dismissal.

The Dean of Students (or designee) reserves the right to broaden or lessen any range of recommended educational outcomes in the case of serious mitigating circumstances, contextual or historical aggravating circumstances, or egregiously offensive behavior. Neither the adjudicator, Dean of Students (or designee), nor any appeals officer will deviate from the range of recommended outcomes unless compelling justification exists to do so.

Educational outcomes may be issued individually, or a combination of outcomes may be imposed. The determination of educational outcomes is based upon a number of factors, including but not limited to: the severity of the incident; the impact on the Complainant; any ongoing risk to either the Complainant or the community posed by Respondent; the impact of the violation on the community, its members, or its property; any previous conduct violations; and any mitigating or aggravating circumstances.

### 11.   Notice of Outcome

The Dean of Students (or designee) will provide simultaneous written notification of the adjudicator's findings and the sanction imposed, to the Respondent and the Complainant in writing. Generally, the outcomes will be final and communicated to the parties within two (2) business days from the date the adjudicator submits her/his/hir report.

47

Confidential

**DEF APP 049**
GRINNELL0001924

The imposition of educational outcomes will take effect immediately and will not be postponed pending the resolution of the appeal.

### 12. Records

The Office of the Title IX Coordinator will retain records of all reports, allegations, and complaints, regardless of whether the matter is resolved by means of Title IX assessment, informal resolution, or formal resolution. Complaints resolved by means of Title IX assessment or informal resolution are not part of a student's conduct file and/or academic record.

Affirmative findings of responsibility in matters resolved by means of formal resolution are part of a student's conduct record. Such records shall be used in reviewing any further misconduct or developing educational outcomes and shall remain a part of a student's conduct record.

Generally, dismissals are permanently noted on a student's transcript. Suspensions and withdrawal pending disciplinary action are removed from a student's transcript after the student successfully completes one semester upon his/her/hir return with no further incident. The conduct files of students who have been suspended or dismissed from the College are permanently maintained in the Dean of Students Office. Conduct files of students who have not been suspended or dismissed are maintained for a period of seven years after the end of the academic year of said violation(s).

Student conduct records may be released to College officials on a "need-to-know" basis. Records may be released to persons and agencies external to the College with the student's permission, and in compliance with the law (FERPA). Records that are lawfully subpoenaed or ordered by a judge may be released without the student's permission. A student's conduct record may also be released if it is in connection with a health and/or safety emergency. Further questions about student conduct record retention should be directed to the Dean of Students.

### F. Appeal Processes

The Complainant and Respondent, within five (5) business days of the date of notice of outcome, may submit a written request to the Appeals Officer (see below). The Complainant and/or Respondent may appeal only the parts of the determination of responsibility and/or educational outcome(s), if applicable, directly relating to him/her/hir. Dissatisfaction with the outcome of the case is not grounds for appeal. The limited grounds for appeal are as follows:

1. New evidence that was not available at the time of the investigation is presented that could be outcome-determinative; and/or

2. Procedural error(s) that had a material impact on the outcome.

48

DEF APP 050
GRINNELL0001925

The appeal shall consist of a plain, concise, and complete written statement expounding on the grounds for the appeal. When an appeal has been submitted, the Title IX Coordinator or designee will notify both parties with a decision to accept or deny the appeal, and with the name of the Appeals Officer. If accepted, each party will be given the opportunity to respond in writing to the other party's appeal. Any response by the opposing party must be submitted within five (5) business days from receipt of the appeal.

Appeals will be evaluated by an impartial decision-maker, referred to as the Appeals Officer. The Appeals Officer will be determined by the role of the Respondent:

- For student respondents, the Appeals Officer is the Assistant Vice President of Student Affairs

- For staff respondents, the Appeals Officer is the Vice President of Finance

- For faculty respondents, the Appeals Officer is the Dean of the College.

If the individual designated for an appeal under this process has been involved in the conduct at issue in the complaint/grievance, or if the individual was consulted about the conduct at issue in the complaint/grievance, then the Title IX Coordinator will direct the appeal to another Senior Official or Appeals Officer. Either party may raise a challenge to the Appeals Officer on the basis of actual bias or conflict of interest. This challenge must be raised, in writing, to the Title IX Coordinator within two (2) business days of receipt of notice of acceptance of the appeal.

If a person has questions about how to file an appeal, the person may contact any of the Senior Officials or Title IX Coordinator.

In any request for an appeal, the burden of proof lies with the party requesting the appeal, as the original determination and educational outcomes are presumed to have been decided reasonably and appropriately. The appeal is not a de novo review. The Appeals Officer shall consider the merits of an appeal only on the basis of the two grounds for appeal and the supporting information provided in the written request for appeal along with the record of the original adjudication meeting(s). The Appeals Officer can affirm the original findings, alter the findings, and/or alter the educational outcomes, depending on the basis of the requested appeal. If the Appeals Officer deems that procedures were not followed in a material manner, the Appeals Officer can ask that new meetings occur before a different adjudicator. In the case of new and relevant information, the Appeals Officer can recommend that the case be returned to the original adjudicator to assess the weight and effect of the new information and render a determination after considering the new facts.

Confidential

**DEF APP 051**
GRINNELL0001926

The Appeals Officer will communicate the result of the appeal to the Complainant and Respondent within ten (10) business days from the date of the submission of all appeal documents by both parties. Appeal decisions are final.

**G.      Finality of Formal Resolution Process**

The College's resolution of the violation through the Formal Resolution process shall be considered final and binding upon the expiration of the appeal deadline or exhaustion of the appeal process. A Complainant may not elect to pursue Informal Resolution of a policy violation after the Formal Resolution process becomes final.

**H.      Other Remedies**

Use of Grinnell College's internal complaint procedures is not a prerequisite to the pursuit of other remedies. At any time, an individual may pursue other remedies available to him/her/hir under applicable state or federal law. Students and employees may also lodge complaints with the Office for Civil Rights.

**XIII.   Prevention and Education Programs**

Grinnell College is committed to the prevention of Prohibited Conduct through education and awareness programs. Incoming students and new faculty and staff receive prevention and awareness programming as part of their orientation, and all students and employees receive ongoing training and related programs on an annual basis.

