IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>GRINNELL COLLEGE, SARAH MOSCHENROSS, ANGELA VOOS, and BAILEY ASBERRY,<br><br>　　　　　　Defendants. | No. 4:17-cv-079-RGE-SBJ<br><br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and Local Rule 56(b)(2), Plaintiff John Doe ("Plaintiff") provides this response to Defendants' Statement of Undisputed Material Facts (Doc. No. 94-1) in resistance to Defendants' motion for summary judgment and separately, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and Local Rule 56(b)(3), provides a Rule 56 Statement of Additional Facts.

### A. Parties and Players

1.　　　　Plaintiff John Doe is a former student of Defendant Grinnell College ("Grinnell"). Cmplt. ¶ 1.

**Plaintiff's Response:** Admitted subject to the qualification that Plaintiff was a student at Grinnell and, on July 13, 2016, after completing his second year, he was dismissed from the College. P-APP 597-602.

2.　　　　Grinnell is a private liberal arts college located in Grinnell, Iowa. Cmplt. ¶ 9.

**Plaintiff's Response:** Admitted subject to the qualification that Grinnell receives various forms of funding from the federal government. P-APP 494-495 at 144:17-148:22.

3.　　　　Voos is currently Grinnell's Vice President for Strategic Planning and Chief of Staff. App. 96[196:23-25].

**Plaintiff's Response:** Admitted.

In 2016, Voos was Grinnell's Title IX coordinator. Cmplt. ¶ 13.

**Plaintiff's Response:** Admitted subject to the qualification that Voos served as Title IX Coordinator from Fall 2012- June 30, 2018. P-APP 1121 at 10:10-18; P-APP 1153-1154 at 196:22-197:8.

As Title IX Coordinator, Voos coordinated the College's handling of reports of sexual misconduct. *See id.*; *see also* App. 29; 100[12:12]-101[13:16].

**Plaintiff's Response:** Admitted subject to the qualification that this was only one of Voos' responsibilities as Title IX Coordinator. P-APP 242-243.

4.      Defendant Bailey Asberry is currently Grinnell's Title IX Coordinator. App. 100[9:17-25].

**Plaintiff's Response:** Admitted.

In 2016, Asberry, then known as Bailey Thompson, was Grinnell's Title IX Deputy for Case Management. Cmplt. ¶ 14.

**Plaintiff's Response:** Admitted subject to the qualification that Asberry served as Title IX Deputy from February 2015-June 30, 2018. P-APP 508-509 at 8:13-10:5.

Asberry assisted Defendant Angela Voos in responding to and managing reports of sexual misconduct. App. 100[12:12]-101[13:16].

**Plaintiff's Response:** Admitted subject to the qualification that this was only one of Asberry's responsibilities as Title IX Deputy. P-APP 509-510 at 12:2-13:16.

5.      Defendant Moschenross is currently Grinnell's Associate Vice President of Student Affairs. App. 117[55:1-4.]

**Plaintiff's Response:** Admitted.

In 2016, Moschenross was Grinnell's Dean of Students. Cmplt. ¶ 11; App. 115[23:7-9.]

**Plaintiff's Response**: Admitted subject to the qualification that Moschenross was Dean of Students from July 2015 to in or around April 2018. P-APP 624 at 18:9-13, P-APP 628 at 55:1-4.

As Dean of Students, Moschenross's duties included reviewing recommendations provided by the adjudicator in sexual misconduct disciplinary proceedings. App. 116[49:18-23].

**Plaintiff's Response**: Admitted.

Moschenross also played a role in deciding whether Grinnell would initiate an investigation following a report of sexual misconduct. App. 116-117[52:18-53:25].

**Plaintiff's Response:** Denied. Under Grinnell's sexual misconduct policy, as Dean of Students, Moschenross was to determine "in consultation with the Title IX Coordinator and the Title IX team" the appropriate manner of resolution. Thus, Moschenross was required to do more than "play a role" in making that decision. P-APP 267; P-APP 628 at 53:19-54-25.

**B. Grinnell's Community Standards.**

6.      Grinnell has Community Standards that applied to Plaintiff and other Grinnell students. App. 1-2; 60[70:16-71:13].

**Plaintiff's Response:** Admitted.

Plaintiff received training on the Community Standards in his student orientation. *Id.*

**Plaintiff's Response**: Admitted subject to the qualification that the mere receipt of training does not speak to the quality or completeness of said training and how it was understood by those being trained.

7.      Standard Two of the Community Standards provides, in part:

**Grinnellians value the personal safety of themselves and other members of the Grinnell community.**

This includes harassment, sexual misconduct, domestic/dating partner violence, physical assault, threatening behavior, hazing, or any related activities aimed at any member of the College community—including one's self—that harms someone physically or psychologically, or causes others to fear being harmed.

App. 1-2 (formatting in original).

**Plaintiff's Response:** Admitted.

## C.  Grinnell's Sexual Misconduct Policy

8.      Grinnell applied a policy entitled "Grinnell College Policy, Procedures and Guide to Preventing, Reporting, and Responding to Sexual Misconduct and other Forms of Interpersonal Violence" (the "Policy") to Plaintiff's student discipline at issue in this case. App. 3-52; 125[47:22]-126[49:8]; 127[55:17-56:9].

**Plaintiff's Response:** Admitted.

9.      The Policy states that Grinnell is "committed to providing a learning, living and working environment that is free from all forms of discrimination and harassment, including sexual and gender-based harassment, sexual misconduct, intimate partner violence, and stalking (referred to collectively in this guide as Prohibited Conduct)." The Policy prohibits Prohibited Conduct, which includes sexual misconduct and sexual assault. App. 3, 13.

**Plaintiff's Response:** Admitted.

10.     The Policy defines sexual assault as "having or attempting to have sexual intercourse or sexual contact with another individual without consent." App. 16. The definition of "sexual assault" includes the following:

> **Related to Non-consensual Sexual Intercourse:** Having or attempting to have sexual intercourse with another individual without consent. Sexual intercourse includes vaginal or anal penetration, however slight, with a body part or object, or oral copulation by mouth-to-genital contact.

> **Related to Non-consensual Sexual Contact:** Having or attempting to have sexual contact with another individual without consent. Sexual contact includes kissing, touching the intimate parts of another, causing the other to touch one's intimate parts, or disrobing or exposure of another without permission. Intimate parts may include the breasts, genitals, buttocks, mouth or any other part of the body that is touched in a sexual manner. Non-consensual Sexual Contact can occur whether individuals are clothed or unclothed.

App. 16 (formatting in original).

**Plaintiff's Response:** Admitted.

11.     The Policy defines "consent" as "affirmative consent." App. 18-19. It states:

The policy is based on affirmative consent. In the spring of 2012, the Grinnell College student body voted overwhelmingly to revise the then-existing Sexual Harassment and Misconduct policy to incorporate affirmative consent. Consent to engage in sexual activity must be given knowingly, voluntarily, and affirmatively. Consent to engage in sexual activity must exist from the beginning to end of each instance of sexual activity and for each form of sexual contact. Consent is demonstrated through mutually understandable words and/or clear, unambiguous actions that indicate a willingness to engage freely in sexual activity. Consent is active, not passive.

- Each participant in a sexual encounter is expected to obtain and give consent to each act of sexual activity. Consent to one form of sexual activity does not constitute consent to engage in all forms of sexual activity.

- Consent consists of an outward demonstration indicating that an individual has freely chosen to engage in sexual activity. Relying on non-verbal communication can lead to misunderstandings or potential policy violations. Consent may not be inferred from silence, passivity, lack of resistance, or lack of an active response alone. A person who does not physically resist or verbally refuse sexual activity is not necessarily giving consent.

- If at any time it is reasonably apparent that either party is hesitant, confused, or unsure, both parties should stop and obtain mutual verbal consent before continuing such activity.

- Consent may be withdrawn by either party at a time. Withdrawal of consent must also be outwardly demonstrated by mutually understandable words or clear, unambiguous actions that indicate a desire to end sexual activity. Once withdrawal of consent has been expressed, sexual activity must cease.

- Individuals with a previous or current intimate relationship do not automatically give initial or continued consent to sexual activity. Even in the context of a relationship, there must be mutually understandable communication that clearly and unambiguously indicates a willingness to engage in sexual activity.

- Consent is not affirmative if it results from the use of threat or physical force, intimidation, or coercion, or any other factor that would eliminate an individual's ability to exercise his/her/hir own free will to choose whether or not to have sexual contact.

5

- An individual who is physically incapacitated from alcohol and/or other drug consumption (voluntarily or involuntarily), or is unconscious, unaware, or otherwise physically helpless is considered unable to give consent.

- In the state of Iowa, consent can never be given by minors under the age of 16.

When evaluating consent, the College will consider the objectively apparent indicia of consent (or lack of consent) from a reasonableness perspective.

App. 18-19.

> **Plaintiff's Response:** Admitted that this is how the Policy defines affirmative consent.

12.     The Policy also defines "coercion" as follows:

Coercion is direct or implied threat of force, violence, danger, hardship, or retribution sufficient to persuade a reasonable person of ordinary susceptibility to perform an act which otherwise would not have been performed or acquiesce in an act to which one would not have submitted. Coercion can include unreasonable and sustained pressure for sexual activity. Coercive behavior differs from seductive behavior based on the type of pressure someone uses to get consent from another. A person's words or conduct cannot amount to coercion unless they wrongfully impair the other's freedom of will and ability to choose whether or not to engage in sexual activity. When someone makes it clear that he/she/zi does not want to engage in sexual activity, that he/she/zi wants to stop, or that he/she/zi does not want to go past a certain point of sexual interaction, continued pressure beyond that point can be coercive.

App. 20.

> **Plaintiff's Response:** Admitted that this is the Policy's definition of coercion.

### D.  Reporting Prohibited Conduct under the Policy.

13.     The Policy states that, for each report of Prohibited Conduct, Grinnell will

"approach the assessment of each report with an earnest intent to understand the perspective and

experiences of each individual involved in order to ensure fair and impartial evaluation and

resolution." App. 24.

> **Plaintiff's Response:** Admitted subject to the qualification that this quote appears on p. 25 of the Policy, or at Def. App. 27.

14.     The 2015 Policy encourages the reporting of Prohibited Conduct. It explains the

Complainant's role in deciding how to proceed after making a report:

> Not only does reporting help the individual, but increased communication about
> issues related to sexual misconduct and interpersonal violence can help prevent
> future acts of Prohibited Conduct. The information community members report
> can illuminate patterns of behavior, immediate threats to the safety of the
> community, and systemic issues.
>
> At the time a report is made, a Complainant does not have to decide whether or
> not to request any particular course of action, including conduct (corrective)
> action. Choosing to make a report, and deciding how to proceed after making the
> report, can be a process that unfolds over time. College officials will do
> everything possible to respect an individual's autonomy in making these
> important decisions and to provide support that will assist each individual in
> making that determination. Unless there is an immediate threat to the community
> or a minor is involved, the Complainant can help set the pace and make decisions
> about how best to proceed (including not naming the other party/ies at the time of
> the report).

App. 27.

**Plaintiff's Response**: Admitted subject to the qualification that the Policy is not dated
and therefore should not be referred to as the "2015 Policy."

15.     An individual "may choose to report Prohibited Conduct to any trusted employee

of the College." App. 29.

**Plaintiff's Response:** Admitted.

Any employee who receives a report of Prohibited Conduct "must share the report with

the Title IX Coordinator." App. 29.

**Plaintiff's Response:** Admitted.

16.     The Policy encourages individuals "to report Prohibited Conduct as soon as

possible," but "does not, however, limit the timeframe for reporting." App. 30.

**Plaintiff's Response**: Admitted subject to the qualification that the Policy states that
"Complainants and witnesses are encouraged to report Prohibited Conduct as soon as
possible in order to maximize the College's ability to respond promptly and effectively."
P-APP 263.