**URLS:**

https://secure.grinnell.edu/campus-life/sexual-respect/about

https://secure.grinnell.edu/campus-life/sexual-respect/policies?group=30355

https://secure.grinnell.edu/policies

Student Handbook

Staff Handbook

Faculty Hanndbook

Confidential

**DEF APP 052**
GRINNELL0001927

# Grinnell College Sexual Harassment and Misconduct Policy



EXHIBIT

D3

cobbler

04-12-16 SW

GRINNELL0007703
DEF APP 053

such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact are used to pursue, harass, or to make unwelcome contact with another person in an unsolicited fashion. Examples include, but are not limited to:

- Unwelcome and repeated visual or physical proximity to a person;

- Repeated oral or written threats;

- Extortion of money or valuables;

- Implicitly threatening physical conduct or any combination of these behaviors directed toward an individual person.

- Unwelcome/unsolicited emails, instant messages, and messages on on-line bulletin boards;

- Unwelcome/unsolicited communications about a person, their family, friends, or co-workers; and/or

- Sending/posting unwelcome/unsolicited messages with another username.

**Retaliation:** Acts or attempts to retaliate or seek retribution against a <u>Complainant</u>, <u>Respondent</u>, or any individual or group of individuals involved in the investigation and/or resolution of an allegation of sexual misconduct. <u>Retaliation</u> can be committed by any individual or group of individuals, not just by a <u>Respondent</u> or <u>Complainant</u>. <u>Retaliation</u> can take many forms, including continued abuse or violence, other forms of harassment, and <u>slander</u> and <u>libel</u>.

## VI. Consent and Related Concepts: Coercion, Incapacitation, and Intimate partner violence

**Consent:** The Sexual Harassment and Misconduct Policy is based on affirmative <u>consent</u>. In the spring of 2012, the Grinnell College student body voted overwhelmingly to revise the Sexual Harassment and Misconduct policy to incorporate affirmative <u>consent</u>. <u>Consent</u> to engage in sexual activity must be given knowingly, voluntarily, and affirmatively. <u>Consent</u> to engage in sexual activity must exist from the beginning to end of each instance of sexual activity and for each form of sexual contact. <u>Consent</u> is demonstrated through mutually understandable words

and/or clear, unambiguous actions that indicate a willingness to engage freely in sexual activity. Consent is active, not passive.

- Each participant in a sexual encounter is expected to obtain and give consent to each act of sexual activity. Consent to one form of sexual activity does not constitute consent to engage in all forms of sexual activity.

- Consent consists of an outward demonstration indicating that an individual has freely chosen to engage in sexual activity. Relying on non-verbal communication can lead to misunderstandings. Consent may not be inferred from silence, passivity, lack of resistance, or lack of an active response alone. A person who does not physically resist or verbally refuse sexual activity is not necessarily giving consent.

- If at any time it is reasonably apparent that either party is hesitant, confused, or unsure, both parties should stop and obtain mutual verbal consent before continuing such activity.

- Consent may be withdrawn by either party at any time. Withdrawal of consent must also be outwardly demonstrated by mutually understandable words or clear, unambiguous actions that indicate a desire to end sexual activity. Once withdrawal of consent has been expressed, sexual activity must cease.

- Individuals with a previous or current intimate relationship do not automatically give initial or continued consent to sexual activity. Even in the context of a relationship, there must be mutually understandable communication that clearly and unambiguously indicates a willingness to engage in sexual activity.

- Consent is not affirmative if it results from the use or threat of physical force, intimidation, or coercion, or any other factor that would eliminate an individual's ability to exercise his/her/hir own free will to choose whether or not to have sexual contact.

- An individual who is physically incapacitated from alcohol and/or other drug consumption (voluntarily or involuntarily), or is unconscious, unaware, or otherwise physically helpless is considered unable to give consent. For example, one who is asleep or passed out cannot give consent.

- In the state of Iowa, consent can never be given by minors under the age of 16.

**Coercion:** A direct or implied threat of force, violence, danger, hardship, or retribution sufficient to persuade a reasonable person of ordinary susceptibility to perform an act which otherwise would not have been performed or acquiesce in an act to which one would not have

GRINNELL0007718
DEF APP 055

submitted. Coercion can include unreasonable pressure for sexual activity. Coercive behavior differs from seductive behavior based on the type of pressure someone uses to get consent from another. A person's words or conduct cannot amount to coercion unless they wrongfully impair the other's freedom of will and ability to choose whether or not to engage in sexual activity. When someone makes it clear that he/she/zi does not want to engage in sexual activity, that he/she/zi wants to stop, or that he/she/zi does not want to go past a certain point of sexual interaction, continued pressure beyond that point can be coercive.

**Force:** Force is the use or threat of physical violence or intimidation to overcome an individual's freedom to choose whether or not to participate in sexual activity.

**Incapacitation:** An individual who is incapacitated cannot consent to sexual activity. Incapacitation is defined as the inability, temporarily or permanently, to give consent, because an individual is mentally and/or physically helpless, unconscious, or unaware that the sexual activity is occurring. Where alcohol and/or other drugs (including prescription drugs) are involved, incapacitation is a state beyond drunkenness or intoxication. Warning signs that a person may be approaching incapacitation may include slurred speech, vomiting, unsteady gait (i.e., a manner of walking, stepping, or running), odor of alcohol or other substance, combativeness, and/or emotional volatility.

An individual who engages in sexual activity with someone the individual knows or reasonably should know is incapable of making a rational, reasonable decision about whether to engage in sexual activity is in violation of this policy. This includes persons whose incapacity results from ingestion of a "date-rape" or "predatory" drug. Possession, use, and/or distribution of any of these drugs, including Rohypnol, Zolpidem, Ketamine, GHB, Burundanga, etc., is prohibited, and administering one of these drugs to another person for the purpose of inducing incapacity is prohibited under College policy and state criminal statutes.