### E.  Responding to a report of Prohibited Conduct.

17.      Under the Policy, "[t]he Title IX Coordinator, working with the Title IX team" is charged to "ensure that the College responds to all reports in a timely, effective, and consistent manner that treats everyone with dignity and respect." App. 32.

**Plaintiff's Response**: Admitted.

18.      The Policy provides: "Generally speaking, the initial assessment and subsequent grievance procedures against a Respondent are overseen by an administrator designated as the Senior Official." App. 32 (formatting altered).

**Plaintiff's Response**: Admitted.

"For reports against a student, the Senior Official is the Dean of Students." App. 33.

**Plaintiff's Response:** Admitted.

19.      After receiving a report of Prohibited Conduct, the Policy requires the Title IX team to complete an initial review or assessment of the report that considers individual and campus community safety. App. 33-34.

**Plaintiff's Response:** Denied. An initial assessment requires "the College" to make an immediate assessment of the report with respect to the *reporting* individual's, or the campus community's, safety and then to notify the Complainant of "his/her/hir" rights, to explain the sexual misconduct process to the Complainant, and to "[d]iscuss the Complainant's expressed preference for manner of resolution and any barriers to proceeding." P-APP 266-267.

Once "the Senior Official, in consultation with the Title IX Coordinator, has sufficient information," the official can "determine the appropriate manner of resolution" of a report. App. 34.

**Plaintiff's Response:** Admitted.

This determination considers "a Complainant's requested course of action." App. 34.

**Plaintiff's Response**: Denied. Per the Policy, *"[t]he Title IX assessment* includes explicit consideration of a Complainant's requested course of action, as outlined in greater detail

8

in the following section on Complainant Agency and Autonomy." (emphasis added) P-APP 267.

20.     The Policy also explains when a Respondent is notified of the manner of

resolution:

> Depending on the circumstances and requested resolution, the Respondent may or may not be notified of the report or resolution. A Respondent will be notified when the action would impact a Respondent, such as the imposition of interim protective measures that would restrict the Respondent's movement on campus, the initiation of an investigation or the decision to involve the Respondent in an informal process.

App. 34-35.

**Plaintiff's Response**: Admitted.

### F.   Selecting formal or informal resolution of a report of Prohibited Conduct.

21.     The Policy generally allows for both formal and informal resolutions of a report

of Prohibited Conduct. *See* App. 32-33; 39-52.

**Plaintiff's Response:** Admitted.

"Informal Resolution does not involve disciplinary action against a Respondent." App.

39.

> **Plaintiff's Response:** Admitted subject to the qualification that, per the Policy, Informal Resolution is defined as "a variety of alternative actions that may be taken by the College to eliminate Prohibited Conduct, prevent its recurrence and address its effects…through the imposition of individual and community *remedies*" (emphasis added). P-APP 272.

In contrast, "Formal Resolution, which involves an investigation to determine if there has

been a policy violation, may result in the imposition of sanctions through conduct (corrective)

action." App. 39.

**Plaintiff's Response:** Admitted.

22.    "Informal Resolution" is meant to "capture a variety of alternative actions that may be taken by the College to eliminate Prohibited Conduct, prevent its recurrence and address its effects." App. 39.

**Plaintiff's Response:** Admitted.

It is "typically used when a Complainant requests anonymity, does not consent to participation in an investigation, or the alleged conduct, even if it does not rise to the level of a policy violation, suggests the need for remedial, educational or preventive action." App. 40.

**Plaintiff's Response**: Admitted.

23.    Informal Resolution may include "Indirect Action," which "is intended to alter and stop the Respondent's behavior without requiring the Complainant to participate in the resolution." App. 41.

**Plaintiff's Response**: Denied. The Policy requires "Indirect Action Taken *by the Senior Official*" or, in the case of students, Indirect Action taken by the Dean of Students. (emphasis added). P-APP 266, 274. Plaintiff admits that Informal Resolution may be "intended to alter and stop the Respondent's behavior without requiring the Complainant to participate in the resolution."

Indirect action can include "targeted or broad-based training or educational programs designed to address the conduct at issue." App. 41.

**Plaintiff's Response**: Admitted.

24.    The Policy states: "The decision whether to pursue Informal or Formal Resolution will be made by the Senior Official, in consultation with the Title IX Coordinator and the Title IX team." App. 39.

**Plaintiff's Response**: Admitted.

25.    The Policy states that, "[i]n some instances, an Informal Resolution by agreement of the Complainant, the Respondent and the College is meant to be a final resolution." App. 40.

**Plaintiff's Response:** Admitted.

26.     The Policy provides the following guidance when determining whether a report of

Prohibited Conduct should or can be handled informally or formally:

> In the course of the Title IX assessment, College officials, to the best of their
> ability, will consider the interest of the Complainant and his/her/hir expressed
> preference for manner of resolution. Where possible, and as warranted by an
> assessment of the facts and circumstances, the College will seek action consistent
> with the Complainant's request. Where a Complainant requests that his/her/hir
> name or other identifiable information not be shared with the Respondent or that
> no formal action be taken, the College will balance this request with its dual
> obligation to provide a safe and non-discriminatory environment for all College
> community members and to afford a Respondent procedural protections by
> providing notice and an opportunity to respond before conduct (corrective) action
> is taken against a Respondent.
>
> In assessing the appropriate resolution, the College will consider the
> Complainant's express preference for manner of resolution in light of the
> following factors:
>
> - The seriousness, persistence, or pervasiveness of the conduct;
>
> - The respective ages and roles of the Complainant and the Respondent;
>
> - Whether there have been other reports of Prohibited Conduct against the
>   Respondent;
>
> - The right of the Respondent to receive notice and relevant information
>   before conduct (corrective) action is sought;
>
> - Whether the circumstances suggest there is an increased risk of the
>   Respondent committing additional acts of Prohibited Conduct;
>
> - Whether the Respondent has a history of arrests or prior conduct
>   violations (at the College or elsewhere, if such information is available)
>   indicating a history of violence;
>
> - Whether the Respondent threatened further acts of Prohibited Conduct or
>   other violence against the Complainant or others;
>
> - Whether the Prohibited Conduct was committed by multiple individuals;
>
> - Whether the circumstances suggest there is an increased risk of future acts
>   of Prohibited Conduct under similar circumstances;

11

- Whether the Prohibited Conduct was perpetrated with a weapon, by force, or through the use of predatory behavior, including the use of incapacitating substances;

- Whether the College possesses other means to obtain relevant evidence (e.g., security cameras or personnel, physical evidence);

- The Respondent's right to receive information if such information is maintained in an "educational record" under FERPA; and,

- The College's obligation to provide a safe and non-discriminatory environment.

App. 35-36.

> **Plaintiff's Response:** Admitted subject to the qualification that this language appears in the section of the Policy with the title "Complainant Agency and Autonomy." This section does not use the phrase "should or can be handled informally or formally" as referenced above but rather states "in assessing the appropriate resolution." P-APP 268.

27.     Finally, the Policy provides:

> Where the College determines that action should be taken that is inconsistent with the request of the Complainant, the Senior Official or Title IX Coordinator will inform the Complainant about the chosen course of action, which may include the College initiating conduct (corrective) action against the Respondent. A Complainant will be encouraged, but not required, to participate in the investigation.

App. 36.

> **Plaintiff's Response**: Admitted.

## G. Formal Resolution Process: Investigation.

28.     The Policy states that the College will pursue an investigation under its Formal Resolution process in the following circumstances: (1) "where a Complainant requests investigation and conduct (corrective) action;" (2) "where the College determines that an investigation is warranted based on the Title IX assessment;" or (3) "where Informal Resolution was unsuccessful or not an appropriate form of resolution." App. 41.

> **Plaintiff's Response:** Admitted.

12

29.     The Policy explains the purpose of the investigation: "to establish whether there is a basis for believing that it is more likely than not the alleged violation of this policy has occurred." App. 43.

**Plaintiff's Response**: Admitted.

30.     The Policy provides the following limitations on the role of investigators: "The investigator(s) will not make any findings or determinations of responsibility. The adjudicator bears the ultimate responsibility of determining, by a preponderance of the evidence, whether the Respondent is responsible for committing Prohibited Conduct in violation of this Policy." App. 43.

**Plaintiff's Response**: Admitted.

31.     The Policy provides that "the Title IX Coordinator will designate a trained investigator to conduct a prompt, thorough and impartial investigation of reports of Prohibited Conduct." App. 42.

**Plaintiff's Response:** Admitted subject to the qualification that the Policy provides that this shall occur "[w]here the College initiates Formal Resolution." P-APP 275.

The Policy allows the College to use an "external investigator engaged to assist the College in conducting an investigation" as opposed to "a College employee." App. 42.

**Plaintiff's Response**: Admitted.

32.     As of 2016, Grinnell had engaged and continues to engage Husch Blackwell to perform investigations for Grinnell when student reports of sexual misconduct are handled through the formal disciplinary process under Policy. App. 295.

**Plaintiff's Response:** Admitted.

33.     The Policy charges the investigators to "conduct a fair and reliable fact-gathering in light of the circumstances of the report." App. 42.

**Plaintiff's Response:** Admitted.

34.    The investigators are "responsible for interviewing the Complainant and

Respondent (separately); interviewing potential witnesses; collecting relevant documentation and

physical evidence . . .; creating a timeline; and preparing a written report documenting the

complete investigation." App. 42.

**Plaintiff's Response**: Admitted.

35.    The Policy provides that "Complainant and Respondent will have an equal

opportunity to be heard, to submit information, and to identify witnesses who may have relevant

information." App. 42.

**Plaintiff's Response:** Admitted.

Additionally, "[b]oth parties will also have equal and timely access to information that

will be used in the adjudication of the report, and timely notice of meetings or proceedings at

which their presence will be required or requested." App. 42.

**Plaintiff's Response**: Admitted.

36.    The Policy expressly permits investigators to "consider other reports of, or

findings of responsibility for, similar conduct by the Respondent to the extent such information

is relevant and available. Such information may be relevant to prove motive, intent, absence of

mistake, pattern or another material fact." App. 43.

**Plaintiff's Response**: Admitted.

37.    The Policy also expressly discusses Grinnell's ability to consolidate investigations

into multiple reports of Prohibited Conduct:

> The Senior Official, in in consultation with the investigator and Title IX
> Coordinator, has the discretion to consolidate multiple reports against a
> Respondent into one investigation and resolution if the evidence related to each
> incident would be relevant and probative in reaching a determination on the other

14

incident. Matters may be consolidated where they involve multiple Complainants, multiple Respondents, or related conduct which would regularly have been heard under the Community Standards and Responsibilities section of the Student Handbook.

App. 43.

> **Plaintiff's Response**: Admitted.

### H.  The investigation report.

38.     Prior to issuing a final report, and upon conclusion of the investigation, the

investigator prepares a preliminary written investigation report for review by the parties. App.

44.

> **Plaintiff's Response**: Admitted.

39.     The parties have the opportunity to review and provide comments to the

investigation report and identify additional witnesses or sources of evidence. App. 44.

> **Plaintiff's Response**: Admitted subject to the qualification that, per the Policy, the Complainant and Respondent (rather than "the parties") have the opportunity to review the preliminary investigation report and may provide comments or identify additional witnesses or evidence within five (5) business days. P-APP 277.

The Senior Official or designee then reviews the parties' responses, "and ask[s] the

investigator(s) to conduct additional investigation as appropriate." App. 44.

> **Plaintiff's Response**: Admitted.

Investigators will then prepare the final investigative report. *Id.*

> **Plaintiff's Response**: Admitted.