**Amnesty:** The welfare of students, staff, and faculty is of paramount importance. The Grinnell College community encourages the reporting of alleged sexual misconduct. Sometimes, survivors (or their friends) are hesitant to report to College officials because they fear that they themselves may be charged with policy violations, such as underage drinking at the time of the incident. Similarly, students are sometimes hesitant to offer assistance to others for fear that they may get themselves in trouble. (For example, an underage student who has been drinking might hesitate to bring the sexual misconduct victim to Campus Safety and Security for reporting and/or assistance.) It is in the best interest of the Grinnell College community for individuals to report allegations of sexual misconduct to College officials. To encourage reporting, Grinnell College pursues a policy of offering survivors of sexual misconduct and students who offer help to others in need a limited immunity from being charged for policy violations related to the sexual misconduct incident. While policy violations cannot be completely overlooked, the College will provide referrals to counseling and may require educational options in such cases.

# GRINNELL COLLEGE POLICY, PROCEDURES AND GUIDE TO PREVENTING, REPORTING, AND RESPONDING TO SEXUAL MISCONDUCT AND OTHER FORMS OF INTERPERSONAL VIOLENCE

*Applies to all forms of sexual and gender-based harassment, sexual assault, sexual exploitation, intimate partner violence (including dating violence and domestic violence), stalking and retaliation.*

I.      Purpose and Intent
II.     Scope
III.    Related Policies
IV.     Title IX
V.      Privacy and Confidentiality
VI.     Prohibited Conduct
VII.    Consent and Related Concepts
VIII.   Prohibited Relationships by Persons in Authority
IX.     Resources and Support
X.      Reporting and Community Responsibility
XI.     Responding to a Report: Initial Assessment and Interim Measures
XII.    Informal and Formal Resolution Options
XIII.   Prevention and Education Programs

## I.      Purpose and Intent

Grinnell College is committed to providing a learning, living and working environment that is free from all forms of discrimination and harassment, including sexual and gender-based harassment, sexual misconduct, intimate partner violence, and stalking ( referred to collectively in this guide as Prohibited Conduct). Grinnell College provides ongoing education and prevention programming and training in an effort to promote an environment free of sexual and other unlawful harassment and discrimination. The College also strives to make reporting concerns and incidents of Prohibited Conduct a responsibility of the community so that affected individuals can be offered support and a range of resources that Grinnell has developed, and appropriate steps can be taken to assess the reported conduct, and as appropriate, eliminate the Prohibited Conduct, prevent its recurrence, and address its effects.

This document, referred to interchangeably as a policy or guide, contains the College's policies and procedures for preventing, reporting and responding to sexual misconduct and other forms of interpersonal violence. The guide also contains information about options, resources, and remedies for all students, employees and third parties who have experienced or been affected by Prohibited Conduct.

All Grinnell College community members have a responsibility to adhere to College policies and local, state, and federal law. Sexual misconduct and interpersonal violence, as used in this guide, are broad terms meant to capture the many varied forms of conduct that may impact our community. Conduct prohibited under this policy poses a threat both to individual members of the Grinnell College community and to the community collectively. These forms of



EXHIBIT
D4
04-24-18 SW

GRINNELL0007775
DEF APP 057

## B.    Sexual Assault

Sexual assault means having or attempting to have sexual intercourse or sexual contact with another individual without consent.  This includes sexual intercourse or sexual contact achieved by the use or threat of force or coercion, where an individual does not consent to the sexual act, or where an individual is incapacitated.  Sexual assault includes the following acts:

**Related to Non-consensual Sexual Intercourse:**  Having or attempting to have sexual intercourse with another individual without consent. Sexual intercourse includes vaginal or anal penetration, however slight, with a body part or object, or oral copulation by mouth-to-genital contact.

**Related to Non-consensual Sexual Contact:**  Having or attempting to have sexual contact with another individual without consent.  Sexual contact includes kissing, touching the intimate parts of another, causing the other to touch one's intimate parts, causing the other to touch their own intimate parts, or disrobing or exposure of another without permission. Intimate parts may include the breasts, groin, genitals, buttocks, mouth or any other part of the body that is touched in a sexual manner.  Non-consensual Sexual Contact can occur whether individuals are clothed or unclothed.

## C.    Sexual Exploitation

Sexual exploitation is knowingly committing non-consensual abuse or exploitation of another person's sexuality for the purpose of sexual gratification, financial gain, personal benefit or advantage, or any other non-legitimate purpose.  Examples include, but are not limited to:

- Observing, recording or photographing another individual's nudity or sexual activity or allowing another to observe, record or photograph consensual sexual activity without the knowledge and consent of all parties involved in a place where the individual would have a reasonable expectation of privacy;

- Streaming or distribution of private images, photography, video or audio recording of sexual activity or nudity without the knowledge and consent of all parties involved;

- Prostituting another individual;

- Exposing one's genitals in non-consensual circumstances;

- Exposing another individual to a sexually transmitted infection or virus without his/her/hir knowledge; and

14

**GRINNELL0007788**
**DEF APP 058**



*COLLEGE*

# Why Even Small, Progressive Grinnell College Has Trouble Dealing With Sexual Assault On Campus

**By Tyler Kingkade**

03/03/2015 07:48 pm ET | Updated Dec 06, 2017

On April 10, 2012, Emily Bartlett received a few text messages from a guy who had left her Grinnell College dorm room about 10 minutes earlier. "If you ever tell anyone God help you," one read.

Bartlett did tell someone: That night she told a confidential advocate on the Iowa campus that the male student had sexually assaulted her. A few days later she went to campus security and filed an official report, but she was unsure whether she wanted to see her alleged attacker punished. She said college administrators suggested she request a mediation session with him, a practice the U.S. Department of Education had explicitly prohibited one year earlier in a letter to all colleges.

The male student "took responsibility for what he did and regretted it" during the mediation, according to a school document shared with The Huffington Post. But the mediation proved to be a failure, Bartlett said, because it retraumatized her and didn't bring a resolution to their case. She moved forward with a hearing process.