### I.  The adjudication.

40.     The Policy requires that "the final investigation report will form the basis [for]

adjudication" of a report of Prohibited Conduct. App. 45.

> **Plaintiff's Response**: Admitted.

41.     The Policy permits the College to retain "a trained individual external to the

College," which the Policy refers to as the adjudicator, to determine whether the Respondent is

responsible for the alleged Prohibited Conduct. App. 34.

> **Plaintiff's Response**: Admitted subject to the qualification that the relevant language
> appears at Defs. App. 45.

The Policy provides outside adjudicators are "typically experienced, retired judges,

trained in the intricacies of Title IX," who "possess the requisite training and experience needed

to competently and fairly adjudicate the matter, and [who] will be free from actual bias or

conflict of interest." App. 43 & 46.

> **Plaintiff's Response**: Admitted.

42.     At the time in question, Grinnell retained Marsha Ternus, former Chief Justice of

the Iowa Supreme Court, to serve as Grinnell's external adjudicator. App. 97[197:23-198:3];

136[18:6-20:5].

> **Plaintiff's Response**: Admitted subject to the qualification that Justice Ternus was first
> retained by Grinnell in January 2015 and has served as Grinnell's sole, external
> adjudicator since that time. P-APP 1154 at 197:23-200:24; P-APP 1197-1198.

Justice Ternus underwent training as an external adjudicator, which familiarized her with

Title IX and adjudication of sexual misconduct claims in the education context. App. 137[23:23-

24:10].

> **Plaintiff's Response**: Denied. In February 2015, Justice Ternus participated in *one*
> conference call with Grinnell's Title IX counsel during which she reviewed a PowerPoint
> presentation and thus her "familiarization" with Title IX and sexual misconduct claims
> has not been established. P-APP 1066 at 23:23-24:10.

43.     "The adjudicator will determine responsibility by a preponderance of the

evidence—whether it is more likely than not that there was a violation of conduct standards or

policy." App. 45 (formatting altered).

**Plaintiff's Response**: Admitted.

44.     The adjudicator holds an adjudication meeting with each party; however, "[i]f a party does not attend an adjudication meeting, for any non-emergency or non-compelling reason, the meeting may be held in his/her/hir absence at the discretion of the Dean of Students (or designee)." App. 46.

**Plaintiff's Response**: Admitted.

45.     The adjudication meetings are private, and the only individuals who may attend are: "the Complainant, the Respondent, any individual serving as a support person (advisor), and the investigator(s)." App. 46. "The Title IX Coordinator, designee, or College counsel may also be present." App. 46.

**Plaintiff's Response**: Admitted.

46.     The Policy provides that both Complainants and Respondents are permitted to have a "support person (advisor)" consult with and accompany them to any meeting or proceeding under the Policy, whether informal or formal. App. 39.

**Plaintiff's Response**: Admitted.

47.     A support person "may be any individual, including an attorney, who is not a witness or otherwise involved in the procedures." The Policy delineates the role of a support person stating that he or she "is a nonparticipating supporter" who "may advise the Complainant or Respondent any the procedural or any other aspects of the matter or assist with the party's review of documents and appeal process[.]" App. 39.

> **Plaintiff's Response**: Admitted subject to the qualification that the Policy states that "The support person (advisor) is a nonparticipating supporter at any meeting or hearing under this policy and procedures." P-APP 272.

48.     The Policy outlines the process that the adjudicator uses in the adjudication

meetings:

> The adjudication meeting is not intended to be adversarial; rather, it is intended to
> be educational, corrective, and developmental. The adjudication is intended to
> provide fair and ample opportunity for each side to present his/her/hir
> account/narrative to determine the facts of the case, make a determination
> regarding the alleged violations of this policy. College regulations and
> Community Standards, and to recommend appropriate educational outcomes
> (sanctions), if necessary. The adjudication meetings are an informal proceeding
> and the mechanism by which the College assesses and, as appropriate, takes
> formal conduct (corrective) action regarding a violation of College policy or
> regulation.

> The adjudicator is required to review all pertinent information regarding the
> Incident, including written statements, the investigation report, documents, items,
> and/or oral information from the Complainant, and Respondent.

> Each adjudication meeting will begin with an explanation of the process. The
> adjudicator will then provide an opportunity to all parties to ask procedural
> questions prior to initial statements and the presentation of information.

> First, the adjudicator will meet separately with a representative of the
> investigative team. The investigator(s) will provide an opening statement
> summarizing the investigation. The opening statement should focus on the areas
> of agreement and disagreement in order to assist the adjudicator in prioritizing
> areas of inquiry. The adjudicator may make Inquiries of the investigator at this
> juncture, and ask any questions that allow a more full understanding of the case.

> Second, the adjudicator will meet with the Complainant and his/her/hir support
> person (advisor). The Complainant may present his/her/hir own account of the
> events in a narrative format. The adjudicator may pose questions to the
> Complainant. The Complainant may also bring an Impact Statement that
> addresses the impact of this event and their suggestions for educational outcomes
> (sanctions), to be considered if the Respondent is found responsible for any of the
> charges in the case.

> Third, the adjudicator will meet with the Respondent and his/her/hir support
> person (advisor). The adjudicator will read the charge(s) against the respondent
> and ask them to enter a plea of "responsible" or "not responsible" for each of the
> charges. The Respondent will be given an opportunity, and is encouraged, to
> present his/her/hir response, again in a narrative format. The adjudicator may pose
> questions to the Respondent. The Respondent may also bring a Mitigation
> Statement that addresses the considerations relevant to sanctioning and their

suggestions for educational outcomes (sanctions), to be considered if the Respondent is found responsible for any of the charges in the case.

App. 47-48.

> **Plaintiff's Response**: Admitted.

### J. The Adjudicator's deliberation and opinion

49.    After the adjudication meetings, the adjudicator deliberates on the report

privately. App. 48.

> **Plaintiff's Response**: Admitted subject to the qualification that the Policy states "[a]fter all of the information has been presented through these three adjudication meetings, the adjudicator will deliberate in private." P-APP 281.

50.    The adjudicator must then "reach a decision on responsibility [for the Prohibited

Conduct] by using the preponderance of evidence"—that is, "the adjudicator will decide whether

it is 'more likely than not,' based on the information provided through the investigation and at

the adjudication meeting(s), that the Respondent is responsible for the alleged violation(s)." App.

48.

> **Plaintiff's Response**: Admitted.

51.    Finally, the adjudicator will issue a written case opinion, which "detail[s] the

findings of fact and the basis/rationale for the decision of the adjudicator [regarding

responsibility], making reference to the evidence that led to the finding." App. 48.

> **Plaintiff's Response**: Admitted.

52.    If the adjudicator finds that the Respondent is responsible for the Prohibited

Conduct, the adjudicator considers any impact statement or mitigation statement provided by the

parties. App. 48.

> **Plaintiff's Response**: Admitted.

53.     If the adjudicator finds a Respondent responsible for Prohibited Conduct, the adjudicator must recommend "appropriate educational outcomes to the Dean of Students (or designee)." App. 48.

> **Plaintiff's Response**: Admitted subject to the qualification that the Policy states that the adjudicator "will recommend" appropriate educational outcomes rather than "must." P-APP 281.

54.     The Policy states that the Dean of Students or designee "is not bound by the recommendations of an external adjudicator and has the final authority to impose appropriate educational outcomes." App. 48.

> **Plaintiff's Response**: Admitted.

Departing from an adjudicator's outcome is permitted only when "compelling justification exists," such as "serious mitigating circumstances, contextual or historical aggravating circumstances, or egregiously offensive behavior." App. 49.

> **Plaintiff's Response**: Denied. Per the Policy, "[n]either the adjudicator, Dean of Students (or designee), nor any appeals officer will deviate from the range of recommended outcomes unless compelling justification exists to do so." P-APP 282. The recommended outcomes referred to in this sentence are those recommended in the policy, not the adjudicator's outcome as stated above. *Id.* "The Dean of Students (or designee) reserves the right to broaden or lessen any range of recommended educational outcomes in the case of serious mitigating circumstances, contextual or historical aggravating circumstances, or egregiously offensive behavior." *Id.*

**K. Educational Outcomes following Adjudication.**

55.     The Dean of Students or designee makes the final decision regarding the appropriate educational outcome for a Respondent who is found responsible for Prohibited Conduct, and "provide[s] simultaneous written notification of the adjudicator's findings and the sanction imposed, to the Respondent and the Complainant in writing." App. 49.

> **Plaintiff's Response**: Admitted subject to the qualification that, under the Policy, the Dean of Students has two (2) business days from the date the adjudicator submits her report to make a decision and notify the parties in writing. P-APP 282.

56.     The Policy provides that "[e]ducational outcomes may range from written warning to permanent separation (i.e., dismissal) from the College." App. 49.

**Plaintiff's Response:** Admitted.

The Policy provides a list of possible "educational, remedial, and/or corrective actions," including conduct warnings, suspension, or dismissal from the Grinnell. App. 49.

**Plaintiff's Response**: Admitted.

57.     The Policy specifies a range of educational outcomes that apply when a Respondent is found responsible for certain types of Prohibited Conduct under the Policy. For example:

- "Any student who is determined to have engaged in Non-consensual Sexual Intercourse may receive educational outcomes ranging from suspension to dismissal."

- "Any student who is determined to have engaged in Non-consensual Sexual Contact (where no intercourse has occurred) may receive educational outcomes ranging from conduct warning to dismissal."

App. 49.

**Plaintiff's Response**: Admitted.

58.     Decisions regarding the appropriate educational outcome are guided by a number of non-exclusive factors laid out in the Policy, including:

the severity of the incident; the impact on the Complainant; any ongoing risk to either the Complainant or the community posed by the Respondent; the impact of the violation on the community, its members, or its property; any previous conduct violations; and any mitigating or aggravating circumstances.

App. 49.

**Plaintiff's Response**: Admitted.

**L.  Appeal.**

59.     A party may appeal a final decision and outcome by submitted an appeal "to the Assistant Vice President of Student Affairs (the "Appeals Officer" for student respondents) within five days of receipt of the notice of outcome. App. 50-51.

**Plaintiff's Response**: Admitted.

60.     However, the Policy provides that mere "[d]issatisfaction with the outcome of the case is not grounds for appeal." App. 50.

**Plaintiff's Response**: Admitted.

Instead, appeal is limited to two narrow grounds: (1) "[n]ew evidence that was not available at the time of the investigation is presented that could be outcome determinative"; or (2) "[p]rocedural error(s) that had a material impact on the outcome." App. 50.

**Plaintiff's Response**: Admitted subject to the qualification that the Policy defines these grounds as "limited" rather than "narrow." P-APP 283.

61.     After the appeal is submitted, the Appeals Officer will review the appeal, and will notify the parties and Title IX Coordinator with the decision regarding whether the appeal is accepted. App. 51.

**Plaintiff's Response**: Denied. Per the Policy, "When an appeal has been submitted, the *Title IX Coordinator or designee* will notify both parties with a decision to accept or deny the appeal, and with the name of the Appeals Officer." (emphasis added) P-APP 284.

62.     On appeal, the burden lies with the appealing party, and the "original determination and educational outcomes are presumed to have been decided reasonably and appropriately." App. 51. In other words, "[t]he appeal is not a de novo review." *Id.*

**Plaintiff's Response**: Admitted.

63.    The Appeals Officer can affirm or alter findings, request a new adjudication occur

before a different adjudicator, or if new evidence exists, return the matter to the original

adjudicator for a new determination. App. 51.

**Plaintiff's Response:** Admitted.

64.    The Appeal Officer's findings are final. App. 52.

**Plaintiff's Response:** Admitted.

**M. Grinnell's legacy policies.**

65.    At the time Plaintiff began his studies at Grinnell—the fall of 2014—Grinnell had

an earlier version of the Policy. App. 60[71:24-72:9]; 53-56.