Despite what Bartlett considered a confession made during the mediation, text message evidence and photos of deep bruising on her body, the college hearing found the accused not responsible for sexual misconduct. He was instead deemed responsible for "disorderly conduct" and "psychological harm" and punished with a year of probation. Campus officials issued the two students a no-contact order. The accused would still be allowed to play baseball and take the same courses as her.

"The no-contact order was a joke," Bartlett said. "I had a class with him through all of this."

On paper, Grinnell was doing everything right: It received praise for putting an affirmative consent standard in place in 2012, and its annual stats for sex offenses were among the highest per capita for colleges — suggesting students there were comfortable coming forward to report their assaults. The school even includes gender-neutral pronouns in its student handbook. There are no rowdy frats or big-time Division I sports stars to blame for rape culture, as has happened elsewhere.

But in some cases, Grinnell forced students to attend class with men the school acknowledged to have sexually assaulted them. The college made offenders write short apology letters to victims as their punishment. When some women struggled in classes due to stress related to their assaults, they say, the college pushed them off campus. And when

EXHIBIT

P7

DEF APP 155

08-15-18 SW

PENGAD 800-631-6989

students confronted Grinnell over its failings, student magazine editors lost their jobs and administrators told activists they were being intimidating.

One student, India Vannoy, was placed on academic suspension from the college while her offender was allowed to return to campus. Another woman, a senior who asked to be identified by only her first name, Anna, saw her attacker punished with "conduct probation." He was also ordered to write an apology letter, but allowed to stay in her classes. He later landed an on-campus job — as head of student security.

While these three cases might not represent the way Grinnell has handled the majority of reported sexual assaults, their consequences have driven two victims away from their dream school and caused daily anxiety for the third, who stayed on campus. The women filed a federal complaint against Grinnell in February due to their concerns the college's handling of their cases violated Title IX, the gender equity law requiring colleges to address to sexual misconduct on their campus.

Grinnell, with its relatively progressive policies surrounding consent, a student body that's buying into rape-prevention efforts and an administration actively working to address sexual violence, may be a bellwether for how difficult it will prove for any college to fully address the needs of assault victims. If a prestigious, close-knit college like Grinnell cannot avoid letting down students who report rape, it raises the question of whether any school truly can.

Grinnell said federal privacy law limited how much they could comment on sexual assault cases. However, in anticipation of this article's publication, the school announced Monday it had requested that the Education Department launch a federal investigation of how it responded to reports of sexual violence.

"Grinnell has a longstanding commitment to creating and fostering an environment free from discrimination and harassment," Grinnell President Raynard Kington told The Huffington Post. "Despite its small size, Grinnell has embraced its Title IX obligations and in recent years taken significant and expansive steps to assure that our policies, procedures, and practices are legally compliant, trauma-informed, and consistent with promising practices across the country."

Frustrations over how the college handles sexual assault have enveloped the tiny Iowa campus, creating a face-off between the administration and an activist group of survivors and allies called Dissenting Voices. A progressive student body that views the "only yes means yes" consent standard as a settled discussion — and is proud of its school for having it — is caught in the middle.

"People want to see change happen now and it's frustrating to know this is a system that goes so deep it's going to take time," said Joyce Bartlett, a senior who works as a peer advocate, meaning she's trained to provide help to victims of sexual violence on campus.



*One of the residence hall buildings at Grinnell College that are located in three areas of the campus. Students who reported being sexually assaulted say they struggled with seeing the accused students in the lounges of their buildings.*

T he liberal arts college dominates the isolated town of Grinnell, Iowa. Fewer than 10,000 people live here, and 1,600 of those are undergraduates at the private school. The student nightlife largely takes place on campus, and it's roughly an hourlong drive on the highway to the nearest metropolitan city.

"The campus is so tiny, everyone's lives are all wrapped up in each other," said Lisa Stern, a junior who works with victims through a hotline run by Grinnell's Domestic Violence Alternatives Student Assault Center. "It's really challenging to navigate how to be in different social situations around people's assaulters."

The way no-contact orders are enforced on such a small campus is key to how some students say Grinnell failed them, but also shows the challenges for administrators in a tight-knit community.

When a professor told the administration Anna's offender was sitting next to her in class, for example, the college said there was nothing they would do.

"The burden is placed equally on both of us to not communicate, so if I would say, 'Get the fuck away from me, don't sit here,' like I wanted to, I would be in just as much trouble," Anna said.

Andrea Conner, the current dean of students, points to several features that limit school administrators' ability to enforce no-contact orders: "We have one dining hall, the campus is roughly a four-block radius, there are not multiple sections of every course."

**DEF APP 157**

"We work with our students to understand the challenges of navigating a no-contact order in the context of a small geographical area with shared common facilities," Kington added in a statement. "We also take strong action when the terms of a no-contact order are violated. We recognize the tension inherent in meeting the needs of a complainant and a respondent when both co-exist on the campus and — where possible, based on the facts and circumstances — separate the parties' housing and class schedules."

But even experts who acknowledge those hurdles criticized Grinnell's approach.

"I have trouble understanding what an institution could call a no-contact order that allows a respondent to regularly come in close proximity and not violate the no-contact order," said John Wesley Lowery, chair of the student affairs of higher education department at Indiana University of Pennsylvania.

"The Department of Education's Office for Civil Rights has never said that expulsion or suspension is required to remedy a hostile environment. But they have said sufficient steps must be taken to remedy that hostile environment," said longtime campus safety advocate S. Daniel Carter of the VTV Family Outreach Foundation, a nonprofit born out of the Virginia Tech massacre. "No-contact orders can be part of that, but they must be effective at separating the victim and the assailant."

Seeing her alleged attacker around Grinnell's campus became too much for Bartlett, who transferred to the University of Missouri in 2013. As recently as December 2014, Grinnell sent Bartlett a letter asking if she would consider returning to the college, and asked her why she "chose to leave."

"I loved Grinnell, or I loved what I thought Grinnell was," Bartlett said. "But after all that there was just no way."



*Clockwise: Text messages Emily Bartlett said a male student sent her just after he sexually assaulted her; An apology letter from the student after a hearing into the alleged assault; A portion of the letter describing the punishment the student received for disorderly conduct and "psychological harm."*

ndia Vannoy left the campus after reporting a sexual assault too, but she didn't leave by choice.