> **Plaintiff's Response**: Denied. At the time that Plaintiff began his studies at Grinnell, the sexual misconduct policy that was in place was the existent policy, not an "earlier version" of the Policy applied in Plaintiff's sexual misconduct process. The two policies could not be more different. The policy that was in place at that time, dated as of August 21, 2014, differed significantly from the Policy applied in Plaintiff's sexual misconduct proceeding because, *inter alia*, it provided for a hearing, whereas the applied Policy utilized an external adjudicator model. *Compare* P-APP 95-99 *with* P-APP 278-282. The August 2014 policy also provided for cross-examination and the examination of witnesses while the Policy applied in Plaintiff's case did not. P-APP 96-97; P-APP 275 ("witnesses will not be called to meet with the adjudicator"). The August 2014 policy *did not* state that relying on non-verbal communication can lead to "potential policy violations." P-APP 63-64; P-APP 252. In February 2015, Grinnell issued a new sexual misconduct policy, with a new name, that *inter alia* adopted the external adjudicator model. *See* P-APP 141-148.

66.    Between Plaintiff's orientation and his 2016 discipline, Grinnell had a few other

iterations of the Policy. App. 53-56; 79[64:12-18], 80[68:17-23], 81[74:20-75:7].

> **Plaintiff's Response**: Denied. As stated above, the August 21, 2014 policy, which was in effect during the time in which Plaintiff's encounter with Jane Doe occurred, was not an "iteration" of the Policy applied in Plaintiff's case. P-APP 49-120; P-APP 1206-1284.
>
> The policies issued subsequent to August 21, 2014 were not date stamped and Grinnell employees could not identify them by date. P-APP 477.1-477.2 at 20:11-22:14; P-APP 1137.2 at 102:4-7; P-APP 626 at 38:4-40:2; P-APP 569-569.1 at 48:16-49:25; P-APP 569.2 at 55:17-56:12. It has been confirmed that P-41 is the Policy that was applied in Plaintiff's sexual misconduct process as it was appended to the investigation reports prepared by Husch Blackwell. P-APP 569.2 at 55:17-56:12; P-APP 626 at 38:21-39:3. It

is Plaintiff's understanding that there was one other policy that was issued in between Plaintiff's orientation and the commencement of a formal disciplinary process against Plaintiff—the policy that issued in February 2015. P-APP 1285-1344. This policy was in effect at the time that Plaintiff and Jane Roe engaged in sexual activity. *Id.* Grinnell applied a later policy to Plaintiff's sexual misconduct process because Husch Blackwell declared that it was substantively the same as prior policies "in effect at the time of the alleged misconduct in this matter." P-APP 701.

67.    The Policy in place at the time of Plaintiff's orientation, prohibited sexual assault,

contained the same definition of "consent" as the 2016 version, with the following exceptions:

- Reference to the policy name in the 2016 version was changed to make it consistent with the name of the Policy in 2016;

- The 2016 version of the Policy stated: "When evaluating consent, the College will consider the objectively apparent indicia of consent (or lack of consent) from a reasonableness perspective," while the 2014 version did not;

- The 2016 version states that "relying on non-verbal communication [to determine the consent of the other party] can lead to misunderstandings or potential policy violations," whereas the 2014 version stopped at "misunderstandings"; and

- The 2016 language deleted the following language from the bullet point related to incapacitation, which the 2014 version included: "For example, one who is asleep or passed out cannot give consent."

*Compare* App. 18-19 *with* App. 54-55.

**Plaintiff's Response**: Admitted subject to the qualification that there was no "2016 version" of the August 21, 2014 policy and that the 2016 Policy referenced above is the Policy that Grinnell applied in Plaintiff's sexual misconduct process. Grinnell employees cannot confirm the date of this Policy and it is therefore inaccurate to refer to it as the "2016" policy. P-APP 477.1-477.2 at 20:11-22:14; P-APP 1137.2 at 102:4-7; P-APP 626 at 38:4-40:2; P-APP 569-569.1 at 48:16-49:25; P-APP 569.2 at 55:17-56:12.

68.    Aside from a minor stylistic change, the definition of "coercion" did not change

from the 2014 version to the 2016 version. *Compare* App. 20 ("Coercion is direct or implied

threat of force . . . ."), *with* App. 54-55 ("Coercion: a direct or implied threat of force . . . ."

(formatting omitted)).

**Plaintiff's Response**: Denied. The Policy applied in Plaintiff's case states that "Coercion can include unreasonable and sustained pressure for sexual activity," (P-APP 253), whereas the August 21, 2014 Policy states "Coercion can include unreasonable pressure for sexual activity." P-APP 65.

**N.  Plaintiff received training on the Policy and understood affirmative consent "needed to be acquired" before engaging in sexual activity with another student.**

69.     Plaintiff testified that, throughout his education at Grinnell, he received training on or was aware of the operative sexual misconduct policies that applied to him. App. 60[71:24-72:9]; 61[74:17-75:14]; *see also id.* 60[70:16]-62[79:20].

**Plaintiff's Response**: Denied. Plaintiff testified that he could not recall receiving training with respect to the August 21, 2014 sexual misconduct policy but that he "probably did." He did not recall anything about any training that he might have received. P-APP 594.5 at 71:23-72:12. Plaintiff testified that he became aware of the definition of affirmative consent in the August 21, 2014 Policy during the informal resolution of Jane Doe's complaint and stated that "I agree with it as it was read to me in November of 2015." P-APP 594.5-594.6 at 72:17-73:18. When asked again whether he had any training concerning "active consent," Plaintiff stated "Yes, I was educated in this after, so chronologically, after the incident with [Jane Roe] occurred and while the incident with [Jane Doe] was being informally resolved." P-APP 594.6 at 74:23-75:4. The incident with Jane Roe was alleged by her to have taken place at the beginning of the Fall 2014 semester, in August 2014. P-APP 619.

Plaintiff further testified that he was made aware of what *Defendant's counsel* referred to as the "2015 Policy," Exhibit D4, through posters he saw in his dorm and that the "training" he received was during the informal resolution of Jane Doe's complaint in November 2015. P-APP 594.6 at 76:2-9. When asked if he received training with respect to "Coercion" as defined in Exhibit D4, Plaintiff responded "not formally, no." P-APP 594.6 at 76:18-23.

Plaintiff testified that he was familiar with what Defendants' counsel referred to as the "2016 Policy," Exhibit D5 and that he received training with respect to that policy. He could not recall the details. P-APP 594.7 at 79:5-80:10.

This included training on consent and sexual misconduct that he received in his new-student orientation. App. 61[74:17-75:14]; *see also* App. 83[103:11-14]; 95[181:13-15].

**Plaintiff's Response**: Admitted subject to the qualification that Ms. Voos did not testify as to the specific training that Plaintiff received, only that a New Student Orientation was held on August 25, 2014 at which students were educated on consent. P-APP 1137.2 at 103:11-14; P-APP 1150.1 at 181:13-15.

70.    Plaintiff testified that he understood the definition of "affirmative consent" under the Policy meant that consent "needs to be acquired" prior to engaging in sexual activity with another student. App. 60[71:24-72:9]; 61[74:17-75:14]; *see also id.* 60[70:16]-62[79:20].

> **Plaintiff's Response**: Denied. Plaintiff testified that he was "generally" trained during orientation concerning the "concept of active consent," "I believe that I was aware of what should happen during a sexual encounter" and "that affirmative consent needs to be acquired." P-APP 594.6 at 75:5-14. When asked "in August of 2014, were you of the philosophy that you could pursue sexual activity with a female partner until she told you to stop" Plaintiff answered "Yes." P-APP 594.8. He also testified that he "derived some benefit" from the education he received about affirmative consent at the Title IX meeting on November 17, 2015. P-APP 595 at 150:10-151:11. Plaintiff received education on affirmative consent *after* the alleged incidents with Jane Doe and Jane Roe occurred. P-APP 594.6 at 74:17-75:4.

### O.  Jane Doe files a report that Plaintiff engaged in nonconsensual sexual activity with her.

71.    On November 10, 2015, Jane Doe, a student at Grinnell, reported to Grinnell's Title IX office that Plaintiff had engaged in non-consensual sexual contact with her. App. 201-203; 87[122:6-19]; 102[76:20-25]; 103[82:21-83:12].

> **Plaintiff's Response**: Denied. On November 2, 2015, Grinnell employee Deanna Shorb reported by phone to Defendant Asberry that Jane Doe told Shorb that she "didn't want a case" but did not want Plaintiff on her study abroad program due to an alleged incident that happened one year earlier. P-APP 1751 (referencing "Jane Doe"); P-APP 514.1-515 at 79:3-81:24. On November 10, 2015, Jane Doe met with Defendants Voos and Asberry to discuss the report she had made to Deanna Shorb. P-APP 534-536. Jane Doe did not describe the activity with Plaintiff as "non-consensual sexual contact," rather she gave her account of what had allegedly occurred. *Id.*

72.    Doe reported that she was concerned about a study abroad program in Israel she was planning to participate in because she had learned that Plaintiff was considering participating in the same program. App. 104[85:18-86:25]; 201-203.

> **Plaintiff's Response**: Admitted.

She reported an incident that had occurred in the fall term of 2014, in which Plaintiff had engaged in unwanted kissing, groping, and masturbation against her body. *See id.*; App. 104[85:4-87:9]; 87[122:17-19].

**Plaintiff's Response**: Admitted.

73.     Voos considered Jane Doe's report, as well as Jane Doe's stated preference for resolution at the time—Jane Doe did not want to pursue formal conduct proceedings against Plaintiff, nor did she feel a no-contact order was necessary at that time. App. 87[122:22-123:3]; *see also* 104[87:11-88:8].

**Plaintiff's Response**: Admitted.

Jane Doe's main concern was that she felt uncomfortable around Plaintiff and did not want to have to spend her study abroad program in close proximity to him. App. 104[85:17-87:1]; 105[92:4-12].

**Plaintiff's Response**: Admitted.

74.     Based on the information available to her, Voos decided that it would be appropriate to address Jane Doe's report through informal resolution in the form of an "educational conversation." App. 87[123:10-13].

**Plaintiff's Response**: Admitted.

When asked at her deposition why she felt it was appropriate to use Informal Resolution with Plaintiff following Jane Doe's report, Voos testified:

> We met with [Jane Doe], who asked if we could have a conversation. She was concerned about the study abroad program and about this situation, and in our policy if a person does not want to move forward with a formal conduct process and the allegation that is made is not extreme or severe, then we have an opportunity to talk to somebody and just say – have an educational conversation with them. That is one of the things our policy allows.
>
> . . .

I believe, to the best of my recollection, [Jane Doe] was able to show us that [Plaintiff] had apologized for what had happened. We have conversations about consent without findings [of responsibility] with women and men to help them.

App. 87[124:5-13]-88[125:3-7].

> **Plaintiff's Response**: Admitted that this is Voos' testimony.

75.     Voos notified Plaintiff of Jane Doe's report and asked him to meet with her. App.

64[131:23-132:3]; Cmplt. ¶¶ 33-34.

> **Plaintiff's Response**: Admitted subject to the qualification that Plaintiff testified that he did not recall who from the Title IX office contacted him about having a meeting, (P-APP 594.10 at 131:23-132:7), and that on November 16, 2015 Voos emailed Plaintiff and asked him to meet so that she could "explain the nature of the information and propose a mutually agreeable resolution to the report." P-APP 1717.

**P.  Grinnell's Educational Intervention with Plaintiff.**

76.     On November 17, 2015, Voos and Asberry met with Plaintiff to discuss Jane

Doe's report. Cmplt. ¶ 34; App. 66[146:12-147:2].