Vannoy said a classmate in her scholarship program sexually assaulted her in April 2012 during a prospective students' weekend before she ever started classes.

**DEF APP 158**

"The day I was raped I was at the [college] president's house — literally five hours before I got raped I was with the president," Vannoy said.

Vannoy filed school conduct charges against the male student in September 2012, as did another woman who said she was assaulted by the same man.

During a January 2013 hearing, Grinnell found him responsible for psychological trauma in Vannoy's case; psychological trauma and sexual misconduct in the case of the other female student; and selling or distributing illegal drugs, according to college documents. He was suspended for three semesters and eligible to petition to return to school in spring 2014.

After the hearing, Vannoy was clinically diagnosed with post-traumatic stress disorder, and took the rest of the spring 2013 semester off to recover. She returned in the fall, but landed on academic probation due to her declining grades, and had to appear before the Committee on Academic Standing.

Grinnell Title IX Coordinator Angela Voos said the college typically would do "anything we can think of to help people navigate this difficult thing," which may include reaching out to professors on a victim's behalf.

But Vannoy said she did not receive the assistance she needed. An administrator told her she was "mentally unstable" and suggested she "should really take some time to get yourself together and get over this," Vannoy claimed. She was placed on academic suspension, and her petitions to return have so far been denied by Grinnell — meaning the attacker is allowed back on campus, but Vannoy is not.

"That's where I started my education; that's where I'd like to finish," Vannoy said. "I worked very, very hard to get into a school as rigorous as Grinnell."



*Grinnell College has a small campus, located in a rural part of Iowa near Interstate 80. It's an hourlong drive to Des Moines, the state's capital, or to Iowa City, where the University of Iowa is located.*

Grinnell's hearing panel for rape cases is like that of many colleges: It includes a student, a professor and a staff member who received special training about sexual violence and Title IX. Yet like many colleges, it's moving toward a single-investigator model. The school is hiring former Iowa Supreme Court Chief Justice Marsha Ternus to handle future assault cases.

Most of the student victims Voos speaks with don't want to engage in an adjudication process, according to numbers that she tracks. Anna's frustrating experience may provide clues as to why.

When a hearing panel took up her case in May 2012, they asked her what kind of bra she was wearing the night of the incident, Anna said, and allowed the accused student to directly question her, a practice "strongly discouraged" by the Department of Education. Anna said the accused asked her, "Why are you doing this to me? Why couldn't we have just talked about this?"

When Anna got to speak, she described explicitly saying "no" and crying during the assault.

"He said he was essentially teaching me about sex and he had a better idea about what I wanted than I did," Anna said.

Anna's offender was found responsible for "disorderly and disruptive behavior," "psychological damage" and "sexual misconduct," according to documents obtained by HuffPost. The school didn't find him guilty of rape — a criminal term — but did find him accountable for "nonconsensual penetrative intercourse." Conduct probation would serve as his punishment.

He also had to write a letter of apology, which the college delivered to Anna in July 2012. In the letter, which is five sentences long, he admits his "actions on the night of February 9th did not meet the definition of effective consent," and says he hopes he will "never commit such a heinous offense ever again."

When a student is found responsible in sexual misconduct cases, the college's first consideration as a sanction is always dismissal, said Conner, the dean. Grinnell then works backward from there depending on "mitigating or aggravating factors," she added.

"We do our best for our sense of ethics and appropriateness," Conner said.

Anna stayed on campus, but in September 2014 gave up on trying to get the college to hold her offender accountable for the alleged violations of the no-contact order, or for harassment she reported by his friends. Adding salt to her wounds, he was hired by the college this academic year for a student security job that gave him oversight of campus events, essentially to make sure students are being safe at parties. The college recently said any student still on probation would not be eligible for this position in the future, and he resigned his position as Anna raised concern on campus about his role.

The accused student in Anna's case told HuffPost he realizes he did violate the school's consent policy at the time, but chalks it up to "mixed signals" and doesn't consider it rape. At the time, Grinnell used an "effective consent" policy that stipulated consent must be "informed, freely and actively given," and could not come from the use of "intimidation, or coercion." The school switched to "affirmative consent" in fall 2012, which states that consent must be given for "each act of sexual activity," and can be withdrawn at any time.

The accused student said he's "pissed" with how Grinnell handled the case as well: The no-contact order meant he could stay in school but couldn't take certain classes, and to avoid violating his probation he had to take routes far out of his way at a time when he was on crutches due to an athletic injury.

**DEF APP 160**

"If the school really thought that I was guilty of this, I shouldn't be here; if my case was as serious as Anna made it out to be, I shouldn't be here right now," he said, adding, "I'm grateful it hasn't changed my views on how I saw rape — I'm not questioning every single woman that said that it happens to them."

Vannoy's alleged assailant maintains it was consensual intercourse, and his attorney sent a statement suggesting colleges are elevating regretted sex to sexual misconduct. Bartlett's alleged assailant could not be reached for comment. The accused men are not being named because they have not been charged with a crime in connection with these cases.



The anger may never have become so public had an editor for a student magazine not been fired for running an op-ed by Anna criticizing how the college punishes sexual assault.

Frustrated with portrayals in various news outlets of Grinnell as a shining example of a college handling sexual assault responsibly, Anna wrote an op-ed in October 2014 for the Grinnell Underground Magazine, or GUM. In it, she criticized how the school punished her attacker, and Grinnell's administration was outraged she used the phrase, "The student was found responsible for raping me."

After meeting with Grinnell administrators, the head of student media fired Linnea Hurst, the editor who published the op-ed, for allegedly barely skirting "libel and slander" by allowing a phrase she knew to be "factually inaccurate" to be published. The student media leaders feared a lawsuit, though they had no idea if anyone planned to file one. Another sin the student media leaders said Hurst committed: She didn't give as much Facebook promotion to the administration's response op-ed as she had to Anna's piece.

Hurst said she couldn't understand why the school was so upset by the phrase, since, after all, "You can't say she was 'sexually misconducted.'"