> **Plaintiff's Response**: Admitted

Plaintiff had multiple support persons present in this meeting: his mother and father

telephonically (though his father had to leave the meeting early) and Rob Cabelli, the campus

rabbi. App. 89[131:9-15]; 103[93:7-21]; 66[146:12-147:2]; 204-207.

> **Plaintiff's Response**: Denied. Rabbi Rob Cabelli was understood to be Plaintiff's support person at the November 17, 2015 meeting, as stated in Defendant Asberry's notes of the meeting which state "Support: Rob Cabelli." P-APP 537-540. Plaintiff testified that Cabelli was his support person. P-APP 595.1 at 161:17-23.

77.     In that meeting, according to Plaintiff, Defendants told him that Jane Doe had

filed a report of Prohibited Conduct against him and Jane Doe did not wish to pursue "any

action" against him. Cmplt. ¶¶ 34; 15; App. 66[146:8-148:10]; 64[131:5]-65[133:-24].

> **Plaintiff's Response**: Admitted subject to the qualification that the term Prohibited Conduct was not expressly used as per the meeting notes. P-APP 537-540.

78.     In that same meeting, according to Plaintiff, Defendants also informed Plaintiff that Jane Doe's allegations "did not rise to the level of warranting investigation" and "that the matter had been resolved through an informal resolution process." Cmplt. ¶¶ 34; 151; App. 66[146:8-148:10]; 64[131:5]-65[133:-24].

> **Plaintiff's Response**: Denied. Per Plaintiff's testimony, "at the time I was informed that there would be no assignment of blame, and the recommended decision was to…spend an hour with me educating me on consent," P-APP 594.10 at 131:5. Plaintiff further testified to his understanding that Jane Doe's "incident" had been "informally resolved." P-APP 594.1 at 10:21-11:4; P-APP 594.5 at 72:17-23; P-APP 594.6 at 74:23-75:4; P-APP 594.10 at 130:14-25. Prior to the meeting, Voos informed Plaintiff that she hoped to reach a "mutually agreeable resolution" of Jane Doe's allegations. P-APP 1717. Per Grinnell's Title IX records "informal resolution [was] used for" Jane Doe's report. P-APP 1720. Further, "Angela worked with the complainant and the respondent to resolve the matter informally." P-APP 619.
>
> Plaintiff alleged that, in November 2015, the College's decision not to pursue an investigation into Jane Doe's allegations indicated that her allegations did not support a violation of the Grinnell Policy. P-APP 12-13, ¶ 35.

79.     Plaintiff testified that in the November 2015 meeting, the definition of affirmative consent was read to him, and when asked if he understood the policy, he answered that he did. App. 61[73:1-75:4].

> **Plaintiff's Response**: Admitted.

   Plaintiff also testified that, in the same meeting, he was educated about affirmative consent under the Policy. App. 64[76:1-17].

> **Plaintiff's Response**: Admitted subject to the qualification that Plaintiff testified that he was educated about affirmative consent under the August 21, 2014 sexual misconduct policy. P-APP 594.5- P-APP 594.6 at 72:17-73:6.

80.     After the November 2015 educational intervention, Plaintiff understood "that the complaint was informally . . . resolved, that [he] had received education, and that . . . [he] was supposed to proceed going forward with this different understanding of consent." App. 67[150:17-22]; *see also* 64[130:19-131:15].

**Plaintiff's Response**: Admitted.

81.     At the November 17, 2015 educational intervention, Defendants advised Plaintiff

that Grinnell was "not moving forward with a formal resolution at this time." App. 72.2[123:18-

25]; *see also* App. 90[133:7-10].

> **Plaintiff's Response**: Denied. The November 17, 2015 meeting notes taken by
> Defendant Asberry reflect, and, upon reading those notes, Ms. Asberry testified that
> Plaintiff's mother asked "Before he answers [questions] does [Jane Doe] want him
> expelled?" Voos replied "no she is <u>not</u> pursing conduct at this time." P-APP 537
> (emphasis in original).

> It was Plaintiff's understanding, per his deposition testimony that Jane Doe's report had
> been informally resolved. *See* Response *supra* Paragraph 78. Plaintiff believed that his
> agreement to receive consent education was a final resolution of the [Jane Doe]
> allegations. P-APP 1757-1758.

> Prior to the November 17th meeting, Voos spoke with Plaintiff's mother about Jane Doe's
> allegations. When Plaintiff's mother asked if she should be concerned about the
> allegations, Voos told her that the matter should get resolved quickly and it was not a big
> issue. P-APP 1183-1184. Plaintiff's mother believed that the November 17, 2015 meeting
> constituted the final resolution of Jane Doe's report. P-APP 1183. Plaintiff's mother even
> emailed Defendant Asberry the next day to thank her and Defendant Voos for their
> assistance. P-APP 1668.

82.     As of the November 2015 meeting, with respect to Jane Doe's report, Grinnell

had decided that at that time, it did not intend to initiate formal disciplinary proceedings. App.

72.1 [100:11-24].

> **Plaintiff's Response**: Denied. The cited testimony does not support this statement
> because the testimony discusses the issue of Plaintiff's mother raising the issue of double
> jeopardy during an April 2016 meeting. Defs. App. 98:12-100:24.

As of the November 17, 2015 meeting, Grinnell had not concluded whether Plaintiff was

responsible for engaging in any Prohibited Conduct, and had not issued him any discipline or

sanction under the disciplinary process in the Policy. *Id.*

> **Plaintiff's Response**: Denied. Defendant Voos testified that "[t]here was no disciplinary
> process. There was no investigation. There was no adjudication." However, Voos also
> testified that "there was an informal resolution." P-APP 1144.1 at 133:11-134:8 at 99:16-

100:24. Informal Resolution is a disciplinary process under the Policy that was used to
resolve the [Jane Doe] allegations against Plaintiff in November 2015. P-APP 272-274.
Per the Policy, the process can be used to "eliminate Prohibited Conduct" where the "the
Title IX Coordinator concludes that Informal Resolution may be appropriate. P-APP 272.
The process requires the "imposition of individual…remedies." *Id.* In Plaintiff's case
Defendant Voos, the Title IX Coordinator provided consent education to Plaintiff, upon
his consent to receive said education. P-APP 539.

83.    There was no agreement by Jane Doe nor Grinnell that the November 2015

informal resolution would serve as the <u>final</u> resolution of Jane Doe's report. *See* App. 295.

**Plaintiff's Response**: Denied. Defendant Voos is incorrect in her assertion, which
contradicts her deposition testimony, that a written agreement was required for a final
resolution through the informal resolution process—that is stated nowhere in the Policy.
P-APP 272-274; P-APP 1143-1144 at 125:13-130:6; P-APP 1720. Prior to the meeting,
Voos informed Plaintiff that she hoped to reach a "mutually agreeable resolution" of Jane
Doe's allegations. [P-APP 1143 at 126:13-127:3; P-APP 1717. Further, both Plaintiff and
Jane Doe agreed to engage in the informal resolution process and "Angela worked with
the complainant and the respondent to resolve the matter informally." P-APP 1144 at
130:7-131:24; P-APP 619.

84.    If there is an agreement between the parties to a report of Prohibited Conduct that

an informal resolution is "final," Grinnell memorializes it with "[a] signed agreement saying this

is a final resolution." App. 70[11:13-20]; 295. Voos testified that, at Grinnell, agreements that an

informal resolution is "final" is "signed by each of the parties." App. 70.1[20:11-17].

**Plaintiff's Response**: Denied. Defendant Voos is incorrect in her assertion, which
contradicts her deposition testimony, that a written agreement was required for a final
resolution through the informal resolution process—that is stated nowhere in the Policy.
P-APP 272-274; P-APP 1143-1144 at 125:13-130:6; P-APP 1720. Prior to the meeting,
Voos informed Plaintiff that she hoped to reach a "mutually agreeable resolution" of Jane
Doe's allegations. P-APP 1143 at 126:13-127:3; P-APP 1717. Further, both Plaintiff and
Jane Doe agreed to engage in the informal resolution process and "Angela worked with
the complainant and the respondent to resolve the matter informally." P-APP at 130:7-
131:24; P-APP 619.

85.    There was no signed agreement between Plaintiff, Jane Doe, and Grinnell stating

that the November 2015 informal resolution was final. App. 295.

**Plaintiff's Response**: Admitted subject to the qualification that, as stated above in
Paragraphs 83 and 84, no written agreement was required.

**Q. Jane Roe's report of sexual misconduct.**

86.     On February 26, 2016, Asberry was notified by a staff member that another student, Jane Roe, had expressed concern about another student whom she believed was going to be studying abroad with her. App. 107[109:12-24].

> **Plaintiff's Response**: Admitted subject to the qualification that there is no evidence that Jane Roe was enrolled to study abroad or was accepted to the Grinnell In London program.

87.     Asberry reached out to Roe to see whether Roe wanted to discuss her concerns with the Title IX office. App. 107[111:14-19]; 208-209.

> **Plaintiff's Response**: Admitted.

88.     On February 29, 2016, Asberry met with Roe. App. 107[112:1-2].

> **Plaintiff's Response**: Admitted.

Roe reported that, over the previous summer, Plaintiff had engaged in nonconsensual sexual intercourse with her. App. 108[113:5-12]; 210-212.

> **Plaintiff's Response**: Denied. At the February 29, 2016 meeting Jane Roe did not assign the descriptor "nonconsensual sexual intercourse" to her allegations against Plaintiff. P-APP 548-550.

She reported that Plaintiff "wouldn't let [her] sleep" and "didn't ask [her] if it was okay" before engaging in the reported nonconsensual sex act. App. 108[113:5-12].

> **Plaintiff's Response**: Denied. Per the contemporaneous notes of the February 29, 2016 meeting, Jane Roe alleged that she had sexual intercourse with Plaintiff at a friend's birthday, that she "drank a little, smoked a little bit" and "anti-anxiety meds mix weirdly with things." P-APP 554-550. She also reported that "he wouldn't let me sleep. He didn't ask me if it was okay."

**R.  Grinnell assesses Jane Roe's report and determines to investigate both Jane Doe and Jane Roe's report due to their concern that Plaintiff may have engaged in a pattern of sexual misconduct.**

89.     After receiving a second report of sexual misconduct against Plaintiff, Voos and Asberry were concerned that Plaintiff may have engaged in a pattern of sexual misconduct. App. 91[142:14-143:3]; 108[114:18-115:19].

**Plaintiff's Response**: Admitted.

90.     Voos and Asberry were concerned because they understood two or more instances of Prohibited Conduct by the same individual constituted a pattern of violations under the Policy. 108[115:14-19]; 110[121:3-24]; 109-110[119:21-121:3]; 91[142:14-143:3]; 27, & 43.

> **Plaintiff's Response**: Admitted that Voos and Asberry testified as to their understanding of what constitutes a pattern, subject to the qualification that Voos and Asberry were unsure whether there was a pattern in Plaintiff's case so Asberry referred the matter to law firm Husch Blackwell to conduct interviews with Jane Doe and Jane Roe in order to make a determination. P-APP 620.

After seeking legal counsel, they determined Grinnell needed to proceed with an investigation into reports of Prohibited Conduct by Plaintiff under Grinnell's formal disciplinary process. *See id.*; *see also* App. 91[143:4-9].

**Plaintiff's Response**: Admitted that Voos and Asberry testified to this.

91.     Defendants determined it was appropriate to consolidate the investigations into Doe and Roe's allegations, since both were about Plaintiff and concerned sexual misconduct under the Policy. App. 116[50:7-18]; 118[69:7-71:11].

> **Plaintiff's Response**: Denied. "Defendants" did not determine that it was appropriate to consolidate Doe's and Roe's allegations. According to Sarah Moschenross' testimony, she "did not decide to consolidate the…cases" even though under the applicable Policy she, as the Senior Official, was responsible for making that determination. P-APP 633 at 69:4-70-23; P-APP 276.