"I thought Grinnell was a pretty good place for women," Hurst said. "I thought it was fine, then everything was exposed to me. That got me very aware very quickly it was a huge fight."

Students formed the group Dissenting Voices and began demonstrating on campus after the flap at the GUM. When administrators would speak about sexual assault, the protesters would show up with red tape over their mouths to symbolize what they felt as their freedom to use the word "rape" being silenced. After one forum, administrators called the protesters "intimidating," student activists said.

Grinnell officials said they have tried to explain to student activists the school can't use "rape" because it's a legal term. Voos also suggested it's "heteronormative."

**DEF APP 161**

"Schools have no legal authority to determine a crime has taken place," explained higher education consultant Brett Sokolow, president and CEO of the National Center for Higher Education Risk Management. When a school requests a student avoid using the term, "it's not meant as a gag order, it's just that most victims don't understand how litigious these things can be."



*Grinnell students organized a protest in fall 2014 after a student was reprimanded for an article criticizing the school's response to rape.*

Grinnell is not under federal investigation yet, but has acted similarly to colleges that are. It hired well-known campus sexual assault consultants Gina Smith and Leslie Gomez to review its policies. It has an ongoing task force on the issue. Voos said she informally provided guidance on the sexual violence policies at Occidental College, another small liberal arts school accused of handing out lax punishments for rape.

"We're a small community. I think we're doing pretty well so far; not everybody's happy and we know that," said Jim Reische, Grinnell's vice president for communication.

The college declined to speak on specific cases, citing federal privacy law. But Kington, the school's president, did note Grinnell no longer uses mediation in sexual assault cases, and it stopped allowing accused students to directly question complainants in 2013. Kington, who took charge of Grinnell in 2010, said the school "proactively initiated a number of changes after commissioning a thorough external review" two years into his tenure.

"Our changes took into account the actions OCR was requiring of other institutions," Kington said. "Our external review also included seeking feedback from complainants and respondents about their experiences with the College's processes. That feedback was instrumental in guiding our actions."

Some students, like Grinnell soccer player Michael Hurley, feel like the college is "really ahead of the curve" with its policies. But as Dan Davis, a Grinnell junior, pointed out, "We're doing better than 95 percent of colleges, but 100 percent of colleges are doing terrible."

Many students who spoke with HuffPost felt the affirmative consent standard was widely accepted among students. But they acknowledged there was tension on campus between activists and the administration over its handling of cases.

**DEF APP 162**

Opeyemi Awe, president of the student government, said she doesn't feel like students are constrained by administration policies at all. She and others proudly noted the affirmative consent policy came at the request of students three years ago.

"I would say we have primary control — we very rarely have members of the administration stepping in and saying, 'You can't do this, and you can't do this.' So Grinnell is different in that way," Awe said. "We are so involved in how we create the culture that we also have a responsibility to change that culture."

**Overview of Changes since Spring 2012**

**Staffing changes**

- Appointed a Title IX coordinator with a direct line to the college president
- Developed a team of Title IX deputies, each with specialized focus
- Created a campus-wide Title IX Task Force on safety, responsibility, and prevention, including students, faculty, and staff

**Policy changes**

- Eliminated mediation and cross-examination from all sexual assault cases
- Introduced the option to use outside investigators, to enhance our investigative capacities
- Required all investigators to attend off-site training
- Converted conduct process from a hearing model to an single adjudicator model
- Engaged a former Iowa Supreme Court Chief Justice as our first external adjudicator
- Reaffirmed that those involved in the conduct process could choose anyone they wished as support persons to accompany them in the process
- Centralized the institutional response process, making it easier for students, faculty, and staff to seek help
- More clearly defined the types of sexual harassment prohibited by the policy
- Accepted student-led proposal to change the standard from effective consent to affirmative consent
- Issued statements defining acceptable behaviors and affirming our commitment to prompt and thorough response
- Instituted timeframes for the conduct process
- Launched a biannual sexual climate survey, starting in 2013; +++
- Increased the retention time for audio recordings of conduct hearings to seven years after conclusion of the process
- Ensured that each party has the full and fair opportunity to review case information
- Provided trained support persons for complainants and respondents

**Resource changes**

- Published a wide array of sexual assault resources, including a website and FAQ
- Strengthened our relationship with crisis intervention services, local law enforcement, and campus advocates
- Completed 75+ trainings for students, faculty, staff, Trustees, and alumni volunteers
- Developed active bystander and peer-to-peer education programs

Show me more about this topic
1 of 1
View on Scribd

Student leaders are exploring changes they can push for beyond the investigation process and consent policy. The Grinnell Student Government Association is currently leading a working group on the conduct process, soliciting input from students for further reform proposals.

It's hard to ignore Dissenting Voices' opinion at this point, which Awe described as "one extreme." She said she feels like "other students are put off by their tactics."

Activists with the group said in response that they spent three years holding quiet meetings with college administrators, to no avail. They also pointed out that some of their actions have come in the form of documentary screenings and a bake sale to raise money for victim services.

**DEF APP 163**

"Yes, sometimes action looks scary and confrontational ... when such action is motivated by deep sympathy and compassion," members of the group said in a statement. They said they think all administrators and students want the campus to be as safe as can be, and that their protest "should be a cause for concern and an opportunity for engagement and empathy from the rest of the community."

College officials acknowledge they'll have to continually adapt to federal guidance and concerns brought forward by community members. Yet they are also clearly concerned by how complicated these cases are, and how difficult it can be to assist students going through traumatic experiences. Additionally, due to confidentiality issues, it's not always possible to discuss every critique.

"You are never going to hear about the cases that students are satisfied with the outcome," Voos notes. "That's really OK, but it's unfortunate, because it's a very lost conversation."

*Need help? In the U.S., visit the National Sexual Assault Online Hotline operated by RAINN. For more resources, visit the National Sexual Violence Resource Center's website.*



These Twins Were Named "Most Beautiful In The World," Wait Till You See Them Today

Give It Love

Here's Why Guys Are Obsessed With This Underwear...