**S.   The investigation.**

92.     On March 2, 2016, Asberry separately emailed Jane Doe and Jane Roe to ask if they would be willing to speak with investigators about their reports. App. 108[116:7-10]; 111[127:16-25]; 213-221; 91[146:19-23].

**Plaintiff's Response**: Admitted.

93.    On March 2, 2016, Asberry contacted the law firm of Husch Blackwell, LLP,

("Husch") to request that they interview Jane Doe and Jane Roe so Grinnell could assess whether

there was potentially a pattern of prohibited conduct with Plaintiff. App. 91[144:17-25]; 167-

169.

**Plaintiff's Response**: Admitted.

94.    Jane Doe agreed to meet with the Husch investigators. *See* App. 249.

**Plaintiff's Response**: Admitted.

95.    Jane Roe initially declined to meet with the Husch investigators. *See* App. 213-

214.

> **Plaintiff's Response**: Admitted subject to the qualification that Jane Roe did not agree to
> meet with investigators during the time in which Asberry had asked the investigators to
> assess whether there was potentially a pattern of prohibited conduct. P-APP 551-552,
> 619.

Later, however, Jane Roe agreed to meet with investigators and met with them on April

20, 2016. *See* App. 249; 150[21:1-22:2].

> **Plaintiff's Response**: Admitted subject to the qualification that Jane Roe only agreed to
> meet with investigators after Defendant Voos informed her that the College, "through
> Title IX, has chosen to proceed with a formal conduct process" and urged Jane Roe to
> participate. P-APP 553.

96.    Meanwhile, on April 13, 2016, Voos notified Plaintiff in writing that "an issue has

been raised by another student that may involve a violation of our policy[.]" App. 222. Voos

asked Plaintiff to meet with her about the matter. *Id.*

> **Plaintiff's Response**: Admitted subject to the qualification that "meanwhile" is
> inaccurate because Plaintiff was contacted by Voos 47 days after the Title IX office
> learned about Jane Doe's report. P-APP 1756; P-APP 560.

97.     The next day, Moschenross, Voos, and Asberry met with Plaintiff and informed him that a formal investigation into both Doe and Roe's complaints was moving forward. *See* App. 171-174; 118[71:14-22]; 93[153:3-13]; 112[131:18-19].

**Plaintiff's Response**: Admitted.

Plaintiff had his mother and Jeff Pedersen, the Grinnell head football coach and Title IX deputy for athletics, with him at this meeting as support persons. *See* App. 171-174; 112[131:18-132:7].

> **Plaintiff's Response:** Denied. Jeff Pedersen was Plaintiff's designated support person as written in the contemporaneous notes of the meeting. Voos and Moschenross also testified that Pedersen was Plaintiff's support person. P-APP 1721; P-APP 633 at 71:14-22; P-APP 1146.2 at 153:3-13. Plaintiff testified that Pedersen was his support person with respect to Jane Roe's allegations, and that Pedersen was recommended to him by the Title IX Office. P-APP 595.1 at 163:8-164:8. Plaintiff testified that Pedersen was not satisfactory as a support person because Plaintiff did not have a close relationship with him, and they "weren't in contact much." *Id*.

98.     On April 20, 2016, investigators met with Plaintiff. App. 249. Plaintiff did not bring a support person with him to the meeting, despite having the right to do so and being advised that he had the right to do so. *See id.* 152[55:18-56:11]; 284-285.

**Plaintiff's Response**: Admitted.

99.     On May 4, 2016, investigators interviewed Plaintiff and Roe a second time. *See* App. 249.

**Plaintiff's Response**: Admitted.

During the course of the investigation, Jane Doe was interviewed twice. *See id.*

> **Plaintiff's Response:** Denied. Jane Doe was first interviewed on March 11, 2016, *prior to* the opening of the investigation. Husch Blackwell was retained to conduct the investigation on April 18, 2016. P-APP 700. Jane Doe was interviewed in March 2016 as part of Husch Blackwell's effort to determine whether there was a potential pattern of behavior. P-APP 620; P-APP 752.

100.   In addition to Doe, Roe, and Plaintiff, the investigators also interviewed three

other student witnesses, and received text messages and emails from parties and witnesses. *See*

App. 249.

> **Plaintiff's Response:** Admitted subject to the qualification that the investigators
> interviewed *four* witnesses in regard to Jane Roe's allegations and no witnesses with
> respect to Jane Doe's allegations, even though Jane Doe offered names of witnesses to be
> interviewed. P-APP 677, 699-700.

101.   The investigators concluded their investigation and issued the preliminary

investigation report for review to the parties, which allowed them to comment on the allegations.

App. 153[59:16-24].

> **Plaintiff's Response**: Admitted.

102.   Plaintiff provided feedback on that report, which Grinnell submitted to Justice

Ternus. *See* Cmplt. ¶ 55; App. 142[58:2-17].

> **Plaintiff's Response**: Admitted subject to the qualification that Plaintiff's comments
> were appended to the Husch Blackwell Final Investigation Report at Tab 19, and per
> Justice Ternus' testimony, she reviewed portions of the Final Investigation Report which
> she could not specify. P-APP 1024-1025; P-APP 1073 at 58:18-59:20.

103.   On May 25, 2016, the investigators issued the final investigation report, which

was thirty pages long, and contained nineteen addenda. App. 248-283.

> **Plaintiff's Response**: Denied. The Final Investigation Report issued on June 6, 2016. P-
> APP 681; P-APP 639.1 at 97:10-98:12. The Preliminary Investigation Report issued on
> May 25, 2016. P-APP 1030. Husch Blackwell backdated the Final Investigation Report to
> the same date as the Preliminary Investigation Report. P-APP 699.

The final report summarized the investigation, provided summaries of each witness

interview, and identified points of agreement and disagreement between the parties. *Id.*

> **Plaintiff's Response**: Admitted subject to the qualification that the final report also had
> 19 attachments, including the Policy, transcripts of party and witness interviews, and
> comments on the preliminary investigation report. P-APP 699-1025.

104.    The investigators did not reach any conclusion about whether Plaintiff had engaged in Prohibited Conduct, whether he was responsible, or whether any particular witness was credible or not. App. 151[28:13-28:11].

> **Plaintiff's Response**: Admitted subject to the qualification that the cited testimony does not support the facts stated above. *See* P-APP 700.

**T. Adjudication meetings.**

105.    The final report was delivered to the adjudicator, Justice Ternus, who reviewed it prior to reaching any decision about the reports. Cmplt. ¶ 49; App. 142[58:2-17]; 138[43:25-44:10].

> **Plaintiff's Response**: Admitted subject to the qualification that Justice Ternus testified that "as best she can reconstruct" she reviewed portions of the final report that differed from the preliminary investigation report. She could not recall whether she read the final report "all through." P-APP 1073 at 59:7-17.

106.    On June 3, 2016, Justice Ternus had an adjudication meeting with Jane Doe. App. 142[57:13-23]. Jane Roe declined to participate in an adjudication meeting. Cmplt. ¶ 36.

> **Plaintiff's Response**: Admitted subject to the qualification that not only did Plaintiff allege that Jane Roe declined to participate, but Justice Ternus testified that she did not meet with Jane Roe. P-APP 1069 at 44:11-17.

107.    On June 13, 2016, Justice Ternus met with Plaintiff for his adjudication meeting for both Jane Doe and Jane Roe's reports. App. 142[57:13-23]. Plaintiff was accompanied by his support person, attorney Patrick Mahaffey. App. 63[126:10-16].

> **Plaintiff's Response**: Admitted.

108.    At their adjudication meetings, Jane Doe and Plaintiff were given an opportunity to explain their knowledge and understanding of the events alleged in the reports. App. 223-228; 141[53:6-18]; 229-244; 144[90:15-25.].

> **Plaintiff's Response:** Admitted subject to the qualification that none of the citations above support the facts stated above.

109.    Justice Ternus testified that she "made independent decisions regarding responsibility in these cases" and didn't use facts from one case to determine responsibility in the other. App. 147[181:6-23].

> **Plaintiff's Response**: Denied. Ternus first testified that she made independent decisions regarding responsibility in the Doe and Roe cases. She then stated that she decided Doe's case first and Roe's case second, or "chronologically." Ternus then testified "And then I decided [Jane Roe]. And, as I said, I made—at least *I tried to make an independent decision in each* without considering the allegations from the other case." P-APP 1089 at 181:6-182:5 (emphasis added).

110.    On June 20, 2016, Justice Ternus issued separate findings for the incidents involving Doe and Roe. App. 223-228; 141[53:6-18]; 229-244; 144[90:15-25].

> **Plaintiff's Response**: Admitted subject to the qualification that Ternus combined the two cases when recommending sanctions and issued a joint report in that regard. P-APP 1116-1118; P-APP 1086 at 153:16-23].

Justice Ternus later corrected a clerical error in her finding for Jane Roe's Report—she had inadvertently used the wrong student name. *See* App. 237-249; 145[152:7]-146[153:2].

> **Plaintiff's Response**: Admitted.

## U. Justice Ternus found Plaintiff responsible for non-consensual sexual contact with Jane Doe.

111.    With respect to Jane Doe's report, Justice Ternus concluded:

> "A preponderance of the evidence shows that [Plaintiff] engaged in sexual touching of [Jane Doe] without her consent on two occasions in August of 2014. This adjudicator concludes, therefore, that [Plaintiff] is responsible for the charge of sexual assault by nonconsensual sexual contact."

App. 228.

> **Plaintiff's Response**: Admitted.

112.    Justice Ternus provided detail about her evaluation of the reported conduct, writing:

> A preponderance of the evidence shows that [Plaintiff] kissed [Jane Doe] and touched her breasts and crotch without any demonstration on her part through

mutually understandable words or clear unambiguous actions that she was willing to engage in this activity. Moreover, a preponderance of the evidence shows [Jane Doe] expressed her desire that [Plaintiff] not touch her in this manner.

App. 227-228.

**Plaintiff's Response**: Admitted.

113.    With respect to Jane Doe's report, Justice Ternus also found that Plaintiff's understanding of consent at the time of the incident with Doe was inconsistent with the Policy's definition of consent, and that, "even if there had been initial consent to [Plaintiff's] sexual contact with [Jane Doe], . . . [Plaintiff] did not honor [Jane Doe's] request that he stop, as a preponderance of the evidence shows he ceased his sexual touching only momentarily, and then resumed," in violation of the Policy. App. 227-228.

> **Plaintiff's Response**: Admitted subject to the qualification that at the time of this finding, Justice Ternus was unaware that, in November 2015, when Jane Doe's allegations were resolved through the Informal Resolution Process, Plaintiff received consent education to address any misunderstandings he had with respect to affirmative consent. P-APP 1088 at 165:7-168:14.

114.    Justice Ternus made a credibility finding and concluded Jane Doe's recollection of events was more credible than Plaintiff's, concluding that Jane Doe "had a confident recollection of what happened," that the activity in question was "out of the ordinary" for Jane Doe and were "very impactful on her." App. 227 & 143[78:11-79:5].

> **Plaintiff's Response**: Admitted subject to the qualification that, with respect to this credibility determination, Ternus testified that she did not recall that Plaintiff denied that the alleged second incident with Jane Doe ever happened, "I do not have that in here that he denied that it happened…you keep saying that, but I don't recall that." P-APP 1076 at 77:23-79:5.

115.    Justice Ternus contrasted Jane Doe's recollection with Plaintiff's, noting that Plaintiff "did not remember much about his interactions with [Jane Doe], and what he did remember of the first encounter corroborated much of what [Doe] recalled." App. 226-227.