The Weekly Brief I Mack Weldon

Luxurious Assisted Living In New York Could Surprise You

Assisted Living I Sponsored Links

Vintage Photos That Captured More Than Expected

Groovy History

7 Yoga Poses You Should Do First Thing In The Morning

Work + Money

You Can't Stop Wearing These Treggings That Flatter Every Body Type

WhoWhatWear I American Giant

## Around The Web

Powered By ZergNet



The Disturbing Truth About 'Dating Naked'

NickiSwift.com

Donald Trump's Bizarre Hairdo Finally Explained

Nypost.com



The Scary Truth About Osama Bin Laden's Youngest Son Revealed

Aol.com

# MOST SHARED

Hillary Clinton Calls LeBron James A 'Class Act' Following Trump Tweet Attack

What Is The Best Temperature For Sleeping?

Sponsored by purple

Patrick Stewart Returning As Jean-Luc Picard In New 'Star Trek' Series

Trump's New Obamacare Sabotage Could Really Stick It To Consumers

'We Are Not A Number': Black Activists Protest At Progressive Convention

# WHAT'S HOT

DEF APP 165

**LeBron James Tweets Positive Message To Kids After Donald Trump Attacks Him**

**Barack Obama's Birthday Officially Celebrated As A Holiday In Illinois**

**1 In 2 Americans Unaware Of This "Computer Trick"**
Sponsored by ScanGuard

**Barack Obama Gets Flooded With Beautiful Birthday Messages On Twitter**

ABOUT US

RSS

User Agreement

ADVERTISE

FAQ

Privacy Policy

About Our Ads

Careers

Comment Policy

Contact Us

Archive

HuffPost Press Room

©2018 Oath Inc. All rights reserved. HuffPost MultiCultural/HPMG News

**DEF APP 166**

# GRINNELL COLLEGE



**Raynard S. Kington, M.D., Ph.D.**
President

Office of the President
Grinnell College
Grinnell, IA 50112-1690

641-269-3000
*fax* 641-269-4473
kington@grinnell.edu

March 2, 2015

Assistant Secretary Catherine Lhamon
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

Dear Assistant Secretary Lhamon,

As the President of Grinnell College, I am writing to request technical assistance from the Office for Civil Rights.

Grinnell is a private, coed, residential liberal arts college with a strong tradition of self-governance and student activism. The College has a longstanding commitment to creating and fostering an environment free from discrimination and harassment. Despite its small size, Grinnell has embraced its Title IX obligations and in recent years taken significant and expansive steps to assure that our policies, procedures, and practices are legally compliant and consistent with promising practices across the country.

Earlier this week, the College received an email inquiry from *Huffington Post* reporter Tyler Kingkade, asking the College to respond to allegations about three specific student sexual misconduct cases. The cases, dating from 2012, were investigated and adjudicated under the College's 2011–12 Sexual Misconduct Policy. Since that time, after engaging in an external audit and a concerted effort to listen to the feedback of our students, the College implemented a uniform and streamlined policy that applies to all students, employees, and third parties; and which incorporates changes in law and guidance from 2011, 2013, and 2014. A second round of changes and updates was guided by an internal policy audit in 2014.

Kingkade's email to the College includes some allegations that could be verified or disputed based on College records—for example, the dates, charges, and outcomes. However, his email contains other, more subjective statements that require full contextual understanding to evaluate fairly. Grinnell is prohibited by federal privacy laws from responding to Kingkade's questions about specific students or cases, correcting inaccuracies, or sharing clarifying information with our community. In particular, we are guided by laws prohibiting the release of personally identifiable information from student educational records and protecting the confidentiality of Title IX processes. These restrictions, while consistent with our institutional values and the integrity of our



**EXHIBIT**
P 34
08-16-18 SLP
PENGAD 800-631-6989

**GRINNELL0008115**
**DEF APP 175**



reporting processes, place the College in the untenable position of not being able to provide open and transparent information about these cases. The public record on these cases is instead defined by inaccurate and incomplete reporting, causing direct harm to individual students as well as our community.

We are deeply concerned that such powerful one-sided narratives may unintentionally deter future reporting by students who experience sexual or gender-based harassment and violence. It is for this reason that Grinnell seeks OCR's assistance.

We applaud the strength and courage of our students and welcome their perspective and feedback—be it positive or negative. A true evaluation of our actions, however, requires that the full context be explored, a standard that is impossible to achieve in the court of public opinion. Upon your acceptance, we will send secure copies of the files from the three matters referenced by Kingkade for OCR review. In keeping with your commitment to neutral and fair process, we hope you will provide answers that help Grinnell and our fellow institutions around the country navigate the complexities of the Title IX landscape. Please contact me to discuss this matter further, so that we may arrange to securely provide the files for your review.

At Grinnell, we are keenly aware that our Title IX commitment does not end at the conclusion of the hearing or appeal. We embrace the duty to care for all of our students while working to create a campus free from discrimination and harassment. In working toward this goal we will not shy from scrutiny, but instead welcome OCR's review and guidance, whatever the outcome may be.

Sincerely,

President Raynard S. Kington, M.D., Ph.D.

cc: Adele Rapport, Regional Director for the U.S. Department of Education, Office of Civil Rights, Chicago

**GRINNELL0008116**
**DEF APP 176**

## GRINNELL COLLEGE



**Raynard S. Kington, M.D., Ph.D.**
President

Office of the President
Grinnell College
Grinnell, Iowa 50112-1690

641-269-3000
*fax* 641-269-4473
www.grinnell.edu

Grinnell faculty, staff, students:

On Wednesday of last week, the College was contacted by *Huffington Post* reporter Tyler Kingkade in connection with an upcoming story that he said would focus on Grinnell and the sexual misconduct process. Kingkade identified "three specific student cases" from 2012, naming the students and listing their specific concerns to allow the College "a chance to respond." We expect the story to run this week.

The College, and President Kington personally, are deeply concerned about the problem of sexual assault and about the welfare of our students, including those who may be featured in the story as either complainants or respondents. Even the most thoughtful coverage may expose painful and deeply personal experiences to public view.