Justice Ternus also observed that Plaintiff's subsequent text messages to Jane Doe indicated that "he remembered enough about his interactions with [Doe] to believe that he owed her an apology for his prior behavior." App. 227.

> **Plaintiff's Response**: Admitted.

### V.  Justice Ternus found Plaintiff responsible for non-consensual sexual intercourse with Jane Roe.

116.    Justice Ternus also found Plaintiff responsible for non-consensual sexual intercourse with Jane Roe, concluding:

> This adjudicator finds by a preponderance of the evidence that [Roe] did not consent to vaginal or anal sexual intercourse with [Plaintiff]. Therefore, this adjudicator concludes that [Plaintiff] is responsible for sexual assault by nonconsensual sexual intercourse."

App. 244.

> **Plaintiff's Response**: Admitted subject to the qualification that it is unclear how Justice Ternus evaluated the credibility of Jane Roe's statements since she did not have an adjudication meeting with Jane Roe, nor did she review any audio recordings of Jane Roe's interviews with investigators. P-APP 1069 at 42:12-43:7, 44:11-17; P-APP 640 at 102:14-103:1.

117.    In reaching her finding on Jane Roe's report, Justice Ternus found "by a preponderance of the evidence that [Jane Roe] did not give affirmative consent." P114, at 5. In reaching this conclusion, Justice Ternus reasoned:

> "Consent to one form of sexual contact does not constitute consent to engage in all forms of sexual contact." Consequently, [Jane Roe]'s consensual participation in kissing at the park and in sexual touching and oral sex in [Plaintiff]'s room does not constitute consent to sexual intercourse. Similarly, [Jane Roe] did not consent to sexual intercourse when she kissed [Plaintiff] after turning toward him in response to his touching and kissing. [Jane Roe]'s response of kissing [Plaintiff] indicated consent to kissing and was not an "objectively apparent indicia of consent [to sexual intercourse] from a reasonableness perspective," particularly in view of her earlier action indicating that she did not want to have sex. In addition, [Jane Roe]'s agreement to watch a movie with [Plaintiff] and even her willingness to accompany him to his room are not "mutually understandable words and/or clear, unambiguous actions" that indicate her wiliness to have sexual intercourse with [Plaintiff]. There is nothing in the record

that supports a finding that [Jane Roe] would or should have understood [Plaintiff]'s invitation to come to his room was an invitation for sexual intercourse. The following caution contained in the Grinnell Sexual Misconduct Policy applies here: "Relying on non-verbal communication can lead to misunderstanding or potential policy violations."

[Plaintiff] had an obligation to obtain [Jane Roe]'s affirmative consent to each sexual activity in which they engaged. A preponderance of the evidence shows he did not do so. While a preponderance of the evidence also shows that at some point [Jane Roe] resigned herself to having sexual intercourse with [Plaintiff], her passive compliance with his persistent prodding for sex is not affirmative consent under the circumstances presented here.

App. 241-242 (quoting Policy (App. 18-19)).

> **Plaintiff's Response**: Admitted that this is an accurate quote of Justice Ternus' opinion.

118.     Justice Ternus also found Plaintiff's "persistent prodding" of Jane Roe was

coercive, and to the extent she consented to sex, it was coerced and violated the Policy:

A preponderance of the evidence shows that [Plaintiff] continued to kiss [Jane Roe], to touch her, and to try to turn her toward him, notwithstanding her stated desire to sleep and her prior verbal indication that she did not want to engage in any more sexual activity. "Coercion can include unreasonable and sustained pressure for sexual activity." [Plaintiff] applied "unreasonable and sustained pressure" that "wrongfully impair[ed] [Jane Roe]'s freedom of will and ability to choose whether or not to engage in sexual activity." This adjudicator finds a preponderance of the evidence shows that to the extent [Jane Doe] consented to sexual intercourse with [Plaintiff], her consent was coerced.

App. 242 (quoting Policy (App. 18-20)).

> **Plaintiff's Response:** Admitted that this is an accurate quote of Justice Ternus' opinion.

119.     Justice Ternus also made credibility findings about consent, concluding Jane

Roe's version of events was more credible than Plaintiff's. App. 243

> **Plaintiff's Response**: Admitted subject to the qualification that it is unclear how Justice Ternus reliably evaluated Jane Roe's credibility since she did not have an adjudication meeting with Jane Roe, nor did she review any audio recordings of Jane Roe's interviews with investigators. P-APP 1069 at 42:12-43:7, 44:11-17; P-APP 640 at 102:14-103:1.

In reaching this conclusion, Justice Ternus relied on the following evidence:

- Jane Roe's "much more detailed memory";

- Analysis of "the actions by [Jane Roe] upon which [Plaintiff] relied to demonstrate [Jane Roe]'s enthusiasm," which she concluded were "not supportive of his assertion."

- "the fact that [Jane Roe] passively allowed [Plaintiff] to have sex with her in different positions does not equate to enthusiasm or affirmative consent" but rather "shows that [Plaintiff]'s sustained pressure on [Jane Roe] coerced her to acquiesce to sexual intercourse that she did not want and to which would not otherwise have submitted."

App. 243.

> **Plaintiff's Response**: Admitted that Justice Ternus' opinion is quoted accurately, subject to the qualification that it is unclear how Justice Ternus could have reliably assessed Jane Roe's credibility since she did not have an adjudication meeting with Jane Roe, nor did she review any audio recordings of Jane Roe's interviews with investigators. P-APP 1069 at 42:12-43:7, 44:11-17; P-APP 640 at 102:14-103:1.

120.    With respect to the allegation that Plaintiff had digitally penetrated Jane Roe's anus without her affirmative consent, which Plaintiff denied, Justice Ternus credited Roe's allegation "for the reasons already discussed." App. 243.

> **Plaintiff's Response**: Admitted that Justice Ternus' opinion is quoted accurately, subject to the qualification that it is unclear how Justice Ternus could have reliably assessed Jane Roe's credibility since she did not have an adjudication meeting with Jane Roe, nor did she review any audio recordings of Jane Roe's interviews with investigators. P-APP 1069 at 42:12-43:7, 44:11-17; P-APP 640 at 102:14-103:1.

Justice Ternus also found that Plaintiff's "assertion that he would never had touched [Plaintiff]'s anus without her consent unbelievable given that he has acknowledged that he did not ask for her consent for any of the other sexual activity in which they engaged." *Id.*

> **Plaintiff's Response**: Admitted that Justice Ternus' opinion is quoted accurately, subject to the qualification that it is unclear how Justice Ternus could have reliably assessed Jane Roe's credibility since she did not have an adjudication meeting with Jane Roe, nor did she review any audio recordings of Jane Roe's interviews with investigators. P-APP 1069 at 42:12-43:7, 44:11-17; P-APP 640 at 102:14-103:1.

**W. Justice Ternus's consolidated recommended educational outcomes.**

121.    Also on June 20, 2016, Justice Ternus issued a consolidated recommended educational outcome for the findings of responsibility. App. 245-247; 146[153:17-23].

**Plaintiff's Response**: Admitted.

Consistent with her process, Justice Ternus only turned to consider a recommended outcome after she determined Plaintiff was responsible for engaging in Prohibited Conduct. App. 146[154:8-155:7].

**Plaintiff's Response**: Admitted that this is Justice Ternus' testimony.

122.    In arriving at the recommended educational outcomes, Justice Ternus considered the relevant portions of the Policy, as well as the impact statement submitted by Jane Doe in making her educational outcome recommendation. App. 245-246; 146[154:8-155:7].

> **Plaintiff's Response**: Admitted subject to the qualification that Justice Ternus considered portions of the Policy that she deemed to be relevant and that her report states that she considered Jane Doe's impact statement. Ternus considered Jane Doe's impact statement at the same time she considered the outcome for Jane Roe's case because she consolidated the two complaints for purposes of her recommendation despite issuing separate opinions. P-APP 1102-1118.

123.    Justice Ternus recommended the sanction of dismissal based on his "responsibility for engaging in nonconsensual sexual intercourse with [Roe] and based upon a predatory pattern of behavior that these two complaints demonstrate." App. 246. She wrote:

> [Plaintiff]'s actions had a significant impact on [Jane Doe] who has had flashbacks and panic attacks. Moreover, [Jane Doe] does not feel safe with [Plaintiff] on campus. Similarly, [Jane Roe] expressed substantial concern about the safety of other women at Grinnell College. <u>This adjudicator share that concern and believes [Plaintiff] poses a risk to the Grinnell College community.</u>

App. 246 (emphasis added).

**Plaintiff's Response**: Admitted that Justice Ternus' report is accurately quoted.

124.    Justice Ternus expressed concern that the incidents, which occurred approximately a year apart, "show a pattern of conduct." App. 246. Justice Ternus reasoned that Plaintiff "did not request consent for his sexual advances in either situation before he initiated sexual contact" and "he persisted in making sexual advances even after both complainants had indicated a desire that sexual activity or contact cease." *Id.*

**Plaintiff**: Admitted that Justice Ternus' report is accurately quoted.

125.    Justice Ternus also wrote that she found Plaintiff's "explanation of why he thinks he had consent from [Jane Doe] and [Jane Roe] is troubling." App. 246.

**Plaintiff's Response**: Admitted that Justice Ternus' report is accurately quoted.

Justice Ternus wrote: "In essence, [Plaintiff] continued to assert that as long as his sexual partner did not verbally object to his sexual advances, physically resist, or physically remove herself from the situation, he had consent." *Id.*

**Plaintiff's Response**: Admitted that Justice Ternus' report is accurately quoted.

126.    Justice Ternus wrote that there may be "other relevant factors not known to this adjudicator that would be relevant to a determination of the appropriate educational outcome," and wrote that "any sanction in this matter be consistent with the sanctions imposed in similar cases[.]" App. 246-247.

**Plaintiff's Response**: Admitted that Justice Ternus' report is accurately quoted.

## X.  The sanction.

127.    On June 22, 2016, Moschenross sent Plaintiff a letter indicating that she had received and reviewed Justice Ternus's opinions in the Doe and Roe investigation, and Justice Ternus's recommendation for educational outcomes. App. 197; 120[134:1-9].

**Plaintiff's Response**: Admitted.

128.    Moschenross adopted educational outcome of dismissal, in concurrence with

Justice Ternus's recommendation. App. 197; 122[135:23-137:8].

> **Plaintiff's Response**: Denied. Moschenross' decided sanction was not in concurrence
> with Justice Ternus' recommendation, which recommended expulsion only if "consistent
> with the sanction imposed in similar cases." P-APP 1118 P-APP 1086 at 155:8-17].
> Moschenross took no action to determine whether the sanction of expulsion was
> consistent with prior outcomes even though Ternus recommended "[t]hat factor—
> consistency—may support dismissal or may warrant a lesser sanction of suspension." P-
> APP 1118; P-APP 645-646 at 117:5-121:18; P-APP 1730, 1745-1747; P-APP 501-504.
>
> Ternus further wrote that "there are additional factors that may not be known to this
> adjudicator that would be relevant to a determination of the appropriate educational
> outcome." P-APP 1117. Ternus did not know that Plaintiff had received consent
> education in November 2015, after the two alleged encounters with Doe and Roe had
> occurred. P-APP 1088 at 165:7-168:14.

In deliberating Plaintiff's sanction, Moschenross considered "the totality of th[e]

information" available to her, and felt that Plaintiff's behavior was sufficiently egregious, given

Justice Ternus's findings and recommendations, to warrant the sanction of dismissal. App.

122[143:10-144:4].

> **Plaintiff's Response**: Denied. Moschenross did not consider the totality of the
> information available to her: she failed to request information relevant to the outcome in
> Plaintiff's case, including with respect to whether expulsion was a consistent outcome or
> documentation from the Title IX Office concerning the same. P-APP 645-646 at 117:5-
> 121:18; P-APP 1730, 1745-1747; P-APP 501-504). Moschenross also incorrectly
> concluded that Jane Roe shared her concerns with Justice Ternus about campus safety. P-
> APP 649-650 at 140:12-141:12.