The allegations Kingkade shared with us do not come as a surprise to the College. The three cases he referenced were each investigated and adjudicated under the misconduct policies in the College's 2011–12 Student Handbook. The students involved in those cases have shared their concerns directly with the College, both in private discussions with administrators and publicly on campus. In fact, the student voice served as a catalyst for change at Grinnell. In response to their concerns, over the past several years, the College made structural changes, implemented a underline policy that incorporated student feedback, and expanded training and educational programs.

**Confidentiality of student information**

Grinnell, like every educational institution, is precluded by federal laws—including the Federal Educational Records Privacy Act (FERPA) and the Violence Against Women Act (VAWA)—from disclosing personally identifiable information from student educational records. These privacy provisions, which protect complainants and respondents alike, apply even if students publicly identify themselves or openly share details of their experiences.

Grinnell's commitment to student privacy is a cornerstone of our Title IX process. Our progress to date in fostering increased reporting is due in part to our commitment to ensuring the privacy of the people involved.

**Incomplete journalistic coverage**

**GRINNELL0008117**
**DEF APP 177**

The privacy restrictions, while consistent with our institutional values and the integrity of our processes, place the College in an untenable position, because we cannot provide open and transparent information about the cases. In some instances, the protected education records confirm or refute Kingkade's claims. In others, the criticisms he reports on are subjective and cannot be fairly addressed without a full contextual understanding.

This dilemma has fueled a national problem. Without access to protected records, recent media coverage of campus sexual assaults has often been one-sided or incomplete. Nationally, we are seeing the impact of reporters' efforts to build a narrative without access to the full facts.

Here is an example of how that lack of access to the full record has affected reporting about Grinnell.

**The impact at Grinnell**

Almost three years ago, on May 4, 2012, a set of deeply alarming first-person accounts of sexual assault were underlined in our college newspaper, the *Scarlet & Black*. Driven by concerns about the experiences students had shared, among other reasons, the College sought an external review of our Title IX policies, procedures, and practices. During that review, which began just weeks later, we sought feedback from students and alumni, inviting every complainant and respondent to share their experiences and concerns about Grinnell's conduct process. This was accompanied by a thorough review of our policies and procedures, conduct records and allegations from 2011–12. The consultants also conducted plenary training sessions open to the entire community.

**Changes to Grinnell's sexual misconduct policies, processes, and resources**

Many of the lapses Kingkade mentions were identified and remedied during the external review process. In keeping with evolving federal guidance and law, additional changes were made during a second-round policy review this fall. An overview of those changes follows this letter.

I acknowledge that aspects of our prior policies and practices were slow to adapt to the rapid pace of the federal regulatory developments. We at the College accept responsibility for those shortcomings. We have worked in depth with individual students to make sure they are supported and their needs met with reasonably available interim and permanent accommodations.

Yet the fact remains that it would be almost impossible for a reporter to link these responsive changes back to specific student concerns without access to confidential student information.

**Inviting federal technical assistance and guidance**

In order to overcome this dilemma, on Monday, March 2, the College contacted the U.S. Department of Education's <u>Office for Civil Rights</u> to request technical assistance. We have specifically invited OCR to review the cases Kingkade has highlighted to us. This is an unconventional and, to our knowledge, unprecedented request: OCR is already investigating more than 100 colleges and universities nationwide. So why is Grinnell asking to be reviewed?

Because, as the federal agency charged with conducting thorough and neutral investigations into potential civil rights violations, OCR is uniquely equipped to view *all* available information and then advise us, on the basis of the full facts, as to whether we complied with the letter and spirit of the law. Grinnell has a longstanding collaborative relationship with OCR and routinely seeks their technical assistance and guidance on our process.

We are confident that OCR's full and unfettered review of the case records will show that Grinnell cared for our students, revised our policies and practices to comply with the law, and attempted to keep pace with changes in how schools like ours prevent and address sexual assault.

There are risks inherent in inviting OCR scrutiny. The regulatory environment around Title IX has been in near-constant flux since the agency released its <u>"Dear Colleague"</u> <u>letter</u> in April 2011. And continuing research on the dynamics and effects of trauma and sexual assault has led to frequent updates in best practices. Expectations sometimes shifted in the midst of individual cases. But if Grinnell has fallen short at any point, I want to know about it now, continue to address the problems, and make things right for our students. Our work should not be judged in the court of public opinion based on incomplete information, but by those responsible for oversight of Title IX, based on comprehensive information about our practices on campus, guided by regulation or law.

**The value of student activism and partnership**

Campus activism has played a crucial role in raising awareness and exposing challenges related to campus sexual assault. Grinnell students are especially good at creating change through activism, and I am grateful for their courage and contributions. Recent media coverage assumes that students and administration have to be at odds to achieve real change, when experience has shown that real change happens when we work together.

I encourage you to review the following list of changes the College has made to its sexual misconduct policies and practices over the last several years, many of them resulting from working partnerships among students, staff, and faculty.

Sincerely,

Raynard

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Pages 180 through 194 of Defendants' Appendix Intentionally Omitted**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>        Plaintiff,<br><br>vs.<br><br>GRINNELL COLLEGE, SARAH MOSCHENROSS, ANGELA VOOS, and BAILEY ASBERRY,<br><br>        Defendants. | No. 4:17-cv-079-RGE-SBJ<br><br><br>**DECLARATION OF ANGELA VOOS** |

I, Angela Voos, have personal knowledge of the following and state:

1.  I am the former Title IX Coordinator for Defendant Grinnell College ("Grinnell"). I held the Title IX Coordinator role throughout Plaintiff John Doe's education at Grinnell.

2.  As of November 17, 2015, there was no agreement by Jane Doe or Grinnell that the November 2015 informal resolution of Jane Doe's report would serve as the final resolution.

3.  There was no signed agreement between Jane Doe, Plaintiff, and a Grinnell representative in November 2015 that stated that the informal resolution of Jane Doe's report was final.

4.  As of 2016, Grinnell regularly engaged the law firm of Husch Blackwell, LLP to provide investigation services for allegations of student sexual misconduct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

DATED   9/24/2018

By: _____