129.    Moschenross testified about the basis for her decision to dismiss Plaintiff from

Grinnell:

> I chose to dismiss him because I felt like Justice Ternus used really strong
> language in her letter. Specifically, she cites her concern and the concern of one
> of the complainants about the safety of other students on our campus and
> describes [Plaintiff]'s behavior – pattern of behavior as predatory, and so I felt
> that it was a difficult decision but that it was important to elevate the safety of the
> community over trying to further educate [Plaintiff].

App. 119[121:19-122:6].

**Plaintiff's Response:** Admitted that this is Moschenross' testimony subject to the qualification that Moschenross further testified that she was aware that Ternus did not interview Jane Roe and simply trusted Ternus' judgment because "she is an expert at adjudicating and has a career of legal knowledge to inform her decision-making process." P-APP 650 at 141:6-142:25.

## Y.  Appeal

130.    On June 29, 2016, Plaintiff, with the assistance of counsel, filed an Appeal of

Justice Ternus's adjudication decision and the educational outcome selected by Moschenross.

Cmpl. ¶ 77; App. 286-288.

**Plaintiff's Response**: Admitted.

131.    In the Appeal, Plaintiff alleged that the original investigation and adjudication

suffered from a variety of procedural defects, including:

- It was procedurally improper to consolidate the investigation of Doe and Roe's allegations into one proceeding;

- Justice Ternus improperly considered the two incidents as a pattern of Prohibited Conduct;

- The improper perception of a pattern of Prohibited Conduct led to a sanction more severe than was warranted under the circumstances;

- Justice Ternus failed to adhere to the preponderance of the evidence standard;

- Justice Ternus was biased against Plaintiff "as the male accused" by presuming he was "guilty of the accusations" from the outset and that the Policy's standard of affirmative consent "improperly shifts the burden of proof onto the accused"; and

- Grinnell and its Policy strikes no balance between the rights of complainants and respondents.

App. 286-288.

**Plaintiff's Response**: Admitted subject to the qualification that the appeal asserted that "the adjudicator failed to *utilize* the preponderance of the evidence standard when she accepted as fact the complainant's version of the events as credible, rather than conducting a thorough balanced review of the evidence." P-APP 1702, ¶ 4.

46

132.     Pursuant to the Policy, Andrea Conner was assigned as the Appeals Officer. Compl. ¶ 78; App. 50-51.

**Plaintiff's Response**: Admitted.

133.     In considering Plaintiff's appeal, Conner reviewed Plaintiff's appeal, Justice Ternus's opinions for Doe and Roe finding Plaintiff responsible for Prohibited Conduct, the Policy, the statements provided by Doe and Roe in response to her July 2, 2016 email, and comments provided by Justice Ternus on the appeal. App. 128[99:12]-129[101:7]; 131[110:5-14]; 133[127:10-24].

**Plaintiff's Response**: Admitted that Ms. Conner testified that the above information is what she reviewed.

134.     However, Conner disregarded Roe's response on appeal, because it spoke to the impact the incident had on Roe, and that was not properly considered on appeal because the grounds alleged were procedural error. App. 129[101:13-102:7].

**Plaintiff's Response**: Admitted that Ms. Conner testified that this was the case.

135.     Conner conferred with Asberry and Voos with respect to Plaintiff's allegation that he was essentially being sanctioned twice for his conduct with Jane Doe—she confirmed that no final resolution to Jane Doe's allegations had been reached with the earlier educational intervention. App. 130[105:16-106:11].

**Plaintiff's Response**: Denied. Conner did not look into whether Plaintiff was being sanctioned "twice for his conduct with Jane Doe." Rather, Conner testified that "her memory" was that she spoke with Asberry and Voos and she "*couldn't say exactly*, but I do believe that in those conversations, they revealed to me that they said to the respondent that at the end of that resolution it didn't prevent the complainant from reraising the issue in a formal capacity later." P-APP 574.1-574.2 at 104:21-106:11, 107:21-108:9 (emphasis added)]. Conner further testified that she had "a learning moment to look for something documented in the future" because she did not review the Title IX files concerning the November 17, 2015 meeting. *Id.*

136.    Conner solicited very limited comments from Justice Ternus regarding her issuance of two separate opinions on responsibility for Doe and Roe's allegations, and sought information from Justice Ternus to ensure "that she did use her professional discernment to hear each case independently." App. 131[111:9-112:7].

> **Plaintiff's Response**: Denied. Conner did not solicit "very limited" comments from Ternus. Rather, Conner attached the appeal to an email she sent to Ternus and stated "I would like to afford you the opportunity to respond if you'd like." P-APP 592-593. In turn, Conner received extensive comments from Ternus. P-APP 588-591. Conner acknowledged that the Policy applied in Plaintiff's case did not expressly permit the adjudicator to review a respondent's appeal. When asked "[w]here in the policy does it permit you to confer with the person that decided the outcome of a sexual misconduct case?" Ms. Conner replied "[i]t feels more important to me that it doesn't prohibit me from doing so"… "[i]t doesn't specify, so then I can infer that I am allowed to, because it doesn't say that I can't." Ms. Conner then testified that she did not believe Plaintiff would have been on notice that Justice Ternus was reviewing his appeal. P-APP 575 at 110: 15-111:8.

Conner testified that she did not rely on Justice Ternus's comments beyond merely gathering information and "filling out . . . impressions of the situation." App. 289-294.

> **Plaintiff's Response**: Admitted subject to the qualification that she did not use the term "merely" and that her testimony related to Ternus' application of the preponderance of the evidence standard. P-APP 577 at 117:6-15.

137.    On July 13, 2016, Conner denied Plaintiff's appeal. App. 289-294.

> **Plaintiff's Response**: Admitted.

### Z. *Dissenting Voices* and the *Huffington Post* Article

138.    In or around 2015, a group that self-identified as *Dissenting Voices* took an interest in Grinnell's sexual misconduct process. *See* Cmplt. ¶ 25.

> **Plaintiff's Response**: Denied. "Dissenting Voices" began heavily criticizing Grinnell's handling of sexual misconduct cases in the Fall of 2014, at around the same time that they met with Defendant Voos and President Kington to demand changes to Grinnell's sexual misconduct policy. P-APP 141-148; P-APP 1138 at 105:12-107:19.

139.   Some members of *Dissenting Voices*, which was not a Grinnell-sponsored or recognized organization, demanded that Grinnell implement drastic changes to the Policy, such as: (1) mandatory, immediate, automatic expulsion for students against whom a report of sexual misconduct is filed (before any disciplinary process); (2) immediate removal of a respondent from the classroom upon receipt of a report of sexual misconduct; and (3) having the Title IX office open a women's center. *See* App. 84[106:10-107:19]; 85[112:5-23]. Grinnell didn't implement these demands. *Id.*

> **Plaintiff's Response**: Denied. Per Voos' testimony, Dissenting Voices demanded "minimum outcomes," and a "women's center" and "other students" demanded immediate removal of a respondent from "a class." P-APP 1138-1139.

140.   *Dissenting Voices* also took offense with the Policy's use of the term "sexual misconduct" instead of "rape," because some felt it minimized the experience of a complainant. App. 85[110:9-24].

> **Plaintiff's Response**: Admitted.

Grinnell modified the Policy to reflect that students were free to describe their experiences as they felt appropriate, but made clear Policy would continue to refer to "sexual misconduct" as it had been defined in the Policy to serve the Policy's educational purpose. App. 85[110:9-111:25].

> **Plaintiff's Response**: Denied, Voos did not testify that Grinnell "made clear" that the Policy would continue to refer to sexual misconduct. P-APP 1139 at 110:9-24. The Spring 2015 sexual misconduct policy stated as follows:
>
> The College is committed to providing a variety of welcoming and accessible ways for community members to voice concerns about and report instances of alleged sexual harassment, sexual violence, sexual assault, intimate partner violence, domestic violence, dating violence, or stalking. These categories are meant to be inclusive and expansive, not exclusive. Survivors are fully supported in using the words that they feel express and/or represent their experience-including words like rape, abuse, attack, or fondling-even when the College policy uses these other, more overarching terms when adjudicating and classifying allegations. P-APP 1315. The language was changed in the

Policy applied in Plaintiff's disciplinary proceeding to include "Complainants" and "victims." P-APP 260.

Additionally, *Dissenting Voices* felt that students who worked in a safety monitoring role should be expected to remain in good conduct standing, and Grinnell took steps to make sure that as the case, as the Policy required. App. 85[111:11-21].

**Plaintiff's Response**: Admitted.

141.    Voos testified that because Grinnell has not complied with the substantive demands by *Dissenting Voices*, the group "continue[s] to not be happy with the Title IX office." App. 84[105:15-106:9]; 86[113:5-19].

**Plaintiff's Response**: Denied. Voos testified only that "Dissenting Voices was…and they continue to not be happy with the Title IX Office." P-APP 1138 at 105:15-18. Voos then testified that Dissenting Voices was upset by the Title IX office's protection of respondent's rights. P-APP 1139-1140 at 112:24-113:24.

142.    Shortly before March 2, 2015, Grinnell learned that the *Huffington Post* intended to publish an article that was critical of Grinnell's handling of three reports of sexual misconduct in or around 2012.  *See* App. 155-166; 71[57:14-72[64:25]; 175-180.

**Plaintiff's Response**: Admitted.

143.    On March 2, 2015, President Kington wrote a letter to the Office of Civil Rights requesting technical assistance on how to handle the allegations in the article in light of the privacy restrictions that prohibited Grinnell from correcting the misstatements in the article. App. 71[58:6-16]; 175-176. President Kington wrote:

We are deeply concerned that such powerful one-sided narratives may unintentionally deter future reporting by students who experience sexual or gender-based harassment and violence. It is for this reason that Grinnell seeks OCR's assistance.

App. 175-176.

**Plaintiff's Response**: Admitted.

144.    President Kington "welcome[d] OCR's review and guidance, whatever the outcome may be." *Id.*

**Plaintiff's Response**: Admitted.

Dated: November 2, 2018

Respectfully submitted,

    /s/ Kara L. Gorycki

Kara L. Gorycki, Esq. (pro hac vice)
Andrew T. Miltenberg, Esq. (pro hac vice)
Philip A. Byler, Esq. (pro hac vice)
NESENOFF & MILTENBERG, LLP.
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Telephone: (212) 736-4500
Email: KGorycki@nmllplaw.com
      AMiltenberg@nmllplaw.com
      PByler@nmllplaw.com

-and-

/s / David H. Goldman
David H. Goldman, Esq.
Phillip F. Van Liew, Esq.
BABICH GOLDMAN, P.C.
501 S.W. 7th Street, Suite J
Des Moines, Iowa 50309
Telephone: (515) 244-4300
Email:dgoldman@babichgoldman.com
Email: pvanliew@babichgoldman.com
***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2018, I electronically filed Plaintiff's Response to

Defendants' Statement of Undisputed Facts in Support of Their Summary Judgment Motion with

the Clerk of the Court using the ECF system which will send notification of such filing to the

following:

Frank Boyd Harty
Nyemaster Goode, P.C.
700 Walnut Street
Suite 1600
Des Moines, Iowa 50309
Tel: 515-283-3100
Facsimile: 515-283-8045
Email: fharty@nyemaster.com

Frances M. Haas
Nyemaster Goode, P.C.
625 First Street SE, Suite 400
Cedar Rapids, Iowa 52401
Tel: 319-286-7000
Facsimile: 319-286-7050
Email:fmhaas@nyemaster.com


        /s/ Kara L. Gorycki